# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-134-CJN** |
| | : | |
| **MARK SAHADY,** | : | |
| **Defendant.** | : | |

## UNITED STATES' OPPOSITION TO THE DEFENDANT'S MOTION TO COMPEL DISCOVERY IN SUPPORT OF HIS CLAIM OF SELECTIVE PROSECUTION

The United States of America respectfully opposes Defendant Sahady's Motion to Compel Discovery in Support of His Claim of Selective Prosecution.[1] Sahady seeks discovery on his claim that the government selectively targeted him for prosecution due to his political beliefs. Because Sahady's motion does not satisfy the rigorous standard for discovery in this setting, the Court should deny it.

A similar discovery request remains pending in *United States v. Garret Miller*, No. 21-cr-119-CJN (D.D.C.). This Court conducted a motions hearing on November 22, 2021, and informed the parties that it would issue a written order. The Court's order in *Miller* may accordingly affect the resolution of Sahady's motion.

## Factual Background

Sahady is charged by Information with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1)); Disorderly and Disruptive Conduct in a

---

[1] Sahady filed a one-page Motion to Adopt, Conform and Supplement Motion to Compel Discovery Pertinent to Selective Prosecution, Doc. 29, referencing a filing made by a different defendant, David Lee Judd, in a different case, *United States v. David Lee Judd*, No. 21-cr-40-TNM (D.D.C.). In this filing, the government adopts its arguments made in opposition to Judd's motion (which is appended to this pleading) and further notes significant factual differences that render Judd's arguments inapposite to Sahady.

Restricted Building or Grounds, in violation 18 U.S.C. § 1752(a)(2)); and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D)). Doc. 9. These charges stem from his conduct at the U.S. Capitol on January 6, 2021.

## I.     Breach of the U.S. Capitol on January 6, 2021

The U.S. Capitol is secured with permanent and temporary barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access. On January 6, 2021, the exterior plaza was also closed to the public.

At 1:00 p.m. on January 6, 2021, a joint session of Congress convened to certify the vote count of the Electoral College of the 2020 Presidential Election. Shortly thereafter, the House and Senate adjourned to separate chambers to resolve an objection. Vice President Mike Pence presided, first in the joint session, and then in the Senate chamber. During these proceedings, a large crowd gathered outside. The U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, around 2:00 p.m., individuals forced entry by breaking windows and by assaulting police officers, as others encouraged and assisted those acts.

At approximately 2:20 p.m., House and Senate members and Vice President Pence were instructed to—and did—evacuate the chambers. The joint session was suspended until shortly after 8:00 p.m. Vice President Pence remained in the Capitol during this period. Video footage from media organizations and individuals on the scene depicted scores of individuals inside the Capitol building without authority.

## II.     Sahady's Participation in the Breach

Sahady is the vice president of an organization called "Super Happy Fun America." Law enforcement located the Sahady's Twitter account under the name "Mark Shady." The account

contains multiple statements that the 2020 election was stolen and that people needed to gather in D.C. on January 6, 2021:

a. On November 16, 2020, Sahady wrote that he was glad to be in D.C. the prior weekend and that if Joe Biden won, he wanted to plan a rally to "oppose" Biden and "send a message" against tyranny.

b. On December 20, 2020, Sahady posted that "it is important that millions of Americans show up in DC on January 6 to support the legitimate President, Donald Trump, and show Democrats what they will be facing if they continue to try and steal the Presidency."

c. When someone asked about transportation, Sahady responded on December 31, 2020 that "we have 7 buses coming." and that there is more space.

d. Sahady posted on January 4, 2021: "January 6 – Washington, DC – It begins."

Law enforcement also identified a Twitter account for Super Happy Fun America. A photograph posted on January 5, 2021 shows Sahady and other individuals traveling by bus to D.C. with their thumbs up.



Following the Capitol breach, individuals and media organizations posted photographs of the crowd. One photograph shows Sahady (in the bottom-right corner) standing in the Capitol building wearing a red and blue hat:

3



Video footage shows Sahady outside the Capitol, traveling up the steps to a fire door near the Senate Parliamentarian's office, entering and trespassing through the Capitol halls, and in front of a line of law-enforcement officers.

### Argument

Although Sahady alleges a selective-prosecution claim, his one-page motion presents no argument or discussion supporting that contention. Rather, Sahady cursorily adopts a motion for selective-prosecution discovery filed in a different case—*United States v. David Lee Judd*, No. 21-cr-40 (D.D.C.) (Doc. 138)—on the apparent belief that anyone charged for any offense arising from the events of January 6, 2021 has been the targeted based on his political beliefs. This superficial effort fails to satisfy the Supreme Court's rigorous standard for selective-prosecution discovery. Sahady's motion should therefore be denied.

I.      **A defendant must make a "rigorous" showing on each element of selective prosecution before he can obtain discovery on the issue.**

Because "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks and citations omitted). This presumption "rests in part on an assessment of the relative competence of prosecutors and courts." *Id.* at 465. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Ibid.* (citation omitted). "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (cleaned up). So "the presumption of regularity" applies to "prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." *Id.* As a result, "[i]n the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Armstrong*, 517 U.S. at 464.

This presumption of regularity "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465. To overcome the presumption of regularity and obtain dismissal of the criminal charges, a defendant

must present "clear evidence" that the government's decision to prosecute was "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 464-65 (citations omitted).

Concerned that selective-prosecution inquiries "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy," the Supreme Court has also imposed a "correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 468. The defendant must initially produce "some evidence tending to show the existence of the essential elements of" selective prosecution, which are: "discriminatory effect and discriminatory intent." *Ibid.* (citation omitted). The defendant's evidence must also be "credible"—something more than "personal conclusions based on anecdotal evidence." *Id.* at 470. "If either part of the test is failed," the defendant cannot "subject[] the Government to discovery." *Att'y Gen. of United States v. Irish People, Inc.*, 684 F.2d 928, 947 (D.C. Cir. 1982); *see also United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008) ("[D]iscovery will not be allowed unless the defendant's evidence supports each of the two furcula of his selective prosecution theory: failure on one branch dooms the discovery motion as a whole").

## II.     Sahady fails to proffer any evidence supporting an inference of selective prosecution.

Sahady has failed to make the threshold showing on either selective-prosecution element. He has not presented any evidence suggesting "that (1) [he] was singled out for prosecution from among others similarly situated and (2) that [his] prosecution was improperly motivated." *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)). "[T]he standard is a demanding one." *Armstrong*, 517 U.S. at 463.

**A.      Sahady has not made a colorable showing that the government singled him out for prosecution.**

Sahady must first adduce evidence that "others similarly situated generally have not been prosecuted for conduct similar to that for which he was prosecuted." *Irish People, Inc.*, 684 F.2d at 946 (citation omitted). As a judge of this Court explained, an individual may be similarly situated if he "committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *United States v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019) (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)); *see also United States v. Lewis*, 517 F.3d 20, 27-28 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced. … A multiplicity of factors legitimately may influence the government's decision to prosecute one individual but not another. These may include, inter alia, the comparability of the crimes, the similarities in the manner in which the crimes were committed, the relative efficacy of each prosecution as a deterrent, and the equivalency of the evidence against each prospective defendant.") (internal citations omitted).

A selective-prosecution claim requires the defendant to identify "similarly situated" individuals who "have not been prosecuted," *Irish People, Inc.*, 684 F.2d at 946 (citation omitted), and Sahady has pointed to no such individual. Sahady instead references the selective-prosecution motion in *Judd*, which cited 39 Oregon cases (from a sample of 74) where the government charged the defendant with federal offenses arising from criminal conduct around the federal courthouse

in Portland, Oregon and subsequently dismissed the charges, entered a deferred-prosecution agreement, or acceded to the defendant's guilty plea on reduced charges in many of those cases. *See Judd*, No. 1:21-cr-40, Doc. 138 at 5.[2]

1.      This cursory effort fails because the offense conduct in this case and *Judd* are not comparable. The government charged Judd with assaulting a federal officer with a dangerous weapon, in violation of 18 U.S.C. § 111(b), because he ignited a firecracker inside a small tunnel and threw it at officers guarding a Capitol entrance. In his selective-prosecution motion, Judd contended that the government failed to pursue felony Section 111(b) charges against individuals who assaulted officers around the Portland, Oregon federal courthouse in May and June 2020. Judd then cataloged instances where several defendants faced only misdemeanor charges. *See Judd*, No. 1:21-cr-40, Doc. 138, at 4-5.[3]

In this case, by contrast, the government has not charged Sahady with felony violations of 18 U.S.C. § 111(b). It has instead charged him with misdemeanor trespassing and disorderly-conduct offenses arising from his presence in the U.S. Capitol on January 6, 2021. Sahady's charged conduct is not thus comparable to the Oregon cases cited in *Judd*, which explains why the government has charged less severe offenses here.

The foundation undergirding the selective-prosecution allegation in *Judd*—the purportedly disparate felony/misdemeanor charges for Oregon and D.C. defendants who assaulted federal law-

_____

[2] Judd's motion further references the docket for four of these cases, and one case in D.C. Superior Court, where, in his view, the defendant's alleged conduct mirrored his actions on January 6, 2021. *See Judd*, No. 21-cr-40, Doc. 138 at 4-6.

[3] In his reply brief, Judd raised a new set of cases stemming from criminal activity in Washington, D.C. during Summer 2020 involving felony civil-disorder offenses and assaults committed in Summer 2020 in proximity to various Washington, D.C. protest activities. The government's surreply documented the flaws in Judd's new comparison. *See Judd*, No. 21-cr-40 (Doc. 163 at 2-4).

enforcement officers—is absent in Sahady's case. As a consequence, Sahady cannot borrow the arguments in *Judd* to satisfy his threshold burden under *Armstrong*'s first element.

2.      Even assuming some of Oregon defendants discussed in the *Judd* pleadings committed misdemeanor offenses for which they were not charged, those defendants serve as improper "comparator[s]" because they and Sahady are not similarly situated. *Stone*, 394 F. Supp. 3d at 31. The cited Oregon defendants—despite committing serious offenses—never entered the federal courthouse structure or impeded an official proceeding. Sahady, by contrast, entered the Capitol building while elected lawmakers and the Vice President were present and attempting to certify the results of the 2020 Presidential Election.

These situational differences represent "distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions" in Sahady's case. *Branch Ministries*, 211 F.3d at 145 (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)); *see also Price v. U.S. Dep't of Justice*, 865 F.3d 676, 681 (D.C. Cir. 2017) (observing that a prosecutor may legitimately consider "concerns such as rehabilitation, allocation of criminal justice resources, the strength of the evidence against the defendant, and the extent of a defendant's cooperation" in plea negotiations) (brackets and citation omitted).

Multiple decisions from this jurisdiction have documented the *sui generis* nature of the criminal conduct committed by Sahady and others on January 6, 2021.[4] At a recent sentencing

---

[4] The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir.). Indeed, judges of this Court have noted the same. *See United States v. Timothy Lous Hale-Cusanelli*, 21-cr-37, (D.D.C. Mar 23, 2021) (Hrg. Tr. at 24) ("Obviously, the January 6th riot was a serious and *sui generis* threat to our country's body politic."). Other members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cha*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. Jun. 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v.*

hearing, this Court observed that "there are not many comparable cases" "outside of the universe of the January 6th cases." *United States v. Thomas Gallgher*, 21-cr-41-CJN (D.D.C.) (Doc. 107 at 37). The Court further explained that the Capitol Breach should not be likened to a run-of-the-mill public-order disturbance: "Convictions for protests or riots in other places and at other times *understate the severity of the events taking place at the Capitol*." *Id*. at 37-38 (emphasis added).

This Court further documented the aggravated features the Capitol Breach—several of which apply to Sahady's conduct: "Many of the rioters entered the Capitol for the express purpose of interrupting [the electoral certification] proceedings"; "[m]any of those rioters engaged in planning efforts, before January 6th, suggesting that they intended to engage in violence on that day"; and "many of those rioters expressed glee and pride after the fact for having actively participated in those events." *Id*. at 33. Such conduct, the Court explained, "throws our entire system of government into disarray, and it undermines the stability of our society." *Id*. at 37.

These observations confirm that the actions taken by Sahady and others on January 6 differ in kind and in degree from any of the Oregon cases cited in the *Judd* pleadings. Sahady was part of a mob who traveled to the Capitol grounds, breached the Capitol building with the goal of impeding congressional certification of the 2020 Presidential Election. Indeed, he is one of more than 600 defendants already charged for participating in the riot, and he does not suggest that he has been treated differently from any other members of this class.

3.    The government's opposition and surreply in *Judd* document the many other factual flaws and legal deficiencies in the selective-prosecution motion filed there. The government

---

*Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

incorporates those pleadings—attached as an appendix to this opposition—by reference. *See Judd*, No. 21-cr-40 (Doc. 154 & 163).

For these reasons, Sahady's effort to borrow the defense presentation in *Judd* lacks merit. Given the absence of colorable evidence that the government singled him out for prosecution, Sahady's discovery request fails at *Armstrong*'s first step.

**B.     Sahady has not made a colorable showing that the government harbored an improper motive in prosecuting him.**

With respect to *Armstrong*'s second prong, Sahady has failed to adduce any evidence that improper motives undergird this prosecution. And, as above, Sahady's cursory adoption of the *Judd* motion is insufficient.

In his motion, Judd intimated that the government accepted favorable dispositions in some of the Oregon cases, but withheld a similar plea offer in his case because he espouses political views that the government disfavors. *See Judd*, No. 1:21-cr-40, Doc. 138 at 157 ("[These dismissals and resolutions have occurred under the same Democratic administration that continues to prosecute Mr. Judd."). But Judd presented no evidence linking any Oregon defendant to a particular political viewpoint. *See Judd*, No. 1:21-cr-40 (Doc. 154 at 22-23). Stripped to its core, Judd relied on rank conjecture in suggesting that political favoritism has guided the government's charging and plea decisions. That is not enough to warrant discovery; "a defendant must provide something more than mere speculation or 'personal conclusions'" of selective prosecution. *Stone*, 394 F. Supp. 3d at 31 (quoting *Armstrong*, 517 U.S. at 470).

Because Judd adduced no evidence that the government initiated these charges in response to his political views, he failed his burden on *Armstrong*'s second element. Sahady's motion in this case, by extension, likewise fails. The U.S. Attorney for the District of Columbia—as an

officer of this Court—further represents that such a consideration plays no role in his office's charging decisions in either case.

## <u>Conclusion</u>

Because Sahady has failed to carry his burden, he is not entitled to discovery and his motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: _____*/s/ Stuart Allen*_____
STUART D. ALLEN
D.C. Bar No. 1005102; N.Y. Bar No. 4839932
Assistant United States Attorney
National Security Section
U.S. Attorney's Office for the District of Columbia
555 Fourth Street, N.W., Eleventh Floor
Washington, D.C. 20530
(202) 252-7794
stuart.allen@usdoj.gov

12

# Appendix

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:21CR40-TNM |
| | ) | |
| DAVID LEE JUDD | ) | |

## Motion to Compel Discovery in Support of Mr. Judd's Claim of Selective Prosecution

Unfortunately, in recent years, crowds have attempted to breach federal buildings in protests across the country. These incidents have caused significant destruction of property, disruption of federal business, physical injury, and, tragically, loss of life. In prosecuting the suspects in each instance, the federal government has created significant disparities in charges and outcomes.

Mr. Judd does not yet contend the allegations below are sufficient for dismissal of the charges against him. However, they are sufficient for the Court to compel specific discovery regarding disparities in charging decisions.

## I. BACKGROUND

### A. David Lee Judd

The government has charged Mr. Judd in a nine-count indictment based on his alleged conduct outside the United States Capitol on January 6, 2021. ECF no. 37. Of course, on that date, a large group of protestors gathered on the Capitol grounds. Eventually a substantial number – though not Mr. Judd – breached and entered the Capitol building.

1

The most serious charge against Mr. Judd is 18 U.S.C. § 111(b), assaulting, resisting or impeding certain officers using a dangerous weapon.  ECF no. 37.  The government alleges that Mr. Judd threw a small firecracker in the direction of Capitol police officers.  The government does not allege that Mr. Judd caused injury to any officers or even that the alleged firecracker activated, but nonetheless classified the object as a dangerous weapon for the purposes of the § 111(b) penalty enhancement.

Most of the January 6 defendants were vocal supporters of then-President Donald Trump, a Republican, and were protesting Congress's certification of Democrat Joseph Biden Jr. as the winner of the November presidential election.  Many individuals – though not Mr. Judd – then breached the Capitol building with the intent of interrupting Congress's certification of the election results.  Mr. Judd and the rest of the January 6 defendants are being prosecuted by a Democratic administration.

Based on the charging decisions and outcomes sought by the government in Mr. Judd's case, Mr. Judd believes he has a colorable claim of selective prosecution when contrasted with the government's charging and prosecutorial decision-making in violent riots in Portland, Oregon in 2020 as well as at least one D.C. riot case in 2020.

### B. Portland Riots

In the summer of 2020, protestors descended on the Federal Courthouse in downtown Portland, Oregon.  The groups gathered to protest the killing of George Floyd by police officers in Minnesota.  While the protest was less organized around a

candidate than that of January 6, one local newspaper found common threads of advocacy for "racial justice and police accountability."[1]  While neither issue strictly follows party lines, both are currently more closely associated with the Democratic Party.[2]  Then-President Trump voiced his support of such an association through Twitter, "The FBI and Law Enforcement must focus their energy on ANTIFA and the Radical Left, those who have spent the summer trying to burn down poorly run Democrat Cities throughout the USA!"[3]

According to the government, the protests in Portland:

> Were followed by nightly criminal activity in the form of vandalism, destruction of property, looting, arson, and assault.  One violent event impacting federal property occurred on May 28, 2020, when the Portland Field Office for the Immigration and Customs Enforcement (ICE) was targeted by a Molotov cocktail.  The Mark O Hatfield Courthouse has experienced significant damage to the façade, glass, and building fixtures during the weeks following this incident.  Additionally, mounted building security cameras and access control devices have been vandalized or stolen.  The most recent repair estimate for the damage at the Mark O. Hatfield Courthouse is in excess of $50,000.  Other federal properties in the area routinely being vandalized include the historic Pioneer Federal Courthouse, the Gus Solomon Courthouse, and the Edith Green Wendall Wyatt Federal Office Building.  FPS law enforcement officers, U.S. Marshal Service Deputies and other federal law enforcement officers working in the protection of the Mark O.

---

[1] Ding, Jaimie, *Portland Protests: Who turned out night after night?,* The Oregonian (May 30, 2021), available at: https://www.oregonlive.com/news/2021/05/who-protested-night-after-night-in-portland.html.

[2] For example, the "George Floyd Justice in Policing Act of 2021 passed the House of Representative with 219 out of 221 Democrats voting in favor and 210 of 211 Republicans voting against.  *See* Clerk, United States House of Representative, Roll Call 60 – George Floyd Justice in Policing Act of 2021 (March 3, 2021), available at: https://clerk.house.gov/Votes/202160.

[3] *Here are President Trump's 5 Tweets about Portland Today,* The Oregonian (Oct. 12, 2020), available at: https://www.oregonlive.com/politics/2020/10/here-are-president-trumps-5-tweets-about-portland-today.html.

> Hatfield Courthouse have been subjected to assault, threats, aerial fireworks including mortars, high intensity lasers targeting officer's eyes, thrown rocks, bottles and balloons filled with paint, and vulgar language from demonstrators while performing their duties.

*United States v. Bouchard,* case no. 3:20-mj-00165 (D. Ore. July 24, 2020), ECF 1-1 at 4-5.

One example of such damage occurred on July 24, 2020, when "protestors attempted to breach into the Mark O. Hatfield Federal United States Courthouse (USCH) by damaging and removing the protective fencing around the west entrances of the USCH." *Id.* at 5. The marshals and U.S. Customs and Border Protection (CBP) deployed tactical teams to defend the breach. *Id.* After repeatedly defying verbal commands to move back, one defendant "placed his right arm around the neck of CBP officer 1 in headlock maneuver." *Id.* at 6. When another officer came to "remove [defendant's] right arm from around the neck of Officer 1… all three individuals went to the ground." *Id.* At the time, the defendant "was carrying a leaf blower and a shield." *Id.* In contrast to Mr. Judd, the defendant was only charged with a misdemeanor, which the government eventually moved to dismiss without prejudice. 3:20-mj-00165, ECF no. 16.

Another defendant "used a homemade shield to strike the officer in the face." *United States v. Johnson,* case no. 3:20-mj-00170 (D. Ore. July 27, 2020), ECF no. 1 at 5. A search of the suspect revealed an "extendable baton, OC spray, steel plated body armor, helmet, individual first aid kid, shin guards, gas mask, goggles…" *Id.* at 6. This defendant was also only charged with a misdemeanor, which the government subsequently moved to dismiss. 3:20-mj-00170, ECF no. 9.

A third defendant "struck DUSM VICTIM 1 in the face with a shield and then punched DUSM Victim 1 in the face with a closed fist." *United States v. Webb*, case no. 3:20-mj-00169 (D. Ore. July 27, 2021) ECF no. 1 at 5. The defendant "resisted arrest by pulling his arms away from the DUSMs in an attempt to avoid being restrained." *Id.* at 5-6. This defendant was also charged with only a misdemeanor, which the government subsequently moved to dismiss. 3:20-mj-00169, ECF no. 22.

After a review of the evidence, the government charged at least twenty-two individuals in Portland with assaulting an officer, in violation of 18 U.S.C. 111(a). *See* Attachment A, List of Portland Defendants and Outcomes. Of those identified by counsel, at least 25 cases were dismissed, including one in which the defendant carried a knapsack with 14 commercial-grade fireworks. *Id.* Of those cases, at least six cases were dismissed with prejudice through a deferred resolution agreement. *Id.* In other cases involving alleged acts of violence, the government agreed to recommend probation. *Id.*

These dismissals and resolutions have occurred under the same Democratic administration that continues to prosecute Mr. Judd.

### C. Fireworks Cases

Moreover, there have been multiple cases with similar factual circumstances (i.e., fireworks were thrown at or towards police officers) where the government chose to dismiss charges and/or declined to classify fireworks as dangerous weapons.

One such defendant was charged in a one-count indictment with only 18 U.S.C. 231(a)(3) civil disorder despite allegedly igniting and throwing a large, cylindrical

firework at a group of police officers. *United States v. Fox*, case no. 3:20-cr-00501 (D. Ore. filed Oct. 20, 2020).[4] Notably, the maximum penalty for the civil disorder charge is five years as compared to an enhanced penalty of up to 20 years for the § 111 charge that Mr. Judd is facing based solely on the government's characterization of the firecracker as a dangerous weapon. 18 U.S.C. § 231(a)(3); 18 U.S.C. § 111(a).

In one case in D.C. Superior Court, a defendant (the "D.C. Fireworks Defendant") was charged with felony assault on a police officer while armed and misdemeanor rioting based on throwing a firework at police officers during a riot that took place in D.C. between August 30-31, 2020.[5] *United States v. Alanna Rogers,* case no. 2020 CF3 006970 (D.C. Super. Ct. dismissed Sept. 30, 2020). The M-80 style firework thrown by Rogers allegedly burned an assistant chief's pant leg. *Id.*, Affidavit in Support of an Arrest Warrant. All charges against the defendant were dismissed without prejudice pursuant to a *nolle prosequi* submitted by the government. *Id.*, Government's Notice of Nolle Prosequi.

---

[4] ASTORIA MAN ACCUSED OF CIVIL DISORDER FOR THROWING A LARGE CYLINDRICAL FIREWORK AT POLICE, U.S. Attorney's Office District of Oregon (May 30, 2021), https://www.justice.gov/usao-or/pr/astoria-man-accused-civil-disorder-throwing-large-cylindrical-firework-police.

[5] The riot was an anti-police protest that took place in D.C. around the "Black Lives Matter Plaza." 2020 CF3 006970, Affidavit in Support of an Arrest Warrant.

## II. DISCUSSION

While the government has "broad discretion" in "enforc[ing] the Nation's criminal laws," that discretion is, nevertheless, "subject to constitutional constraints." *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (citations omitted). "One of these constraints, imposed by the equal protection component of the Due Process Clause of the Fifth Amendment" is that the government cannot pursue criminal charges against a citizen that amounts to a "'practical denial' of equal protection of law." *Id.* (citations omitted). Such a pursuit would give rise to a claim of "selective prosecution." *Id.*

The primary way in which discriminatory law enforcement can be exhibited is using the prosecutorial prerogative itself to discriminate against those whose constitutionally protected views or activities are not popular with the government (selective prosecution). *United States v. Banks*, 368 F. Supp. 1245, 1251 (D.S.D. 1973). To show selective prosecution, a defendant must show that (1) the prosecution had a discriminatory effect, and (2) that the prosecution was motivated by a discriminatory purpose. *Armstrong*, 517 U.S. at 465.

To establish a discriminatory effect, a defendant must show that "similarly situated" individuals were not prosecuted. *Id.* Similarly situated requires "some degree of commonality among the indictable group, such that the defendant challenging his indictment may make a supportable demonstration that those unindicted persons are, in fact, similarly situated, and consequently, there must be

7

an improper motive behind the selected individual's prosecution." *United States v. Blackley*, 986 F. Supp. 616, 619 (D.D.C. 1997).

The defendant may establish discriminatory purpose either with direct evidence of discriminatory intent or with statistical disparities or other indirect evidence regarding the unequal application of the law. *Branch Ministries, Inc. v. Richardson*, 970 F. Supp. 11, 17 (D.D.C. 1997).

In order to proceed to either an evidentiary hearing or the production of discovery, a defendant must establish "'at least a colorable claim'" as to these two prongs. *Branch Ministries*, 970 F. Supp. at 16.

First, Mr. Judd is similarly situated to the individuals protesting the federal courthouse in Portland and the D.C. Fireworks Defendant.  In another January 6 case, the government has argued that the allegations are not comparable, citing courts' statements of the "*sui generalis* nature of this criminal conduct." *See U.S. v. Miller,* 1:21-cr-00119 (D.D.C. July 22, 2021, ECF no. 39 at 8-9.[6]

Of course, if the standard was whether defendants were "identically situated", Mr. Judd's claim would fall short.  However, the standard requires the individuals simply be "similarly situated." Both Mr. Judd and the above defendants were alleged to have committed violence against federal officers in circumstances where a large crowd was attempting to breach a federal building, and, in at least two instances,

---

[6] Mr. Judd's case resembles the circumstances of the Portland allegations more broadly than that of Mr. Miller.  Mr. Judd never entered the Capitol building, he did not bring any weapons to the Capitol, and never "articulated plans to track and potentially kill a U.S. Capitol police officer" as Mr. Miller is alleged to have done.

fireworks were also involved. In both cases, the government had substantial – though not identical evidence. The complaints in the Portland cases identify law enforcement victims and eyewitnesses in each allegation. Of course, much of the evidence against Mr. Judd will be video evidence. Finally, the purposes of sentencing in each instance would not be so disparate as to warrant such vastly different outcomes. 18 U.S.C. § 3553(a)(2). In both cases, the government has an interest in seeking just punishment, promoting deterrence, and protecting the public from the actions of individuals alleged to have attacked officers during attempted breaches of a federal building.

The discriminatory effects in this case are the outcomes: protestors supporting left-leaning causes in Portland assaulted officers in the attempted breach of a federal building and in D.C. assaulted officers directly in an anti-police protest. Mr. Judd was at a protest associated with right-leaning causes and support of President Trump and is alleged to have assaulted officers in the attempted breach of a federal building. At least 25 similarly situated defendants in Portland and the D.C. Fireworks Defendant had their charges dismissed, whereas Mr. Judd—who caused no injury and who has no history of violence and is in criminal history category I—received a plea offer that would result in estimated sentencing guidelines of ***46 to 57 months***. The disparity in outcomes is sufficient that the government must turn over the targeted discovery specified in Section III. Mr. Judd's request is not a fishing expedition, and he recommends *in camera* review by the Court where work product of open prosecutions is involved.

The discriminatory purpose is that the government has treated violence toward law enforcement differently when it is done by conservative versus liberal protestors. This purpose is illustrated by the disparate outcomes in large numbers of prosecutions both in Portland in 2020 and in Washington in 2021.

Mr. Judd has made "a colorable claim" that he is the subject of selective prosecution when compared with those arrested for violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 111 in relation to the Portland riots.

## III. RELIEF REQUESTED

The above factual basis amounts to a "colorable claim" of selective prosecution, and Mr. Judd requests this Court order discovery regarding the disparities in charges. Specifically, Mr. Judd seeks:

(1) Communication between the Department of Justice ("Main Justice") and the U.S. Attorney's Office for the District of Oregon regarding prosecution of defendants arrested in connection with protests in 2020.

(2) Communication between management at the U.S. Attorney's Office for the District of Oregon and line Assistant U.S. Attorneys regarding prosecution of defendants arrested in connection with protests in 2020.

(3) Communication between the Department of Justice ("Main Justice") and the U.S. Attorney's Office for the District of Columbia regarding prosecution of defendants arrested in connection with the January 6 demonstrations at the U.S. Capitol.

(4) Communication between management at the U.S. Attorney's Office for the District of Columbia and line Assistant U.S. Attorneys regarding prosecution of defendants arrested in connection with the January 6 demonstrations at the U.S. Capitol.

(5) Communication between the Department of Justice ("Main Justice") and the U.S. Attorney's Office for the District of Columbia regarding prosecution of the D.C. Fireworks Defendant.

(6) Communication between management at the U.S. Attorney's Office for the District of Columbia and line Assistant U.S. Attorneys regarding prosecution of the D.C. Fireworks Defendant.

*See Armstrong*, 517 U.S. at 468 ("Government must assemble from its own files documents which might corroborate or refute his selective prosecution] claim.")

To the extent that the materials involved are work product pertaining to open prosecutions, Mr. Judd requests that the government review the communications *in camera* for material relevant to Mr. Judd's selective prosecution claim.

Respectfully submitted,

David Judd

By Counsel

___/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
DC Bar Number 484020
Assistant Federal Public Defender

Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0879 (T)
(703) 600-0880 (F)
Elizabeth_Mullin@fd.org (email)

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2021, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.


___/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
DC Bar Number 484020
Assistant Federal Public Defender

*Last updated: September 24, 2021*

**PORTLAND FEDERAL COURTHOUSE PROTEST CASES**

    *Protestors gathered beginning on May 26, 2020, in various public areas in Portland to protest including the Lownsdale Square, Chapman Square and Terry Schrunk Plaza. The Portland Justice Center, which houses Portland Police Bureau's Central Precinct and the Multnomah County Detention Center borders these parks, as does the Mark O. Hatfield United States Federal Courthouse (hereinafter "Courthouse"). The entire city block occupied by the Courthouse is owned by the USA. The Courthouse was a target of violent protestors and experienced significant damage to the façade, glass and building fixtures in the weeks following the initial protests. Some 74 people were charged by the U.S. Attorney's Office for the District of Oregon.*

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| **Completed Cases** | | | | | |
| Evan Kriechbaum | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00178 | Dismissed without prejudice | Picked up a recently launched tear gas canister. Officers moved to detain him (affidavit says there was no intent to arrest him) for officer safety. No indication that Kriechbaum tried to throw the canister, but he resisted the officers and tried to escape by swinging his arms and wriggling. Swung his elbow back and hit an officer in the face.<br><br>Kriechbaum stated that he didn't realize they were police at the time and that he complied once he realized they were police. The officers were wearing protective gear marked "POLICE", but it was the early morning hours. |
| Gretchen Margaret Blank | 18:111(a)(1)[1] - Assaulting a Federal Officer | Yes | 3:20-cr-00224 | Dismissed with prejudice (DRA[2]) | Blank pushed an officer in the back with a "flimsy" plastic shield when he was attempting to arrest another protestor. The |

---

[1] Felony

[2] Deferred resolution agreement.

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | officer "los[t] his balance." The shield was recovered (pictures in the affidavit). |
| Brodie Storey | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr -00330 | Dismissed with prejudice (DRA) | Officers declared an unlawful assembly and tried to disperse a line of protestors. The affiant alleges that Storey attempted to tackle a deputy U.S. Marshal. The Marshal then tried to arrest Storey, who violently resisted until he was tased. |
| Caleb Wills | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00296 | Dismissed with prejudice (DRA) | The alleged victim, a Deputy United States Marshal was assisting another officer with an arrest when he was allegedly attacked by three individuals, including Wills. The assailants grabbed and punched the victim and attempted to take off his mask. Two of the assailants escaped, but Wills was arrested.<br><br>Wills has a criminal history (absence without leave from the TN National Guard, probation violation, drug manufacture, delivery and sale, possession of drug paraphernalia and failure to appear) and has active warrants for burglary and felony breaking and entering. |
| Christopher Fellini[3] | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00212 | Dismissed without prejudice | Fellini allegedly shined a green laser at officers. Fellini was tackled and arrested and an officer was hurt in the process (he fell when trying to grab Fellini). Fellini was |

---

[3] https://www.justice.gov/usao-or/pr/seven-arrested-facing-federal-charges-after-weekend-riots-hatfield-federal-courthouse

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | carrying Mace-brand "Pepper Gel" and a small knife. |
| David Michael Bouchard | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00165 | Dismissed without prejudice | Bouchard was told to leave an area. A CBP officer placed a hand on Bouchard's shoulder to move him, when Bouchard put the officer in a headlock. A second officer attempted to remove Bouchard's arm from the first officer and the group ended up in a pile on the ground. Bouchard was arrested. Bouchard admitted that he placed his right arm around the neck and shoulders of the officer, but stated that his intent was not to hurt anyone and was just to "stand his ground." |
| Jeffree Cheyenne Cary | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00329 | Dismissed with prejudice (DRA) | Cary used a shield to knock an officer in the back. Cary was then detained and arrested. |
| Jordan Matthew Johnson | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00179 | Dismissed without prejudice | Johnson allegedly tried to pick up a smoke grenade that had been activated by law enforcement. Officers tried to stop him with rubber bullets, but eventually tackled him to the ground and placed him under arrest for failing to disperse. While he was being arrested, Johnson allegedly struck an officer in the neck, another in the head and resisted arrest.<br><br>Johnson was subsequently interviewed and denied being aware that the people he was tackled by were police officers. He saw |

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | camouflage uniforms and denied attacking anyone. Once he was handcuffed, he stopped resisting.<br><br>Johnson has a criminal history from 2007 to 2013 in Oregon, which includes DUI, failure to appear and probation violations. |
| Joshua Webb | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00169 | Dismissed without prejudice | Webb allegedly struck an officer in the face with a shield and then punched him in the face with a closed fist. Webb was then arrested and pulled his arms away in resistance. Webb stated that he did not hear any warnings given by FPS and PPB to leave the area and that he was tackled and arrested when he was starting to back up.<br><br>Webb was wearing tactical equipment (tactical vest, shin guards, gloves). |
| Patrick Stafford | 18:111(a)(1)[4] - Assaulting a Federal Officer | Yes | 3:20-cr-00295 | Dismissed with prejudice (DRA) | Stafford allegedly slammed into an officer with a shield while another protestor (Storey) was being arrested to help him get away. Once on the ground, Stafford was compliant and obeyed all commands. |
| Stephen O'Donnell | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00166 | Dismissed without prejudice | O'Donnell was allegedly shining a flashlight at a CBP agent. The agent identified himself as a "Border Patrol Agent" and told O'Donnell to show him his hands. O'Donnell threw something at the agent's |

---

[4] Felony

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | face. The agent wasn't sure what the object was, but said it was hard (no injuries). O'Donnell was then arrested. |
| Taylor Charles Lemons | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00374 | Dismissed without prejudice | Lemons allegedly charged at a USMS tactical team carrying a home-made shield. He was repelled with a marshal's arm, which Lemons then struck with the shield. Lemons violently resisted arrest ("twisting, turning, and fighting"). Lemons was arrested while other protestors were throwing objects at law enforcement and while officers were trying to secure the courthouse.<br><br>Lemons was arrested and searched. He was carrying a Luger LCP pistol with 6 rounds loaded. Lemons had a valid CCW permit. |
| Thomas Johnson | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00170 | Dismissed without prejudice | Johnson allegedly struck an officer in the face with a homemade shield. Johnson was carrying an ASP baton, OC spray, steel-plated body armor, a helmet, shin guards, gas mask, goggles. |
| Travis Williams | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00331 | Dismissed with prejudice (DRA) | Williams was allegedly yelling: "Take your mask off! Let's go." Williams lunged towards the neck and face of an officer and another officer attempted to arrest Williams. Williams violently resisted and pulled the officers over a park bench, ripped off "communication sets" from both officers' vests and ripped part of one officer's ballistic |

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | vest partially off his body. Williams was tased to no effect and continued to fight. Williams went limp while the officers were leading him away and screamed that they would need to carry him if he was going to be arrested. Williams continued resisting after being transported to the courthouse. He tried to whip deputies with his hair and tried to break a deputy's arm with his elbow and body weight. Williams said: "I almost ripped your buddy's arm off. I'm a state wrestler." |
| Jennifer Lynn Kristiansen | 18:111(a)(1) - Assaulting a Federal Officer (1)  40:1315 and 41 C.F.R. 102-74.385 Failing to Obey a Lawful Order (2) | Unknown | 3:20-cr-00245 | Count 1 dismissed with prejudice  Count 2 dismissed without prejudice | A 37-year-old Portland family law attorney. She claims she was protesting with the "Wall of Moms" when she was separated from the group and groped and assaulted by officers. |
| Giovanni Terrence Bondurant | 18:111(a)(1)[5] - Assaulting a Federal Officer | Yes | 3:2020cr00302 | Dismissed with prejudice (DRA) | A Border Patrol Agent approached Bondurant who was equipped with a shield and had been throwing rocks and bottles with another protestor. The agent told the pair to put down their shields. They refused and tried to leave, when they were grabbed by |

[5] Felony

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | | officers. Bondurant struck an officer trying to free the other person, Yarnell. Bondurant told officers that he was in the park with his friend when they were approached by officers. He said that they had found the shields on the ground. Bondurant claimed he didn't throw anything and that he had merely tried to help his friend when he was being arrested. Bondurant denied striking the officer and said the officers were dressed in camouflage. |
| Taimane Jame Teo | 18:111(a)(1) - Assaulting a Federal Officer | | 3:2020cr00205 | Dismissed without prejudice | Teo was accused of assaulting officers with a laser. Known as "Zouk" in the BLM community. A GoFundMe was created for him and had raised $4,050 as of July 7, 2020. |
| Benjamin Wood-Pavich | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20-cr-00209 | Dismissed without prejudice | No details available. |
| Gabriel Huston | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20-cr-00252 | Dismissed without prejudice | No details available. It looks like he's a philosophy major at Portland State University.[6] |

---

[6] https://www.facebook.com/PDXCLAS/posts/3257374180953442:0

7

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| Pablo Avvacato | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20-cr-00278 | Dismissed without prejudice | No details available. Avvacato was previously arrested at a reservoir protest.[7] |
| Douglas Dean | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20-cr-00279 | Dismissed without prejudice | No details available. |
| Rebecca Mota Gonzalez | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:2020mj00168 | Dismissed with prejudice | Gonzalez stood in front of officers and refused to comply with orders to disperse. As an officer reached for Gonzalez, she struck him with a closed fist and then was handcuffed and arrested after minor resistance. |
| Joshua Webb | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-mj-00169 | Dismissed with prejudice | Webb was ordered to disperse, but refused and struck an officer in the face with a shield and punched the officer with a closed fist when approached. Webb resisted arrest, but was eventually handcuffed. Webb stated that he did not hear any warnings to leave the area and was backing up to leave when he was tackled and arrested. Webb was wearing a black tactical vest and shin guards. |
| Jerusalem A. Callan | 40:1315 and 41 CFR, Section 102-74.380(b) - Willfully Damaging or | Unknown | 3:2020cr00247 | Dismissed without prejudice | No details available. |

---

[7] https://www.oregonlive.com/portland/2013/07/four_arrested_in_mount_tabor_r.html

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | Destroying Property | | | | |
| Isaiah Jason Maza, Jr.[8] | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-CR-00343 | Dismissed (Maza is deceased) | Maza and a group of protestors began removing plywood protection on the front of the Courthouse. Once uncovered, Maza tried to kick in the window, struck it with a metal object that appeared to be a hammer. Someone else eventually broke the window ad Maza placed a lit object into the broken window which exploded. A U.S. Marshal suffered injuries to both of his legs as a result of the blast. Maza was chased from the scene and arrested. |
| Dakota Kurtis Means | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:2020cr00392 | Plead guilty<br><br>Sentenced to time served (60 days) with 1 year of supervised release | Means threatened a federal contract employee with a paintball gun outside the Courthouse.[9] |
| Josslynn Kreutz | 40:1315 and 41 C.F.R. 102-74.385 Failing to Obey a | Unknown | 3:2020cr00271 | Dismissed with prejudice | No details available. |

[8] https://www.justice.gov/usao-or/pr/portland-man-charged-assaulting-deputy-us-marshal-explosive-device-during-courthouse
[9] https://www.oregonlive.com/crime/2021/01/portland-man-who-threatened-federal-contract-worker-with-paintball-gun-sentenced-to-time-served-year-of-supervision.html?utm_medium=social&utm_campaign=theoregonian_sf&utm_source=facebook&fbclid=IwAR25kRzHLOjWJ8Vj_SZV4ouq5qmUVDTmi1uvy3CXlH6xygyks5Ps_y-TcYU

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | Lawful Order (1)[10] | | | | |
| Brodie Storey | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20-cr-00330 | Dismissed with prejudice (DRA) | Storey attempted to tackle an officer. Storey was then arrested while he continued to resist and refused to comply with orders. Another protestor assaulted the officer restraining Storey to try and help him. |
| Carly Anne Ballard | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20mj00163 | Pending arraignment | Ballard was spotted near a breach in the fence surrounding the courthouse and was ordered to move away by officers. She refused and began to approach the officers. She was then placed under arrest for not complying and escorted into the courthouse for processing. There, she allegedly yelled profanities and kicked one of the arresting officers in the leg. |
| Andrew Steven Faulkner[11] | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20cr00203 | Plead guilty, sentenced to three years of probation and home confinement. Government agreed to recommend probation. | Assaulted officers by pointing a high-powered laser at police officers. Possessed a sheathed machete. |

---

[10] **Note**: There were other failing to obey a lawful order cases, but they are not reflected here. Refer to this DOJ list of federal defendants.

[11] https://www.justice.gov/usao-or/pr/seven-arrested-facing-federal-charges-after-weekend-riots-hatfield-federal-courthouse

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| Cody Beau Porter | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20cr00211 | Information dismissed | Porter shot a laser at officers. Blank tried to stop officers from arrested Porter. Porter was also carrying a satchel containing 14 "commercial-grade" fireworks (pictures in complaint). |
| Jacob Michael Gaines[12] | 18:111(a)(1) - Assaulting a Federal Officer | Yes | 3:20cr00223 | Guilty to plea to felony, government agreed to recommend low-end of the guidelines | Gaines was observed damaging a barricaded entrance at the Courthouse with a 4 lb DeWalt construction hammer. Officers moved to detain him when Gaines struck one of the deputies with a hammer three times. |
| Lillith Grin | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20cr00290 | Information dismissed | No details available. |
| Benjamin Bolen | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20cr00216 | Guilty plea to misdemeanor assault on a police office, | No details available. |

---

[12] https://www.justice.gov/usao-or/pr/texas-man-charged-assaulting-deputy-us-marshal-hammer-during-weekend-protests-portland

| Defendant | Charges | Arrested on Scene? | Case Number | Disposition | Description |
|---|---|---|---|---|---|
| | | | | parties jointly recommended probation | |
| Tyler John Gabriel | 18:111(a)(1) - Assaulting a Federal Officer (1-5) | Unknown | 3:20cr00280 | Charged with misdemeanor, pending trial | No details available. |
| Noelle Angelina Mandolfo | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20cr00282 | Information dismissed without prejudice | No details available. |
| Sabastian Dubar | 18:111(a)(1) - Assaulting a Federal Officer | Unknown | 3:20cr00289 | Charged with misdemeanor, pending trial | No details available. |
| Dakotah Ray Horton | 18:111(a)(1) and (b) - Assault on a Federal Officer with a Dangerous Weapon, Resulting in Bodily Injury (1) | No | 3:20cr00419 | Plea to felony, per plea agreement government agrees to recommend 24 months | Horton assaulted an officer that was arrested striking him several times from behind. He was identified through photos and videos from the events. At the time of arrest, Horton was carrying a HiPoint 9mm semi-automatic firearm in a holster. |
| Ty John Fox | 18:231(a)(3) - Civil Disorder | Yes | 3:2020cr00501 | Charged with civil disorder, pending trial | Fox used a torch lighter to ignite a large, cylindrical firework, which he threw at officers. An explosion and flash was observed near the officers. |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-40-TNM** |
| | : | |
| **DAVID LEE JUDD,** | : | |
| **Defendant.** | : | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S  MOTION TO COMPEL DISCOVERY IN SUPPORT OF MR. JUDD'S CLAIM OF SELECTIVE PROSECUTION

The United States of America hereby respectfully submits its opposition to the Defendant's Motion to Compel Discovery in Support of Mr. Judd's Claim of Selective Prosecution in the above-captioned case.  Defendant seeks discovery on his claim that the government selectively targeted him for prosecution due to his political beliefs.  Because Judd's motion (Doc. 138) does not satisfy the rigorous standard for discovery in this setting, this Court should deny it.

### Factual Background

The grand jury charged Judd with one count of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); two counts of Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1); one count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) and (2); one count of Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); one count of

Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); and two misdemeanor offenses under 40 U.S.C. § 5104(e)(2). Doc. 102. These charges all stem from Judd's conduct at the U.S. Capitol on January 6, 2021.

On January 6, a joint session of Congress convened to certify the votes of the Electoral College for the 2020 Presidential Election, which took place on November 3, 2020. At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. Officers with the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD") attempted to keep the crowd away from the building. Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol by, among other things, breaking windows and assaulting both USCP and MPD officers as others in the crowd encouraged and assisted those acts. In response to this intrusion, representatives, senators, and Vice President Pence evacuated their respective chambers around 2:20 p.m.

After the Capitol was breached, USCP requested assistance from MPD and other law enforcement agencies in the area to protect the Capitol, keep more people from entering the Capitol, and expel the crowd that was inside the Capitol. Multiple MPD officers and other law enforcement officers came to assist.

By 2:30 p.m. on January 6, 2021, rioters had engulfed the west side of the Capitol and officers had begun retreating from the first landing of the Lower West Terrace, as shown in the still from USCP surveillance below.



Around the same time, rioters were climbing on the scaffolding in front of the building and other features of the building.  Although the Capitol Building had already been breached and protesters had flooded in through several entrances, a group of MPD officers and members of the USCP and other agencies called to assist gathered to protect the Capitol at the very prominent entrance on the second landing of the Lower West Terrace.  (This is the exit through which the President typically comes through during inauguration, as pictured below in a photo from later that night.)  To enter the Capitol through the Lower West Terrace doors on January 6, one had to walk, climb, or scale up to the second landing, go up a set of stairs, walk through an arch and a short tunnel, and then walk through a series of glass doorways that the officers had locked.  The

tunnel and doorways are very narrow, with the entryway through the doors measuring only around ten feet across.



Around 2:40 p.m., a group of law enforcement officers were maintaining a line at the second set of glass doors inside the tunnel.  Officers reporting to the scene rushed to the tunnel from within the building while protesters outside of the tunnel continued to summon more men to push their way through the tunnel.  A growing number of protesters made their way into the tunnel with a variety of tools and weapons.  The tunnel became the point of an intense and prolonged clash between protesters and law enforcement at the United States Capitol.  Many of the protesters

in the tunnel were recording videos, and many of the videos circulated and continue to circulate on Internet channels, social media, and the news.

Portions of the rioters' effort in the tunnel to get through the Lower West Terrace doors were captured both in video surveillance from a USCP camera in the tunnel and in video footage posted to YouTube (hereinafter, YouTube Video 1). Around 2:52 p.m., YouTube Video 1 shows a white male with curly blonde hair wearing a red "Make America Great Again" baseball hat backwards, a black hoodie, and a grey vest, who was subsequently identified as Judd, to the side of the entrance of the tunnel.

Then, at approximately 2:56 p.m., Judd can be seen in surveillance footage going into the tunnel with additional rioters walking toward the line of law enforcement guarding the Lower West Terrace doors, as shown in the still image below with a red rectangle added around Judd.



As captured on surveillance video, Judd then joined the group as the rioters pushed in unison against the officers. As captured in video filmed on the phone held by co-Defendant Tristan Stevens, who was next to Judd in the tunnel, multiple rioters yelled "ready, heave" as

Judd, Stevens, and the group pushed in unison against the officers guarding the doors.

Then, at approximately 2:58 p.m., Judd can be seen in USCP surveillance footage turning around and exiting the tunnel.  Surveillance footage over the next few minutes shows Judd remaining near the arch, occasionally waving others into the tunnel and yelling.

Around 3:06 p.m., as captured by another video filmed outside of the arch and posted to YouTube (hereinafter, YouTube Video 2), Judd can be seen next to co-defendant Robert Morss as Morss yells for the crowd to pass back riot shields that had been stolen from law enforcement in order to make a "shield wall."  Judd can also be seen yelling "shield wall" as he pumps his fist in the air in YouTube Video 2.

Surveillance video, which captured the same events from a different perspective, then shows Judd helping move at least two shields into the tunnel and pass them to another rioter in front of him around 3:06 p.m., as shown in the still below with a red circle around Judd.



Moments later Judd can be seen on the surveillance footage walking into the tunnel.  He

then lights a cylindrical object on fire and throws it at the line of law enforcement officers who are guarding the Lower West Terrace doors to the United States Capitol Building, as shown in the stills below.  He then immediately turns and walks out of the tunnel.  As captured in another video filmed inside the tunnel and originally posted to YouTube (hereinafter, "YouTube Video 3"), immediately after Judd begins to walk away, an unidentified member of the crowd (who can be seen standing next to Judd in surveillance video when he throws the item) can be heard yelling: "You going to do that and run away! What the fuck."  When asked what the individual did, the unidentified member of the crowd states:  "He threw a firecracker, a big giant, what the …."



It bears noting how small and crowded this tunnel was.  As evidenced in the still shot from the surveillance video right after he lit the firecracker, the tunnel is so small it does not appear to be wide enough to fit more than 10 people standing shoulder to shoulder.  (Judd is indicated by the green box.)

7



Despite its small size, it was full of people, both other rioters, who are visible in the still shot above, and the law enforcement officers that were standing underneath the camera capturing Judd's actions. As visible in the still shot below from YouTube Video 1, around 3:07 p.m. where what appears to be the lit firecracker thrown by Judd is visible in the top left-hand corner (as marked by an added red box), law enforcement officers were packed shoulder to shoulder in the area where Judd threw the firecracker. (The surveillance camera capturing Judd throwing the firecracker is located directly above the first set of doors visible in this still shot.)



8

As captured on Body Worn Camera footage, an officer in the tunnel can be heard reacting to the firecracker around the same time, yelling what sounds like "a firework!" through his gas mask and turning his head in the direction of where the firework appears to land based on the video still shot shown above.  Another can be heard on Body Worn Camera footage warning his colleagues about the firecracker on the ground.  Thankfully, despite being lit and thrown at the officers, it appears that the firecracker failed to explode.  Instead, based on currently identified Body Worn Camera footage and surveillance footage near where it was thrown, the firecracker streamed smoke into the area of the tunnel where law enforcement officers were standing.

As seen on USCP surveillance video, after throwing the firecracker and leaving, Judd then stayed at the entrance to the tunnel and appeared to be directing the crowd to the tunnel by waving them forward.  Additional USCP surveillance footage and many different videos posted online show Judd present at various locations near the arch entrance of the Lower West Terrace tunnel for approximately the next hour.  In these various videos, Judd can be seen chanting with the crowd, encouraging people to enter the tunnel, and assisting the rioters exiting the tunnel with washing the OC spray from their faces with water.

For example, in a video posted to Parler and then posted online, which corresponds to USCP surveillance from around 4:14 p.m., Judd can be seen triumphantly lifting an American flag in the air moments after another rioter threw a long projectile at the officers, as shown in the stills below (with the projectile highlighted in a yellow rectangle and Judd in a red rectangle).





Then, around 4:16 p.m., as can be seen in USCP surveillance footage, Judd once again joined a large group of rioters pushing against law enforcement officers guarding the Lower West Terrace doors, as shown in the still below with a red rectangle around Judd. The rioters pushed as a group against the officers for a few minutes until they were once again forced back out of the tunnel by law enforcement.



The same events were captured near the end of another video posted to YouTube, ("YouTube Video 4"), in which unidentified rioters can be heard yelling "push" as the crowd all tried to push into the tunnel and past the line of law enforcement. Judd can be seen joining the crowd at the tunnel entrance pushing forward toward the police line, as shown in the still below.



.

After an arrest warrant was issued, FBI agents arrested Judd at his residence in Carrolton,

Texas on March 26, 2021.

## Argument

In a motion riddled with speculation and insinuations, Judd alleges that the government

selectively targeted him for prosecution based on his political beliefs.  He specifically references

the charge for assaulting an officer with a dangerous weapon in violation of 18 U.S.C. § 111(b)

for his decision to light a firecracker inside a small tunnel filled with people and throw it at

officers guarding an entrance to the Capitol on January 6, 2021.  Judd contends that the

government failed to prosecute similar conduct occurring during protests around the Portland,

Oregon federal courthouse in May and June 2020.

Judd's motion fails the threshold evidentiary showing for a selective-prosecution claim.

His request for discovery should be denied.

## I.      A defendant must make a "rigorous" showing on each element of selective prosecution before he can obtain discovery on the issue.

Because "[t]he Attorney General and United States Attorneys retain broad discretion to

enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial

decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks and citations omitted). This presumption "rests in part on an assessment of the relative competence of prosecutors and courts." *Id.* at 465. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Ibid.* (citation omitted). "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (cleaned up). So "the presumption of regularity" applies to "prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." *Id.*

As a result, "[i]n the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Armstrong*, 517 U.S. at 464.

This presumption of regularity "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Armstrong*, 517 U.S. at 465. To overcome the presumption of regularity and obtain dismissal of the criminal charges, a defendant must present "clear evidence" that the government's decision to prosecute was "based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Id.* at 464-65 (citations omitted).

13

Concerned that selective-prosecution inquiries "will divert prosecutors' resources and may disclose the Government's prosecutorial strategy," the Supreme Court has also imposed a "correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 468. The defendant must initially produce "some evidence tending to show the existence of the essential elements of" selective prosecution, which are: "discriminatory effect and discriminatory intent." *Ibid*. (citation omitted). The defendant's evidence must also be "credible"—something more than "personal conclusions based on anecdotal evidence." *Id*. at 470. "If either part of the test is failed," the defendant cannot "subject[] the Government to discovery." *Att'y Gen. of United States v. Irish People, Inc*., 684 F.2d 928, 947 (D.C. Cir. 1982); *see also United States v. Lewis*, 517 F.3d 20, 25 (1st Cir. 2008) ("[D]iscovery will not be allowed unless the defendant's evidence supports each of the two furcula of his selective prosecution theory: failure on one branch dooms the discovery motion as a whole").

## II. Judd fails to proffer any evidence supporting an inference of selective prosecution.

Judd has failed to make the threshold showing on either selective-prosecution element. He has not presented any evidence suggesting "that (1) [he] was singled out for prosecution from among others similarly situated and (2) that [his] prosecution was improperly motivated." *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000) (quoting *United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983)). "[T]he standard is a demanding one." *Armstrong*, 517 U.S. at 463.

### A. Judd has not made a colorable showing that the government singled him out for prosecution.

Judd must first adduce evidence that "others similarly situated generally have not been prosecuted for conduct similar to that for which he was prosecuted." *Irish People, Inc.*, 684 F.2d

14

at 946 (citation omitted).  As a judge of this Court explained, an individual may be similarly situated if he "committed the same basic crime in substantially the same manner as the defendant— so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant." *United States v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019) (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)); *see also United States v. Lewis*, 517 F.3d 20, 27-28 (1st Cir. 2008) ("A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced. … A multiplicity of factors legitimately may influence the government's decision to prosecute one individual but not another.  These may include, inter alia, the comparability of the crimes, the similarities in the manner in which the crimes were committed, the relative efficacy of each prosecution as a deterrent, and the equivalency of the evidence against each prospective defendant.") (internal citations omitted).

Judd fails this showing.  A selective-prosecution claim requires the defendant to identify "similarly situated" individuals who "have not been prosecuted," *Irish People, Inc.*, 684 F.2d at 946 (citation omitted), and Judd has pointed to no such individual.  He instead cites thirty-nine cases (from a sample of seventy-four) where the government charged the defendant with federal offenses arising from riots around the federal courthouse in Portland, Oregon and subsequently dismissed the charges, entered a deferred-prosecution agreement, or acceded to the defendant's guilty plea on reduced charges in many of those cases. Doc. 138 at 5.[1]

---

[1] Judd's motion further references details from the docket for four of these cases, and one case in D.C. Superior Court, where, in his view, the defendant's alleged conduct mirrored his actions on January 6, 2021. Doc. 138 at 4-6.

This comparison fails, first and foremost, because the government actually charged nearly all defendants in the listed Oregon cases with civil-disorder or assault offenses.  *See* Doc. 138-1. As such, he has failed to "show anyone in a similar situation who was not prosecuted."  *Irish People, Inc.*, 684 F.2d at 946.

 Moreover, of the cases cited by Judd, those whose conduct is most similar to Judd, i.e., cases involving lighting and throwing a firework of some kind on video, were also all charged with comparable felony offenses for their conduct (and none were dismissed as part of a deferred resolution agreement or pled down to a misdemeanor).  For example, Isaiah Maza, Jr. -- the only other individual cited in Judd's group who allegedly lit and threw some kind of pyrotechinic[2] at federal law enforcement officers or those assisting them -- was indicted on the exact same charge as Judd, a violation of 18 U.S.C. § 111(b).  *See United States v. Isaiah Jason Maza, Jr.,* case no. 3:20-cr-00343 (D. Ore. filed Aug. 19, 2020).  Moreover, the charges against Maza were only dismissed because the defendant died before trial and not as part of a resolution with the government.  (Judd's summary chart is inaccurate as to this charge, as it does not list the actual indicted charges in the case.)  Similarly, Ty John Fox — whose case is still pending and who allegedly lit and threw a firework near officers standing outside of a police precinct – was indicted on one of the same felony charges that Judd is also facing, a violation of 18 U.S.C. § 231.[3]

---

[2] The affidavit in support of the arrest warrant describes the object as a "yellow cylindrical object" with a "string attached to the cylinder" that appeared on video to spark, like a lit fuse. *United States v. Isaiah Jason Maza, Jr.,* case no. 3:20-cr-00343 (D. Ore. filed Aug. 19, 2020), Doc. 7-1 at 4. The defendant claimed it was a "pyrotechnic as big as his hand," which he thought was a "ground bloom" (which is a type of firework) that "would not cause a big explosion." *Id.* at 9.  In video surveillance, Judd is likewise seen lighting a cylindrical object about the size of his hand with a string that appeared to spark after Judd lit it.

[3] Unlike Judd, Fox also appears to involve parallel criminal charges before the Oregon courts and a decision by the Oregon U.S. Attorney to defer to state counterparts, which of course increases the differences between the cases. *See, e.g.*, *United States v. Fox*, 3:20-cr-501 (D. Or.) (information recited in motion to continue trial date at Doc. 15)

(Notably, because Fox appears to have thrown the firework at state police officers, not at federal law enforcement officers or those assisting them like in Judd's case, and did not do so on federal property, it does not appear that Fox's actions could qualify for an 18 U.S.C. § 111(b) charge, as it would not meet the requisite elements.  For the same reasons, the additional D.C. Superior Court case cited by Judd, *United States v. Alana Rogers*, 2020 CF3 006970, similarly would not meet the elements for a federal 18 U.S.C. § 111(b) charge.)

Further, contrary to his claims, each of the three cases Judd cites in his motion as examples where a defendant had only been charged with a misdemeanor actually involved a felony charge to 18 U.S.C. § 111(a).  Although it is true that each case was eventually dismissed by the government for unknown reasons (typically after the defendants repeatedly agreed to waive their rights to a preliminary hearing or indictment over a period of months), all were initially facing felony charges.  For example, Judd states that the defendant in *United States v. Johnson,* case no. 3:20-mj-00170 (D. Ore. July 27, 2020), was charged solely with a misdemeanor.  Doc. 138 at 4 ("In contrast to Mr. Judd, the defendant was only charged with a misdemeanor, which the government eventually moved to dismiss without prejudice.)  However, the affidavit in support of the arrest warrant clearly states that Johnson was being charged with a felony.[4]  Similarly, the affidavit in support of the arrest warrant for *United States v. Bouchard,* case no. 3:20-mj-00165 (D. Ore. July 24, 2020), also makes it clear he was being charged with a felony, contrary to Judd's claims.[5]  The third case cited by Judd also appears to have involved a felony charge, not a

---

[4] *Id.*, Doc. 1-1 ("I submit this affidavit in support of a criminal complaint and arrest warrant for Jordan Matthew JOHNSON.  As set forth below, there is probable cause to believe, and I do believe, that JOHNSON committed the offense of Assaulting a Federal Officer (felony), in violation of 18 U.S.C. § 111(a)(1).")

[5] Doc. 1-1 ("As set forth below, there is probable cause to believe, and I do believe, that BOUCHARD committed the offense of Assaulting a Federal Officer (Felony), in violation of 18 U.S.C. § 111(a)(l).")

misdemeanor as claimed by Judd.[6]   (In addition, although Judd cites additional Oregon cases in his chart that supposedly involved only misdemeanor charges for assaults on officers, based on a brief review of the docket for these cases, Judd's chart appears to include some inaccuracies—as at least two cases did involve felony charges, contrary to Judd's claims.[7])

Judd has accordingly shown no disparate treatment in the government's charging approaches.   He instead focuses on the way the government ultimately resolved some of the Oregon cases and contrasts it with the plea offer that the government recently transmitted to him. Doc. 138 at 9.  This presentation—which compares the government's initial plea offer to him with the government's final resolution in thirty-nine hand-picked Oregon cases (while excluding other comparable Oregon cases that have not resulted in similar resolutions) — "falls woefully short of demonstrating a consistent pattern of unequal administration of the law." *United States v. Bernal-Rojas*, 933 F.2d 97, 99 (1st Cir. 1991). In fact, the government's initial plea offer here rebuts any inference that that it has "refused to plea bargain with [Judd], yet regularly reached agreements with otherwise similarly situated defendants." *Ibid.*

In addition, others in the Oregon group listed by Judd faced (and eventually pled) to the same 18 U.S.C. § 111(b) charge as Judd – which is of course very difficult to square with Judd's overarching claim that the government is engaging in selective prosecution here based on a failure to offer Judd a misdemeanor or deferred resolution plea offer.  *See United States v. Jacob Michael*

---

[6] *United States v. Webb*, case no. 3:20-mj-00169 (D. Ore. July 27, 2020) Doc. 1-1 at 3 (explaining that "[u]nder § 111(a), simple assault is a misdemeanor; an assault involving physical contact with the victim or an intent to commit another felony is a felony" and then explaining the alleged facts, which involve physical contact).

[7] *See United States v. Wills*, case no. 3:20-cr-00296 (D. Ore. July 27, 2020) Doc. 6 (indictment for felony violation of 18 U.S.C. § 111(a)); *United States v. O'Donnell*, case no. 3:20-mj-00166 (D. Ore. July 27, 2020) Doc. 1-1 (affidavit in support of arrest warrant explaining that under § 111(a), an assault involving physical contact with the victim is a felony and later indicating probable cause to believe the defendant assaulted officer and "in so doing made physical contact with a federal officer").

*Gaines*, case no. 3:20-cr-00223 (D. Ore. filed July 16, 2020), Doc. 14 and Doc. 53 (plea agreement to violation of 18 U.S.C. § 111(b) for hitting Marshal with a hammer); *United States v. Dakotah Ray Horton,* case no. 3:20-cr-00419 (D. Ore. filed Aug. 16, 2020), Doc. 25 (plea agreement to violation of 18 U.S.C. § 111(b) for hitting Marshal with a bat).

Similarly, there are comparable Oregon cases *not* cited by Judd in his chart or in his motion that specifically involve allegations of lighting fireworks or some other pyrotechnic. Like Judd, each defendant's actions were captured on video. Like Judd, each defendant in those cases was charged with a felony as a result and the cases remain pending. *See United States v. Gabriel E. Agard-Berryhill,* case no. 3:20-cr-00352 (D. Ore. filed Aug. 19, 2020) (defendant charged with felony for allegedly lighting and throwing a firecracker at a federal building and causing a small fire); *United States v. Joseph Ybarra,* case no. 3:20-cr-00294 (D. Ore. filed Aug. 4, 2020) (defendant charged with felony for allegedly throwing a Molotov cocktail at a federal building, although bottle failed to ignite). In addition, although also not included in Judd's chart, other defendants in the Portland cases who were engaged in equally reckless and dangerous behavior were charged with (and pled) to felonies as a result. *See, e.g*., *United States v. Schinzing,* case no. 3:20-cr-00298 (D. Ore. filed Aug. 5, 2020) (defendant sentenced to 15 months of imprisonment after pleading guilty to felony arson for breaking into a corrections facility and setting fire to cubicle); *United States v. Weier*, case no. 3:20-cr-00263 (D. Ore. filed July 23, 2020) (defendant pled guilty to felony for unsuccessfully attempting to set fire to a courthouse by repositioning a piece of lit wood against the building). Again, like Judd, each of these two cases was captured on video.

More fundamentally, the thirty-nine Oregon cases serve as improper "comparator[s]" because those defendants and Judd are not similarly situated. *Stone*, 394 F. Supp. 3d at 31. Judd

spent hours with other rioters at the front lines of violent attempts to break into the Capitol building. He did so while elected lawmakers and the Vice President of the United States were present in the building and attempting to certify the results of the 2020 Presidential Election in accordance with Article II of the Constitution. And he committed a host of federal offenses attendant to this riot, including lighting and throwing a firecracker at officers standing feet in front of him inside a packed small tunnel, helping to create a shield wall that was used by other rioters to smash up against officers inside that same small tunnel, and repeatedly joining heave-ho efforts with other rioters as they used all of their might as a group to try to collectively push through law enforcement officers in that same small tunnel. All this was captured on multiple high-definition videos.

Contrast that with the thirty-nine Oregon defendants, who—despite committing serious offenses—never entered the federal courthouse structure, impeded an official proceeding, or were alleged to have engaged in repeated assaults on law enforcement officers spread out over a few hours. Additionally, as noted above, the government's evidence in those Oregon cases that resulted in dismissal or deferred resolution agreements, often relied on officer recollections (*e.g.*, identifying the particular offender on a darkened plaza with throngs of people) that could be challenged at trial — rather than the multiple videos from different angles capturing Judd's actions in this case.[8] (Similarly, far from being entirely captured on multiple videos, the one

---

[8] For example, the three cases flagged in Judd's motion do not appear to have been captured on video. *See United States v. Johnson*, case no. 3:20. 3:20-mj-00170 (D. Ore. July 27, 2020), Doc. No 1-1 (affidavit in support of arrest warrant explaining evidence based on testimony of officers involved and no mention of video); *United States v. Bouchard,* case no. 3:20-mj-00165 (D. Ore. July 24, 2020), Doc. 1-1 (same); *United States v. Bouchard,* case no. 3:20-mj-00165 (D. Ore. July 24, 2020), Doc. 1-1 (same). Similarly, based on a brief review of some of the cases resulting in deferred resolution agreements that are mentioned in Judd's chart, they also appear to not involve cases captured on video. *See, e.g.*, *United States v. Blank,* case no. 3:20-cr-00224 (D. Ore. July 26, 2020) Doc. 1-1 (affidavit in support of arrest warrant explaining evidence based on testimony of officers involved and no mention of video); *United States v. Storey*, case no. 3:20-cr-00330 (D. Ore. July 27, 2020) Doc. 1-1 (same); *United States v. Wills*, case no. 3:20-cr-00296 (D. Ore. July 27, 2020) Doc. 1-1 (same).

D.C. Superior Court case cited by Judd appears to have relied entirely on a brief observation by just one witness in the middle of an extremely hectic encounter.  *See United States v. Alanna Rogers*, 2020 CF3 006970, Affidavit in Support of an Arrest Warrant.)

These situational and evidentiary differences represent "distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions" in Judd's case. *Branch Ministries*, 211 F.3d at 145 (quoting *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)); *see also Price v. U.S. Dep't of Justice*, 865 F.3d 676, 681 (D.C. Cir. 2017) (observing that a prosecutor may legitimately consider "concerns such as rehabilitation, allocation of criminal justice resources, the strength of the evidence against the defendant, and the extent of a defendant's cooperation" in plea negotiations) (brackets and citation omitted).

Multiple decisions from this jurisdiction and this Court have also documented the *sui generis* nature of this criminal conduct.  The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir.).  Indeed, this Court has noted the same.  *See United States v. Timothy Lous Hale-Cusanelli*, 21-cr-37, (D.D.C. Mar 23, 2021) (Hrg. Tr. at 24) ("Obviously, the January 6th riot was a serious and *sui generis* threat to our country's body politic.").  Other members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cha*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021); *see also United States v. Fox*, No. 21-cr-108 (D.D.C. Jun. 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, No. 21-mj-218, 2021 WL 765662, at *7 (D.D.C. Feb. 26,

21

2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.").

These decisions confirm that the actions taken by Judd and others on January 6 differ in kind and in degree from the thirty-nine cited Oregon cases. Judd was part of a mob who traveled to the Capitol grounds, repeatedly attempted to breach the Capitol building with physical force, and repeatedly assaulted law enforcement with the goal of impeding congressional certification of the 2020 Presidential Election. Indeed, he is one of more than 600 defendants already charged for participating in the riot, and he does not suggest that he has been treated differently than any of those similarly situated defendants.

Judd's effort to draw comparisons to the thirty-nine Oregon cases (and one D.C. Superior Court case) accordingly fails. Lacking colorable evidence that the government singled him out for prosecution, Judd's discovery request fails at the first step.

**B. Judd has not made a colorable showing that the government harbored an improper motive in prosecuting him.**

With respect to the second prong, Judd has failed to adduce any evidence that improper motives undergird this prosecution.

Judd instead intimates that the government accepted favorable dispositions in some of the thirty-nine Oregon cases, but withheld a similar plea offer here because he espouses political views that the government disfavors. Doc. 138 at 157 ("[These dismissals and resolutions have occurred under the same Democratic administration that continues to prosecute Mr. Judd."). But Judd presents no evidence linking any Oregon defendant to a particular political viewpoint. For example, nothing in the affidavits in support of arrest for the three main Oregon cases described

22

in his motion include any evidence that those defendants ascribed to a particular political viewpoint.[9]

Stripped to its core, Judd relies on rank conjecture in suggesting that political favoritism has guided the government's charging and plea decisions. That is not enough to warrant discovery here; "a defendant must provide something more than mere speculation or 'personal conclusions'" of selective prosecution. *Stone*, 394 F. Supp. 3d at 31 (quoting *Armstrong*, 517 U.S. at 470).

At bottom, the government has determined that Judd's offense conduct warrants a penalty more significant than the Oregon defendants cited in his motion. That reflects an appropriate exercise of its prosecutorial discretion in balancing the seriousness of Judd's conduct, the strength of the evidence against him, the need for his rehabilitation, the need to deter him and others from future criminal activity targeting the electoral process, and the allocation of the government's resources. All these factors constitute permissible prosecutorial considerations. *See Price*, 865 F.3d at 681.

Judd has adduced no evidence that the government initiated these charges in response to his political views. The Acting U.S. Attorney for the District of Columbia—as an officer of this Court—further represents that such a consideration plays no role in his office's charging policies—be it in this investigation or elsewhere. Judd accordingly fails his burden on the second element.

---

[9] *See United States v. Johnson*, case no. 3:20. 3:20-mj-00170 (D. Ore. July 27, 2020), Doc. No 1-1 at 6 (Defendant "stated his reason for attending the protest was to make sure his friends get home safe"); *United States v. Bouchard*, case no. 3:20-mj-00165 (D. Ore. July 24, 2020), Doc. 1-1 (defendant made no statement about his intent other than to say "his intent was not to hurt anyone, but to 'stand his ground.'"); *United States v. Bouchard*, case no. 3:20-mj-00165 (D. Ore. July 24, 2020), Doc. 1-1 (defendant "stated that he comes out often to the protests because he supports the movement that the protest represents" with no further explanation provided).

23

**Conclusion**

Because Judd has failed to carry his burden, he is not entitled to discovery on his selective-prosecution claim and his motion should be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By: _____

**MELISSA JACKSON**
Assistant United States Attorney
D.C Bar Number 996787
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 815-8585
Email: Melissa.Jackson@USDOJ.GOV

JOCELYN BOND
Assistant United States Attorney
Email: Jocelyn.Bond@usdoj.gov
KIMBERLEY C. NIELSEN
Assistant United States Attorney
Email: Kimberley.Nielsen@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 18, 2021, I caused a copy of the foregoing opposition to be served on counsel of record via electronic filing.

<u>*/s/ Melissa Jackson*</u>
Melissa Jackson
Assistant United States Attorney

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:21CR40-TNM |
| | ) | |
| DAVID LEE JUDD | ) | |

**Reply to Government's Opposition to Motion to Compel Discovery in
Support of Mr. Judd's Claim of Selective Prosecution**

Defendant David Lee Judd, through counsel, submits this reply to the government's opposition to his motion to compel discovery. In his motion for discovery, Mr. Judd made a prima facie case of discriminatory effect and purpose which the government has failed to rebut.  Instead, the cases cited by the government support Mr. Judd's claim that he and other January 6 defendants have a colorable claim of selective prosecution when compared with the government's charging and resolution of cases stemming from violent riots in Portland, Oregon in 2020 as well as riot cases stemming from protests in Washington, D.C., which spanned the summer of 2020.

1. **The Defendant Must Offer a "Colorable Claim" to be Entitled to Discovery on His Selective Prosecution Claim.**

While it is true that prosecutorial decisions enjoy a "presumption of regularity," *United States v. Armstrong*, 517 U.S. 456, 464 (1996), prosecutorial discretion is subject to constitutional constraints. *Armstrong*, 517 U.S. at 464 (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). "The Equal Protection Clause prohibits **selective** enforcement "based upon an unjustifiable standard such

1

as race, religion, or other arbitrary classification." *United States v. Barnes*, WL 5538550 (D.C. Cir. 2019) (internal citations omitted).

In order to be entitled to discovery in a selective prosecution case, the defendant must offer "at least a colorable claim" that (1) he or she was singled out for prosecution from among others similarly situated, and (2) that his or her prosecution was improperly motivated. *See United States v. Washington,* 705 F.2d 489, 494 (D.C. Cir. 1983); *Attorney General v. Irish People, Inc.,* 684 F.2d 928, 932 (D.C. Cir. 1982); *Synanon Church v. United States,* 579 F. Supp. 967, 977 (D.D.C. 1984).   Mr. Judd has made a "colorable claim" and therefore, he is entitled to discovery.

### i.    The Charging of the Comparative Group Does Not Bar a Selective Prosecution Claim.

Mr. Judd has catalogued a number of "Portland Riot" cases in which the government either dismissed the case outright or offered a deferred resolution agreement (DRA).  Doc. 138.  Rather than offer a rational explanation as to why significant numbers of the Portland defendants' cases were outright dismissed by *nolle prosequi* or resolved by DRA when they were similarly situated to that of the January 6 defendants, the government points to three cases cited by Mr. Judd in which defendants were *initially* charged with assault on a police officer while in the same breath admitting that the charges were dismissed: "Although it is true that each case was *eventually dismissed* by the government for unknown reasons (typically after the defendants repeatedly agreed to waive their rights to a preliminary hearing or indictment over a period of months), all were initially facing felony charges.)." Gov't. Opp. Doc. 154 at 17 (emphasis added).

2

In relying on those three cases, the government argues that because the Portland cases were *initially* pursued, Mr. Judd cannot establish that similarly situated people were "not prosecuted," which he is required to show under *Armstrong*. Gov't Opp. at 16.  But the government misses the mark by conflating charging with prosecution, thereby losing sight of the Equal Protection touchstone of selective prosecution.  Specifically, by the government's logic, it could treat two classes of people differently under the law—i.e., punish only one group—if it merely *charges* both groups first. The result is both absurd and untenable.  The Equal Protection Clause does not operate by form, but by function.  That is why the test for selective prosecution is functional, focusing on discriminatory *effects*.[1]

Moreover, the government cites no direct support for its position that charging disqualifies a comparative class.  Instead, the government relies on an extension of the language and logic in *Armstrong*.  But *Armstrong* does not stand for the proposition that a claim of selective prosecution is *per se* precluded if the government can locate a few similarly situated defendants who were only initially charged and then granted *nolle prosequi*.  Indeed, elsewhere in the *Armstrong* opinion, the Court described the threshold that a defendant must meet as "a credible showing of different treatment of similarly situated persons…"  *Armstrong,* 517 U.S. 456 at 470 ("We think the required threshold—a credible showing of *different treatm*ent of similarly situated persons—adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution.")

---

[1] This is particularly true when discussing higher up decision-making.

(emphasis added). The Portland cases the government relies upon show just that: different treatment of similarly situated persons.

Finally, while it is true that there is little case law that addresses the issue even indirectly, courts often frame the selective prosecutorial endeavor as a matter of wrongly singling out a defendant or class of defendants for *punishment*, not process. *See, e.g.*, *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) ("The court should dismiss a case, or take other appropriate action, if the defendant can prove that the prosecutor or investigator intentionally singled him out *for punishment*.") (emphasis added). And at least one court has expressly observed that differences in prosecutorial *technique* can support a selective prosecution claim. *United States v. Daniels*, 142 F. Supp. 2d 140, 143 (D. Mass. 2001) ("[T]he [selective prosecution] claimant must prove that the Government's enforcement technique had a discriminatory effect and that it was motivated by a discriminatory purpose.") (citing and quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985) (internal quotations omitted).

### ii. The Prosecutorial Decision-making Cannot Be Explained By Any Differences in the Strength of the Evidence Between the Portland Defendants and the January 6 Defendants

In each of the cases the government cites in its opposition, according to the Affidavits in support of arrest, the offenses were witnessed by at least one (and in two cases, multiple) law enforcement witnesses and a law enforcement victim was physically struck or placed in a headlock. Thus, the evidence was strong. And yet, the cases were ultimately dismissed on the government's motion.

The first of those defendants, Jordan Johnson, was observed by two Deputy United States Marshals (DUSM) striking another DUSM in the face with a homemade shield.  *United States v. Johnson*, 3:20-mj-170 (D. Or.), Doc. 1 (Aff.). Johnson's belongings were searched and a baton, OC spray, steel plated body armor, helmet, a first aid kit, gas mask, and goggles were recovered.  Yet, as the government acknowledges, inexplicably, Johnson's case was dismissed on the government's own motion.  Doc. 20.

Next, the government points to the case of Portland rioter Bouchard.  In that case, a Special Agent with the Federal Protective Service witnessed Bouchard place his arm around an officer's neck in a "headlock maneuver."  Bouchard was also observed carrying a shield.  *United States v. Bouchard*, 3:20-mj-165 (D. Or.), Doc. 1-1 (Aff.).  Though the offense was witnessed by several federal officers, defendant Bouchard's case was also inexplicably dismissed upon motion by the government. Doc. 17.

Finally, in this subset of cases, the government points to *United States v. Webb*, another felony case dismissed (with prejudice) by the government for reasons unknown.  3:20-mj-169 (D. Or.), Doc. 22.  In that case, Webb was observed striking a DUSM in the face with a shield.  He then resisted arrest "by pulling his arms away from the DUSMs in an attempt to avoid being restrained." Doc. 1 (Aff.).

Contrast the Portland defendants to Mr. Judd, who has never been before been in trouble, and who was arrested over eight months ago and has twice agreed to toll his speedy trial rights as the government assembles discovery.  The only plea offer

extended was to the lead felony count with the enhancement (18 USC §111(b)) and would have Mr. Judd stipulate to a guideline range of a significant sentence of imprisonment.  Not only was he never offered an opportunity to participate in a DRA like many of the Portland defendants were, his efforts to negotiate a more favorable plea agreement were met with total resistance.

The government next argues that Mr. Judd is not similarly situated to a defendant charged in D.C. Superior Court, who, during a protest, was alleged to have thrown an M-80 style firework at a police officer, burning his pant leg.  *United States v. Alanna Rogers,* 2020 CF3 006970 (D.C. Super. Ct. dismissed Sept. 30, 2020).  While that defendant's offense was not captured on video, there was physical evidence that the defendant's firework ignited and *made contact with* a police officer.  That defendant's case was dismissed in its entirety by the same U.S. Attorney's Office that charged Mr. Judd.  And while the government correctly notes that defendant Rogers could not be charged with 18 USC § 111(b), the government fails to explain why it declined to classify the firecracker as a dangerous weapon under the D.C. Code.  In another Portland fireworks case cited by Mr. Judd, the government points out that the defendant, John Ty Fox, was charged with a felony (civil disorder), but again fails to explain why it declined to classify the firework Fox used as a dangerous weapon, removing any potential for an enhancement penalty.  Despite the fact that the small object that Mr. Judd is alleged to have tossed did not ignite, the government elected to charge the object as a "dangerous weapon," subjecting Mr. Judd to enhanced penalties. This is clearly disparate treatment of similarly situated defendants.

### iii. The Government's Reliance on a Small Handful of Portland Riot Cases That Resulted in Felony Pleas is Unavailing Because Mr. Judd is Not Similarly Situated to Those Particular Defendants.

The government points to Portland riot cases in which defendants pleaded guilty to felonies. Gov't. Opp. p. 18-19. As an initial matter, it is telling that the government can only point to a handful of Portland riot cases which were resolved in felony plea agreements. Moreover, those particular defendants were not similarly situated to Mr. Judd. For example, the government relies on a case in which a defendant "attacked a door at the Hatfield Courthouse with a sledgehammer, and then assaulted a responding Deputy U.S. Marshal by striking him with the same hammer." *United States v. Jacob Gaines*, 3:20cr223 (D. Or.) Doc. 29 (Gov't Resp. to Motion for Pre-trial Release). In the struggle that ensued, Gaines struck the marshal *three times with a hammer. Id.* Gaines pleaded guilty to one count of 18 U.S.C. § 111(b) and the government agreed to recommend the "low end" of the applicable range as long as the defendant demonstrated acceptance of responsibility. Doc. 53 (Plea Agreement). In another case the government cites, a defendant who *struck a DUSM repeatedly from behind with a wooden baseball bat* pleaded guilty to 18 U.S.C. §111(b). In that case, even though the officer experienced "significant bruising and soreness," the government agreed to recommend a sentence of just 24 months. *U.S. v. Dakotah Ray Horton*, Case No. 3:20CR419 (D. Or.) Doc. 25 (Plea Agreement). It bears emphasis here that Mr. Judd did not cause injury to any officer and the guideline range contemplated in Mr. Judd's plea offer is substantially higher than the 24 months the government agreed was appropriate for defendant Horton.

7

The government points to two purportedly "comparable" Oregon cases involving allegations of "lighting fireworks or some other pyrotechnic." Gov't Opp. at 19. But in one of these cases, the defendant caused a fire to break out[2] and in the other, the defendant threw a Molotov cocktail. When it twice failed to ignite, the defendant picked it up and threw it again.[3] Those defendants' alleged actions are not comparable to Mr. Judd's and therefore, they are not similarly situated. *Irish People v. Inc.*, 684 F.2d 928, 946 (D.C. Cir. 1982) (an individual is similarly situated if he committed the same crime in "substantially the same manner" as the defendant).

## 2. Mr. Judd Has Made a Prima Facie Showing of Discriminatory Purpose.

The government argues that Mr. Judd cannot produce evidence "linking any Oregon defendant to a particular viewpoint." Gov't. Opp. at 22. But of course, the government cannot with a straight face refute that the Portland protests were associated with left-leaning causes and that the January 6 protests were associated with supporters of President Trump. Indeed, the government made a point that Mr. Judd's was pictured wearing a red "Make America Great Hat." Gov't. Opp. at 5. Mr. Judd does not stand alone in his observation that he and other January 6 defendants are being treated more harshly than the Portland defendants. Indeed, federal lawmakers have also questioned the government's treatment of the January 6 defendants as comparted to the Portland rioters. In a letter to Attorney General Garland, a group of senators observed:

---

[2] *U.S. v. Agard-Berryhill*, 3:20CF352 (D. Or.) Doc. 1-1, Affidavit in support of Arrest Warrant.
[3] *U.S. v. Jospeh Ybarra*, 3:20CR294 (D. Or.) Doc. 1-1, Affidavit in support of Arrest Warrant.

During the spring and summer of 2020, individuals used peaceful protests across the country to engage in rioting and other crimes that resulted in loss of life, injuries to law enforcement officers, and significant property damage.  A federal courthouse in Portland, Oregon, has been effectively under siege for months.  Property destruction stemming from the 2020 social justice protests throughout the country will reportedly result in at least $1 billion to $2 billion in paid insurance claims.[4]

The senators were also troubled by the DOJ's lax treatment of Portland riot defendants:

Despite these numerous examples of violence occurring during these protests, it appears that the individuals charged with committing crimes at these events may benefit from infrequent prosecutions and minimal, if any, penalties.  According to a recent article, "prosecutors have approved deals in at least half a dozen federal felony cases arising from clashes between protesters and law enforcement in Oregon last summer. The arrangements — known as deferred resolution agreements — will leave the defendants with a clean criminal record if they stay out of trouble for a period of time and complete a modest amount of community service, according to defense attorneys and court records."[5]

The senators go on to point out—as Mr. Judd has—that the DOJ's treatment of the Portland cases "stands in stark contrast to the harsher treatment of the individuals charged in connection with the January 6, 2021, breach of the U.S. Capitol Building."[6]

The government's decision to treat the January 6 defendants differently than other similarly situated defendants (that is, defendants arrested for conduct at a protest) is not limited to its disparate treatment of the Portland protestors.  Its discriminatory prosecution is also evidenced by the District of Columbia U.S.

---

[4] Letter to the Hon. Merrick B. Garland, June 7, 2021 (citations omitted), attached hereto as Exhibit 1.
[5] *Id.* citing Josh Gerstein, Leniency for defendants in Portland clashes could affect Capitol riot cases, Politico, Apr. 14, 2021, https://www.politico.com/news/2021/04/14/portland-capitol-riot-cases-481346.
[6] *Id.*

Attorney's Office's own handling of civil disorder cases stemming from the widespread protests which occurred in the District in the wake of the death of George Floyd.[7]  Some of those protests became violent.  Based on counsel's analysis of arrest data culled from https://mpdc.dc.gov/publication/mpd-unrest-related-arrest-data-set, between May and September, 2020, 102 protest participants were arrested for felony rioting stemming from the DC protests.   Of those individuals, 39 were charged with criminal offenses.  Of the 39 charged with criminal offenses, 12 were nolle prossed, 15 individuals were offered diversionary programs, two defendants were charged with felonies which were later pleaded down to misdemeanors, one was charged with a felony and sentenced to probation with 10 months suspended, one defendant was charged with a misdemeanor and pleaded and sentenced to probation with 150 days suspended.  There are currently two pending misdemeanor cases stemming from the DC protests and six defendants charged with felonies.  In each of those felony cases, the defendants were arrested for entering and looting a store or establishment.[8]  During the same time period, 37 protest participants were arrested for assaulting a police officer during the DC protests.  Of those individuals, 25 were charged with criminal offenses.  Of the 25 charged, only four were charged with felonies.  Of the four felony cases, one pleaded down to a misdemeanor, and one was

---

[7] *See* George Floyd death: Violence in Washington DC as protests continue, BBC News, June 1, 2020. https://www.bbc.com/news/av/world-us-canada-52876902; Night of Destruction across D.C. after protestors clash with police outside White House, Washington Post, June 1, 2021, https://www.washingtonpost.com/local/dc-braces-for-third-day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html

[8] *See U.S v. Daequan Anderson*, 2020 CF3 005107*; U.S. v. Tanisha Bauffer*, 2020 CF3 005095, *U.S. v. Jerrick Dorsey*, 2020 CF3 005099; *U.S v. Hezekiah Grooms*, 2020 CF3 005108; *U.S. v. Marquese Harris*, 2020 CF3 005100; *U.S. v. James Williams*, 2020 CF2 005572.  (D.C. Super. Ct.)

10

nolle prossed.[9]  Of the 21 cases resulting in misdemeanor charges, six were nolle prossed, and four resulted in deferred prosecution agreements.  While it is true that the D.C. protest defendants were charged in D.C. Superior Court, they were prosecuted by the same U.S. Attorney's Office that charged the January 6 defendants in federal court and even a cursory review of the outcomes of those cases show that the government is taking a much harsher approach to the January 6 defendants for similar conduct.

By presenting evidence of the disparate treatment of January 6 defendants as compared to other protestors associated with left-leaning causes, Mr. Judd has made the "colorable showing of different treatment of similarly situated persons" required by *Armstrong* and is therefore entitled to discovery. 517 U.S. at 470.

### 3.  Mr. Judd is Entitled to Narrowly Tailored Discovery to Support His Claim of Selective Prosecution.

Mr. Judd has requested discovery to support his claim of selective prosecution and because he has made a colorable claim, the Court should grant his request.  At the status conference in this matter, the Court suggested that counsel investigate what types of discovery has been ordered in other cases.

Of course, it is impossible to analogize the January 6 prosecutions to any other prosecution of a group of defendants, simply because a mass prosecution of this

---

[9]  There are two remaining pending felony assault cases: *United States v. Herman McNeal*, 2020CF36380 (D.C. Super. Ct.) (defendant McNeal is charged with throwing rocks at police officers. One of the rocks caused a spiral compound fracture of an officer's tibia); *United States v. Jamar Byrd*, 2020CF32020 (D.C. Super. Ct.) (while being transported to a transport wagon, Byrd is reported to have bit an officer, breaking the skin; inside the transport wagon, Byrd kicked an officer and headbutted another officer).

breadth is unprecedented. However, district court orders in other cases involving claims of selective enforcement and/or selective prosecution are instructive as to the type and scope of discovery the government should be compelled to produce. The cases make clear that the discovery should be responsive to the defendant's claim of selective prosecution. For example, in one case, a Black defendant charged with distributing crack cocaine moved to obtain discovery as to whether federal controlled substance laws prohibiting distribution of cocaine in form of cocaine base were being unfairly, arbitrarily and discriminatorily enforced against him. The district judge held that the defendant had demonstrated the threshold level of selective prosecution sufficient to warrant discovery. In that case, the judge granted the defendant's request for the following discovery:

> A list of all federal cases in which the defendant has been charged with a cocaine offense, specifying whether the charge involved cocaine base or cocaine powder; 2.the racial or ethnic identity of each defendant in the listed case; 3.A statement identifying (a) each of the law enforcement agencies, including joint federal-state-local task forces or other inter-Governmental organizations, involved in the selection of targets for investigation of cocaine powder or cocaine base criminal offenses, and (b) the policies followed in making that determination; Statements identifying (a) the agencies involved and (b) the policies followed in determining which particular persons will be prosecuted in state or federal court;  A statement of the practices followed in implementing each policy articulated in response to requests 3(b) and 4(b) including articulable criteria employed in actual practice; An explanation of how the decisions to investigate and prosecute Defendant Tuitt in the present case were made and how they were compliant with the policy and practices articulated in responses to requests 3 through 5.

*United States v. Tuitt*, 68 F. Supp. 2d 4, 17 (D. Mass. 1999). In another case involving a defendant indicted on charges of stealing secrets about the U.S. nuclear arsenal on

behalf of the People's Republic of China, the district judge granted the defendant's motion for discovery on his selective prosecution claim and ordered the government to produce, among other materials, "the full classified transcript of testimony by the Attorney General and other Department of Justice officials before any congressional committee with respect to the defendant and the investigations in this case." *United States v. Wen Ho Lee*, CR99-1417 JP (D.N.M. August 25, 2000) (Order granting Motion for Discovery of Materials Related to Selective Prosecution). In a case involving the operation of "phony stash houses," the district judge granted the defendants' motion for discovery to support claims of racial profiling in the investigation and prosecution of the "stash house" cases. *United States v. Paxton*, 2014 WL 1648746 (N.D. Ill. April 17, 2014). In *Paxton*, the defendants requested broad discovery into the ATF's policies and procedures related to sting operations. The district judge held that "although defendants have made a sufficient showing to entitle them to discovery, the court finds that the scope of the defendants' request to be broader than necessary." *Id.* at 6. As such, the district judge ordered the parties to "meet and confer regarding which items on the list may be disclosed by agreement" and report back to the court. *Id.*

In Mr. Judd's case, if the Court is not inclined to compel the government to disclose each of the items listed in his initial motion (Doc. 138 at 10), the Court limit could order the government to produce discovery narrowly tailored to support Mr. Judd's claim. For example, the Court could order the government to produce internal Department of Justice memos regarding charging decisions and plea offers in the

January 6 cases and the Portland riot cases. The Court could also order the government to produce internal memos and emails regarding the charging and plea offer decisions in Mr. Judd's case and the Portland riot cases involving the alleged use of a firework or other explosive devices. Finally, particularly since the protests happened in the same city and were prosecuted by the same office, the Court could order the government to produce internal memos and emails regarding its charging decisions in the Jan. 6 cases and protests that occurred in the District of Columbia during the summer of 2020.

## Conclusion

For the reasons stated herein and Mr. Judd's initial Motion to Compel and any other reasons that may appear to the Court after a hearing, Mr. Judd moves the Court to order the government to produce discovery related to his claim of selective prosecution.

Respectfully submitted,

David Judd

By Counsel

___/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
DC Bar Number 484020
Assistant Federal Public Defender

Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0879 (T)
(703) 600-0880 (F)
Elizabeth_Mullin@fd.org (email)

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2021, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

___/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
DC Bar Number 484020
Assistant Federal Public Defender

**Exhibit 1: Letter from federal lawmakers to Attorney General Garland**



**WASHINGTON, DC 20510**

June 7, 2021

The Honorable Merrick B. Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Attorney General Garland:

The U.S. Department of Justice (DOJ) is currently dedicating enormous resources and manpower to investigating and prosecuting the criminals who breached the U.S. Capitol on January 6, 2021. We fully support and appreciate the efforts by the DOJ and its federal, state and local law enforcement partners to hold those responsible fully accountable.

We join all Americans in the expectation that the DOJ's response to the events of January 6 will result in rightful criminal prosecutions and accountability. As you are aware, the mission of the DOJ is, among other things, to ensure fair and impartial administration of justice for all Americans. Today, we write to request information about our concerns regarding potential unequal justice administered in response to other recent instances of mass unrest, destruction, and loss of life throughout the United States.

During the spring and summer of 2020, individuals used peaceful protests across the country to engage in rioting and other crimes that resulted in loss of life, injuries to law enforcement officers, and significant property damage.[1] A federal court house in Portland, Oregon, has been effectively under siege for months.[2] Property destruction stemming from the 2020 social justice protests throughout the country will reportedly result in at least $1 billion to $2 billion in paid insurance claims.[3]

In June 2020, the DOJ reportedly compiled the following information regarding last year's unrest:

- "One federal officer [was] killed, 147 federal officers [were] injured and 600 local officers [were] injured around the country during the protests, frequently from projectiles."[4]

---

[1] Jennifer Kingson, *Exclusive: $1 billion-plus riot damage is most expensive in insurance history*, Axios, Sept. 16, 2020, https://www.axios.com/riots-cost-property-damage-276cc9bcc-a455-4067-b06a-66f9db4cea9c.html.

[2] Conrad Wilson and Jonathan Levinson, Protesters, federal officers clash outside Portland's courthouse Thursday, OPB, Mar. 12, 2021, https://www.opb.org/article/2021/03/12/protesters-vandalize-portlands-federal-courthouse-again/.

[3] Jennifer Kingson, *Exclusive: $1 billion-plus riot damage is most expensive in insurance history*, Axios, Sept. 16, 2020, https://www.axios.com/riots-cost-property-damage-276cc9bcc-a455-4067-b06a-66f9db4cea9c.html.

[4] Published in the Intercept, Jul. 15, 2020, https://theintercept.com/document/2020/07/15/preventing-violence-and-criminal-activity-in-protection-of-lawful-protest/.

- According to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), "since the start of the unrest there has been 81 Federal Firearms License burglaries of an estimated loss of 1,116 firearms; 876 reported arsons; 76 explosive incidents; and 46 ATF arrests[.]"[5]

Despite these numerous examples of violence occurring during these protests, it appears that individuals charged with committing crimes at these events may benefit from infrequent prosecutions and minimal, if any, penalties.  According to a recent article, "prosecutors have approved deals in at least half a dozen federal felony cases arising from clashes between protesters and law enforcement in Oregon last summer. The arrangements — known as deferred resolution agreements — will leave the defendants with a clean criminal record if they stay out of trouble for a period of time and complete a modest amount of community service, according to defense attorneys and court records."[6]

DOJ's apparent unwillingness to punish these individuals who allegedly committed crimes during the spring and summer 2020 protests stands in stark contrast to the harsher treatment of the individuals charged in connection with the January 6, 2021 breach of the U.S. Capitol Building in Washington, D.C.  To date, DOJ has charged 510 individuals stemming from Capitol breach.[7]  DOJ maintains and updates a webpage that lists the defendants charged with crimes committed at the Capitol.  This database includes information such as the defendant's name, charge(s), case number, case documents, location of arrest, case status, and informs readers when the entry was last updated.[8]  No such database exists for alleged perpetrators of crimes associated with the spring and summer 2020 protests.  It is unclear whether any defendants charged with crimes in connection with the Capitol breach have received deferred resolution agreements.

Americans have the constitutional right to peaceably assemble and petition the government for a redress of grievances.  This constitutional right should be cherished and protected.  Violence, property damage, and vandalism of any kind should not be tolerated and individuals that break the law should be prosecuted.  However, the potential unequal administration of justice with respect to certain protestors is particularly concerning.  In order to assist Congress in conducting its oversight work, we respectfully request answers to the following questions by June 21, 2021:

---

[5] *Id.*

[6] Josh Gerstein, *Leniency for defendants in Portland clashes could affect Capitol riot cases*, Politico, Apr. 14, 2021, https://www.politico.com/news/2021/04/14/portland-capitol-riot-cases-481346.

[7] Madison Hall et al., *493 people have been charged in the Capitol insurrection so far. This searchable table shows them all.*, Insider, accessed June 4, 2021, https://www.insider.com/all-the-us-capitol-pro-trump-riot-arrests-charges-names-2021-1.

[8] *Capitol Breach Cases,* U.S. Dep't of Justice, accessed May 21, 2021, https://www.justice.gov/usao-dc/capitol-breach-cases?combine=&order=title&sort=asc.

**Spring and Summer 2020 Unrest:**

1. Did federal law enforcement utilize geolocation data from defendants' cell phones to track protestors associated with the unrest in the spring and summer of 2020? If so, how many times and for which locations/riots?

2. How many individuals who may have committed crimes associated with protests in the spring and summer of 2020 were arrested by law enforcement using pre-dawn raids and SWAT teams?

3. How many individuals were incarcerated for allegedly committing crimes associated with protests in the spring and summer of 2020?

4. How many of these individuals are or were placed in solitary confinement? What was the average amount of consecutive days such individuals were in solitary confinement?

5. How many of these individuals have been released on bail?

6. How many of these individuals were released on their own recognizance or without being required to post bond?

7. How many of these individuals were offered deferred resolution agreements?[9]

8. How many DOJ prosecutors were assigned to work on cases involving defendants who allegedly committed crimes associated with protests in the spring and summer of 2020?

9. How many FBI personnel were assigned to work on cases involving defendants who allegedly committed crimes associated with protests in the spring and summer of 2020?

**January 6, 2021 U.S. Capitol Breach:**

10. Did federal law enforcement utilize geolocation data from defendants' cell phones to track protestors associated with the January 6, 2021 protests and Capitol breach? If so, how many times and how many additional arrests resulted from law enforcement utilizing geolocation information?

11. How many individuals who may have committed crimes associated with the Capitol breach were arrested by law enforcement using pre-dawn raids and SWAT teams?

12. How many individuals are incarcerated for allegedly committing crimes associated with the Capitol breach?

---

[9] Josh Gerstein, *Leniency for defendants in Portland clashes could affect Capitol riot cases*, Politico, Apr. 14, 2021, https://www.politico.com/news/2021/04/14/portland-capitol-riot-cases-481346.

13. How many of these individuals are or were placed in solitary confinement?  What was the average amount of consecutive days such individuals were in solitary confinement?

14. How many of these individuals have been released on bail?

15. How many of these individuals have been released on their own recognizance or without being required to post bond?

16. How many of these individuals were offered deferred resolution agreements?

17. How many DOJ prosecutors have been assigned to work on cases involving defendants who allegedly committed crimes associated with the Capitol breach?

18. How many FBI personnel were assigned to work on cases involving defendants who allegedly committed crimes associated with the Capitol breach?

Sincerely,

Ron Johnson
United States Senator

Tommy Tuberville
United States Senator

Mike Lee
United States Senator

Rick Scott
United States Senator

Ted Cruz
United States Senator

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-40 (TNM)** |
| | : | |
| **DAVID LEE JUDD,** | : | |
| **Defendant.** | : | |

### UNITED STATES' SURREPLY TO DEFENDANT'S MOTION TO COMPEL DISCOVERY IN SUPPORT OF HIS CLAIM OF SELECTIVE PROSECUTION

The United States of America respectfully submits this surreply to respond to the Defendant's new arguments in his reply (ECF No. 157) and dispute certain misstatements. Notwithstanding the Defendant's efforts, his motion for selective-prosecution discovery lacks merit and should be denied.

**I.      Judd's Belated Comparison to a New Group of D.C. Superior Court Cases Is Procedurally Improper and Flawed.**

In support of his selective-prosecution allegation, Judd's reply proffers an entirely new set of cases stemming from criminal activity in Washington D.C. during Summer 2020 protests.[1]  This Court should reject Judd's new comparator group as arriving too late.  "Reply briefs *reply* to

---

[1] Judd initially cited one D.C. Superior Court case, *United States v. Alana Rogers*, 2020 CF3 006970.  As already addressed, the quantum of evidence there was much lower.  Unlike Judd's conduct, which was captured on multiple videos, the evidence in *Rogers* turned on a brief observation by one witness in the middle of a hectic encounter.  While Judd agrees that federal charges were not appropriate in *Rogers*, he attempts to show selective prosecution by the government's purported failure to initially classify the defendant's firework as a dangerous weapon.  However, as clearly stated on the complaint in *Rogers*, the defendant was charged with an Assault on a Police Officer While Armed *with a Dangerous Weapon*.  Similarly, in his reply, Judd alleges the government's failure to charge the defendant facing a felony civil disorder charge in *United States v. Fox*, 3:20-cr-501 (D. Or.), with an enhancement for using a dangerous weapon.  However, there is no dangerous-weapon enhancement in that code provision, foreclosing Judd's proffered inference of disparate treatment.

arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 575 (D.C. Cir. 2010) (brackets and citation omitted).

In any event, Judd's new comparator group fails to support an inference of selective prosecution. The cited cases involve civil-disorder offenses and assaults committed in Summer 2020 in proximity to various Washington D.C. protest activities. Judd's criminal conduct on January 6, 2021, differed in kind and in degree. Judd and other defendants spent hours trying to force their way into the U.S. Capitol Building, knowing that elected representatives had convened inside and were attempting to certify the Presidential Election. That conduct—which directly targeted the personnel and gears of the legislative branch and posed "a grave danger to our democracy," *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021)—reflects a "distinguishable legitimate prosecutorial factor[] that might justify making different prosecutorial decisions" in Judd's case. *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000) (citation omitted). As a consequence, this group of D.C. cases—like the Portland citations that Judd previously assembled—is not similarly situated for purposes of the selective-prosecution inquiry.[2]

---

[2] Even were one to ignore the *sui generis* and grave nature of the crimes committed on January 6, Judd still fails to demonstrate that members of the D.C. cases he cited are similar in nature to his. Judd provides generalized descriptions of the D.C. cases he cites, such as "participants charged with assaulting a police officer during the DC protests." ECF 157 at 10. Based solely on that generalized description and without any evidence that felony charges (federal or otherwise) were even potentially applicable to those cases, Judd asks the court to assume that the number of misdemeanor charges is nonetheless evidence of disparate treatment. However, even in just reviewing at random one of the cases in the chart of arrest data cited by Judd, it is clear that such an assumption is not warranted. *See, e.g.*, *United States v. Siera Clark*¸ 2020 CMD 008459 (D.C. Superior Court filed Nov. 2, 2020) (affidavit in support of arrest describes defendant throwing eggs at officers and building). Judd cannot claim that evidence of a defendant being charged with a misdemeanor is itself evidence of disparate treatment even where no felony charges were ever applicable.

Judd's new comparator group also suffers a second flaw: it is a cherry-picked sample of prosecutions from Summer 2020 and omits examples where federal charges were both applicable and pursued by the government.  For instance, in *United States v. Jerritt Pace*, No. 20-cr-104-RC, (D.D.C. filed July 7, 2020), the government obtained a felony conviction where the defendant assembled, ignited, and threw a Molotov cocktail at the sidewalk in front of a police station – an event captured on video filmed by the defendant.  *See* Government's Sentencing Memorandum, Dkt. at 45.  Although "no one was hurt in the process and little damage was done," the government nonetheless brought felony charges and ultimately reached a disposition to a felony. *Id.*  Given that Judd's conduct here exceeds *Pace*, the government has similarly sought felony charges against him.[3]

## II.     Judd's New Authorities Fall Short.

Judd's reply cites three new decisions to advance his request for selective-prosecution discovery.  None supports his case.

In *United States v. Tuitt,* 68 F. Supp. 2d 4 (D. Mass. 1999), the magistrate judge granted discovery based on defense submissions that the government had prosecuted only persons of color, and no white individuals, for crack-cocaine offenses in a particular federal court division.   *Id*. at 7-9.  *Tuitt* reveals the shortcomings in Judd's presentation here.  The defense there identified one comparator group (individuals who commit drug offenses) and identified different charging outcomes based on race.  This case presents two disparate groups: individuals who committed civil-disorder offenses and assaults in Oregon and D.C., and individuals who engaged in such

---

[3] This is one example of federal felony charges for crimes adjacent to the Summer 2020 protests. *See, e.g.*, *United States v. Josue Rodas*, 20-CR-148 (D.D.C. filed Aug. 4, 2020) (Dkt. 91) (defendant broke bank window and then rummaged through interior); *United States v. Kenneth Deberry,* 20-CR-260 (D.D.C. filed Nov. 24, 2020) (Dkt. 29) (defendant captured on video punching a Million MAGA March attendee from whom a firearm was recovered upon his arrest.).

crimes on January 6 as part of a targeted effort to overrun the U.S. Capitol Building and disrupt Congress's certification of the Presidential Election. Moreover, unlike *Tuitt*, the record here contains no evidence (other than defense conjecture) that Judd's political beliefs differed from the defendants in the cited D.C. and Oregon cases. Judd cannot accordingly sustain an inference of disparate treatment, much less one based on an improper factor.

*United States v. Wen Ho Lee,* 99-cr-01417 (D.N.M. filed Dec. 10, 1999), is even further afield. The district court in *Lee* directed the government to submit specific documents for *in camera* review as the court evaluated the defendant's request for selective-prosecution discovery. But the court's order (Dkt. 154) expressly declined to grant discovery at that juncture and the court assured the government that the defense would not receive access to the *in camera* submissions. A review of the docket in *Lee* also reveals that the court never granted the defense motion for discovery, undercutting Judd's reliance on this case.

*United States v. Paxton*, 2014 U.S. Dist. LEXIS 56857 (N.D. Ill. Apr. 17, 2014), involved a selective *enforcement* claim against the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), not a selective *prosecution* claim against the government. As explained in *Paxton*, under Seventh Circuit precedent, selective enforcement claims involve a modified burden for the defense that can be met with "statistics alone." *Id.* at 14. Furthermore, in *Paxton*, the defendant presented a detailed analysis identifying the race of the suspects (all persons of color) targeted by ATF using a law enforcement technique (a fake stash-house sting operation) over the preceding eight years. *Id*. at 4. In this case, by contrast, Judd has not raised a selective enforcement claim. He instead raised a selective prosecution claim; provided an incomplete, cherry-picked sample of dissimilar D.C. and Oregon cases; and speculated (without evidence of the political viewpoints of any defendant in his sample) that the prosecutors in his case targeted him based on political animus.

That presentation falls well short of Judd's burden.  *See United States v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019) ("[A] defendant must provide something more than mere speculation or 'personal conclusions based on anecdotal evidence.'").

## Conclusion

Because Judd has failed to carry his burden, he is not entitled to discovery on his selective-prosecution claim and his motion should be denied.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
DC Bar No. 415793

By: _____
MELISSA JACKSON
Assistant United States Attorney
D.C Bar Number 996787
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 815-8585
Email: Melissa.Jackson@USDOJ.GOV

JOCELYN BOND
Assistant United States Attorney
Email: Jocelyn.Bond@usdoj.gov
KIMBERLEY C. NIELSEN
Assistant United States Attorney
Email: Kimberley.Nielsen@usdoj.gov