THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>v.<br><br>MARK SAHADY,<br><br>                      Defendant. | Case No. 1:21-cr-00134 (CJN) |

### MR. SAHADY'S MEMORANDUM OF LAW IN SUPPORT OF HIS
### MOTION TO TRANSFER VENUE

The United States Constitutional right to an impartial jury preserved by the Fifth and Sixth Amendments is protected at all costs. Because of this great safeguard, this Court must transfer Mr. Sahady's trial to a different venue, as the reasons below demonstrate that Mr. Sahady suffers from such a unique prejudice in Washington, D.C., that he cannot obtain a fair and impartial here.

### FACTUAL BACKGROUND

Mr. Sahady is charged in a three-count Criminal Complaint based on his alleged conduct near and/or inside the United States Capitol on January 6, 2021. ECF No. 1. As has been extensively covered by the media, on January 6, 2021, Mr. Sahady along with other January 6 defendants were protesting the November 2020 presidential election, where Democrat Joe Biden was declared the winner over incumbent Republican Donald Trump. ECF No. 1-1. Many individuals, including Mr. Sahady, are alleged to have entered the United States Capitol building during a protest of the presidential election results. *See id.*

The government alleges in the Criminal Complaint that Mr. Sahady was an individual "inside the U.S. Capitol building without authority to be there," and that Mr. Sahady generally was not acting

1

orderly while he was inside the Capitol. ECF No. 1-1 at 2-6. The Criminal Complaint states nothing about Mr. Sahady engaging in any violent behavior. *See id.*

As a result of the media coverage of the January 6 events in Washington, D.C., and the resulting tainting of the jury pool in D.C., Mr. Sahady now requests a transfer of this action to the District of Massachusetts—where Mr. Sahady resides and where the government claims he traveled from to commit his alleged crimes on January 6. ECF No. 1-1.

## STATEMENT OF LAW

The United States Constitution establishes that "[t]he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed," U.S. Const. art. III, § 2, and the Federal Rules of Criminal Procedure narrow the default venue to "a district where the offense was committed." Fed. R. Crim. P. 18.

However, there is a crucial exception to this general rule to ensure that the constitutional right to an impartial jury enshrined by the Fifth and Sixth Amendments is protected. The exception to the general rule is that a court *must* transfer the defendant's trial to a different venue if a defendant requests a transfer and demonstrates that "so great a prejudice against the defendant exists in the [original] district that the defendant cannot obtain a fair and impartial trial there[.]" Fed. R. Crim. P. 21(a); *see Skilling v. United States*, 561 U.S. 358, 378 (2010) ("The Constitution's place-of-trial prescriptions … do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial").

In *Skilling*, the United States Supreme Court provided three factors for courts to consider in determining whether this local prejudice will prevent a fair trial: (1) "the size and characteristics of the community in which the crime occurred," (2) the presence of "blatantly prejudicial information"

in news stories available to jurors, and (3) the time elapsed between the alleged crime and trial. *Id.* at 382. These three factors weighs in favor of transferring venue.

## ANALYSIS

I. **MR. SAHADY'S CIRCUMSTANCES MEET THE SKILLING FACTORS**

    A. **The Size and Characteristics of the Community**

Washington, D.C.'s size and characteristics weigh in favor of transfer. With respect to size, while it is true that the Supreme Court has recognized a "reduced likelihood of prejudice where [the] venire was drawn from a pool of over 600,000 individuals," federal courts have found a venue transfer appropriate in districts that were larger than Washington, D.C. *See United States v. McVeigh*, 918 F. Supp. 1467, 1474 (W.D. Okla. 1996) (granting motion for change of venue in 1996); Population Stat, *Oklahoma City, United States Population* (last visited March 16, 2023)[1] (Oklahoma City's population was approximately 733,000 in 1996).

Further, this "reduced likelihood" of prejudice for populations over 600,000 becomes insignificant when considering the incredible uniqueness of D.C. (i.e., its characteristics) as it relates to the events of January 6. D.C. is largely political[2] and democratic,[3] and the very events of January 6, 2021, could of course only have happened in D.C. given its unique nature and characteristic as the

---

[1] https://populationstat.com/united-states/oklahoma-city.
[2] Jeff Clabaugh, *Exactly how many Washingtonians work for the federal government?*, WTOP NEWS (February 19, 2018), https://wtop.com/business-finance/2018/02/exactly-many-washingtonians-work-federal-government/ ("The federal government remains the largest single employer in the Washington metropolitan area").
[3] *Party affiliation among adults in the Washington, DC metro area*, PEW RESEARCH CENTER, https://www.pewresearch.org/religion/religious-landscape-study/metroarea/washington-dc-metro-area/party-affiliation/ (approximately 56% of adults in the Washington, DC metro area identify as Democrats compared to only 28% who identify as Republican); *Politics & Voting in Washington, District of Columbia*, BEST PLACES (last visited March 16, 2023), https://www.bestplaces.net/voting/city/district_of_columbia/washington ("In District of Columbia County, DC 92.1% of the people voted Democrat in the last presidential election, 5.4% voted for the Republican Party, and the remaining 2.5% voted Independent.").

3

nation's capital. Unsurprisingly, there is substantial evidence that this unique characteristic directly prejudices Mr. Sahady. *See* Survey results located at 1:21-cr-00129-ABJ, ECF No. 54-1[4] (Venue survey data of D.C. voters obtained during the month of January 2022 reveals, among other things, that 73% of respondents believed that anyone who merely entered the Capitol building on January 6 is guilty of insurrection, 95% of the respondents stated that they were familiar with the January 6, 2021 events at the capitol, 67% of those same respondents stated that they were very familiar with the events at the Capitol).

While the D.C. community being largely democratic alone may be insufficient to meet this first *Skilling* factor, this fact becomes crucial when considering how political leanings effect the jury pool's view of the events on January 6. *See* Domenico Montanaro, *A Majority Thinks Trump Is to Blame for Jan. 6 But Won't Face Charges, Poll Finds*, NPR (July 21, 2022)[5] (stating that while 12% of Republicans and 52% of Independents believe that the event on January 6 was "an insurrection and a threat to democracy," 86% of Democrats believe this claim).

Further, advanced data and analytics undisputedly demonstrates that D.C. residents overwhelmingly search the terms "Proud Boys," "Seditious Conspiracy," "Sedition," "Select Committee," "Jan. 6th Committee," "Insurrection," "Capitol Riot," and "White Supremacist" more than any other state in the nation. *See United States v. Christopher Alberts*, 1:21-cr-00026-CRC (ECF No. 86) at 16–23. Of course, the reason why D.C. residents have been searching more than any other population is because they feel they are the victims of the events of January 6. *See* Cara Castronuova,

---

[4] This Court may take judicial notice of public filings in other cases in this District. *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014) ("A court may take judicial notice of facts contained in public records of other proceedings[.]") (citing *Covad Communs. Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222, 366 U.S. App. D.C. 24 (2005)).

[5] https://www.npr.org/2022/07/21/1112546450/a-majority-thinks-trump-is-to-blame-for-jan-6-but-wont-face-charges-poll-finds.

*Gateway Pundit: Polls Show Extreme Jury Bias In January 6 Trials*, YOUR NEWS (July 19, 2022)[6] (82% of the DC Community claim high levels of personal impact and perceived victimization caused by the events of January 6, including a feeling of increased concern for safety, experiencing restrictions on the freedom of movement, identifying as a member of a group they believe was targeted, and by being personally affected by the events of January 6). Of course, the "characteristic" of D.C. resulting in its citizens feeling like victims of charges against Mr. Sahady is dispositive on the issue of transfer. *See*, e.g., *United States v. Harris*, 380 U.S. App. D.C. 84, 90, 515 F.3d 1307, 1313 (2008) (the key focus on juror impartiality is bias and prejudice). Importantly, the bias of the D.C. jurors is inescapable and, indeed, logical, as their freedom was *directly* limited as a result of the allegations against Mr. Sahady on January 6. *See* Barbara Sprunt, *D.C. Mayor Issues 6 P.M. Curfew As Trump Supporters Breach Capitol*, NPR, (January 6, 2021)[7] (stating that the entire D.C. jury pool was ordered, on January 6, that "no person, other than persons designated by the Mayor, shall walk, bike, run, loiter, stand, or motor by car or other mode of transport upon any street, alley, park, or other public place within the District."). These same D.C. jurors whose freedom was directly impacted by the allegations against Mr. Sahady are now being tasked with impartially determining the facts in his case. This denies Mr. Sahady his due process rights. *See*, e.g.,. *Harris*, 515 F.3d at 1313.

Consequently, for these reasons and because of this substantial evidence, Washington, D.C.'s size and characteristics, specifically its unique connection to the events at issue in this case which causes inescapable bias, weigh in favor of transfer.

---

[6] https://yournews.com/2022/07/19/2380134/gateway-pundit-polls-show-extreme-jury-bias-in-january-6/.

[7] https://www.npr.org/sections/congress-electoral-college-tally-live-updates/2021/01/06/954052803/d-c-mayor-issues-6-pm-curfew-as-trump-supporters-breach-capitol.

### B. The Presence of "Blatantly Prejudicial Information" in News Stories Available to Jurors

Next, the type of information included in the media coverage was the "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382. Indeed, the coverage of January 6 has been sensationalized and called the "Capitol Hill riots" by many outlets,[8] and even after almost one and a half years, January 6 coverage and news is so prevalent and difficult "to shut from sight" that there were outside "viewing parties" of the congressional hearings on the January 6 events in Washington, D.C. *See* John Koblin, *At Least 20 Million Watched Jan. 6 Hearing*, NEW YORK TIMES (June 10, 2022).[9] It is undeniable that the citizens of D.C. have been deeply impacted as a result of the January 6 events and the resulting news coverage. *See* Liz Vinson, JANUARY 6: STATE OF D.C. ONE YEAR LATER, SOUTHERN POVERTY LAW CENTER (January 6, 2022)[10] (Photographer Pete Kiehart documents the events in Washington, D.C., on the one-year anniversary of the January 6 events, including a candlelight vigil on the steps of the U.S. Capitol); Philip Elliott, *The Jan. 6 Hearing Laid Bare How D.C. Is Still Recovering From That Awful Day*, TIME MAGAZINE (June 10, 2022)[11] ("The siege lasted just a few hours, but Washington has been living with the consequences ever since.").

Further, unlike in other cases where this factor did not weigh in favor of transfer, Mr. Sahady can identify plenty of "pretrial publicity that mentions him." *See United States v. Brock*, No. 21-140 (JDB), 2022 U.S. Dist. LEXIS 156672, at *22 (D.D.C. Aug. 31, 2022). As provided for in Section C, *infra*, Mr. Sahady has been discussed in D.C. news outlets such as the Washington Post and WTOP

---

[8] *See*, e.g., Troy Closson, *Social Media Posts Lead to Arrest of N.Y. Man for Role in Capitol Riot*, NEW YORK TIMES (Updated February 14, 2023), https://www.nytimes.com/2021/01/17/nyregion/ny-man-arrested-Capitol-riots.html.
[9] https://www.nytimes.com/2022/06/10/business/media/jan-6-hearing-ratings.html.
[10] https://www.splcenter.org/news/2022/01/06/january-6-state-dc-one-year-later.
[11] https://time.com/6186499/jan-6-hearings-first-day-washington-consequences/.

News.[12] For these reasons, the type of information included in the media coverage was clearly the "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." Consequently, this second factor also weighs in favor of transfer.

### C. The Time Elapsed Between the Alleged Crime and Trial

This third and final factor also weighs in favor of transfer. While the actual events of January 6 will be over two years once Mr. Sahady's trial occurs, this passage of time has, crucially, not allowed the "decibel level of publicity about the crimes themselves to drop and community passions to diminish." *In re Tsarnaev*, 780 F.3d 14, 22 (1st Cir. 2015). The community passions have not been able to diminish because, despite the passage of time, the events of January 6 remain a topic of coverage on a daily basis. Specifically, and especially, as recently as December 22, 2022, the House Select Committee to Investigate the January 6th Attack on the United States Capitol released their final report after holding hearings over the previous three months.[13] Of course, unsurprisingly, the hearings were watched by a massive audience, "in the ballpark of big television events like a[n] '[NFL] Sunday Night Football' game." *See* John Koblin, *At Least 20 Million Watched Jan. 6 Hearing*, THE NEW YORK TIMES (Updated October 13, 2022).[14]

Indeed, other Courts have acknowledged that "these hearings make the passage of time somewhat less significant," *Brock*, 2022 U.S. Dist. LEXIS 156672 at 24, and that "media coverage

---

[12] *See*, e.g., Abigail Hauslohner, *'This is a political prosecution': After its members were charged in the Capitol riot, one group says it is more popular than ever*, THE WASHINGTON POST (April 8, 2021), https://www.washingtonpost.com/national/capitol-riot-group/2021/04/07/5a77bf7e-8cc6-11eb-a730-1b4ed9656258story.html; *Ex-town official pleads guilty to Capitol riot charge*, WTOP NEWS (Sep. 14, 2022), https://wtop.com/government/2022/09/ex-town-official-pleads-guilty-to-capitol-riot-charge/.

[13] *See Select January 6th Committee Final Report and Supporting Materials Collection*, https://www.govinfo.gov/collection/january-6th-committee-final-report?path=/GPO/January%206th%20Committee%20Final%20Report%20and%20Supporting%20Materials%20Collection.

[14] https://www.nytimes.com/2022/06/10/business/media/jan-6-hearing-ratings.html.

has been heavy due to the ongoing public hearings of the Select Committee." *See Rhodes*, 2022 U.S. Dist. LEXIS 114264, 2022 WL 2315554, at *22.

Further, while one Court concluded that "the Select Committee hearings were broadcast nationally, and [the defendant] has offered no evidence demonstrating that Washington, D.C. residents were a disproportionate percentage of the viewership," there is indeed evidence that Washington, D.C. residents are disproportionately impacted by these hearings. *See* 1:21-cr-00129-ABJ, ECF No. 54-1 at 3 ("Greater than 9 in 10 respondents (95%) [in D.C.] said they have overall familiarity (very and somewhat combined) with the January 6, 2021 events at the Capitol; and more than two-thirds (67%) of whom stated they are very familiar with these events."); *See* John Koblin, *At Least 20 Million Watched Jan. 6 Hearing*, NEW YORK TIMES (June 10, 2022)[15] (holding outside "viewing parties" of the hearings in Washington, D.C); John Henry, *Locals view January 6 hearings at several DC watch parties*, WUSA9 NEWS ("People viewed the first night of the January 6 Committee hearings at several watch parties in D.C.") (Updated June 10, 2022).[16]

Overall, for the reasons above, the three *Skilling* factors weigh in favor of transfer. Indeed, the United States government has implicitly acknowledged that the events of January 6, 2021, are so unique that they clearly warrant a transfer when it compared the events of January 6 to the Oklahoma City bombing. *See* Jerry Dunleavy, *Merrick Garland ties Oklahoma City bombing to Capitol riot*, THE WASHINGTON EXAMINER (June 15, 2021)[17] (United States Attorney General Merrick Garland comparing the Oklahoma City Bombing in 1995 to the January 6 events, stating that the government's "current effort comes on the heels of another large and heinous attack [like the Oklahoma City

---

[15] https://www.nytimes.com/2022/06/10/business/media/jan-6-hearing-ratings.html.
[16] https://www.wusa9.com/article/news/national/capitol-riots/january-6-hearings-dc-watch-parties/65-22c97ebf-e689-4e2f-90a2-de0ab4d69854.
[17] https://www.washingtonexaminer.com/news/garland-oklahoma-city-bombing-capitol-riot.

Bombing], this time the Jan. 6 assault on our nation's capital."). Of course, a federal court agreed that the events in Oklahoma City after the bombing in 1995 were "so profound and pervasive that no detailed discussion of the evidence [to transfer] is [even] necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1474 (W.D. Okla. 1996) (granting motion for change of venue). Such logic equally applies to Mr. Sahady's case.

## II. MR. SAHADY'S CASE IS REMARKABLY SIMILAR TO *RIDEAU*

Not only do the *Skilling* factors weigh in favor of transfer, but the Supreme Court's decision to transfer venue in *Rideau v. Louisiana*, 373 U.S. 723 (1963), is directly applicable to this case. In *Rideau* the Supreme Court held that the defendant was entitled to a change of venue when the defendant's taped confession was broadcast to the community—even though the broadcast did not reach as much as two thirds of the venire. *Id.*; *see Brock*, 2022 U.S. Dist. LEXIS 156672, at 15–16 ("the defendant's taped confession was broadcast to [approximately] a third of the venire"). The Court reasoned that a trial in the community that witnessed the evidence on broadcast would be tantamount to a "kangaroo court," as the taped and broadcast evidence was "in a very real sense [the defendant's] trial—at which he pleaded guilty." *Id.* at 726.

The defendant in *Rideau* is remarkably similar to Mr. Sahady. First, like *Rideau*, but unlike many January 6 defendants who are unrecognizable to the general public, Mr. Sahady has been broadcast in D.C. as a major figure in the events that are the subject of his charges. Indeed, Mr.

Sahady has been covered in news outlets such as the Daily Beast,[18] the Washington Post,[19] and the New York Times.[20]

Second, Mr. Sahady's actions and the events of January 6 were not only broadcast to approximately one third of the community like the defendant in *Rideau*, but a substantially larger percentage. Indeed, there is evidence that the events of January 6 were broadcast to nearly 100% of the Washington, D.C. jury pool. *See* 1:21-cr-00129-ABJ, ECF No. 54-1 at 3 ("Greater than 9 in 10 respondents (95%) said they have overall familiarity (very and somewhat combined) with the January 6, 2021 events at the Capitol; and more than two-thirds (67%) of whom stated they are very familiar with these events.").

Third, and finally, a trial in the District of Columbia would amount to a "kangaroo court" just as the trial in *Rideau* for the same reasons: the broadcasted actions of Mr. Sahady would "in a very real sense [be his] trial." *Id.* at 726. Specifically, there are multiple photographs associated with Mr. Sahady's case that the media has consistently portrayed as proof of wrongdoing. These photographs purport to be of Mr. Sahady around or inside of the Capitol building on January 6, 2021. *See*, e.g., Ariel Zilber, *Organizers of Boston 'Straight Pride' parade and a baseball bat-wielding man who 'confessed to assaulting cops' are arrested for taking part in MAGA riot at US Capitol*, DAILY BEAST (Jan. 20, 2021), https://www.dailymail.co.uk/news/article-9166307/Straight-Pride-parade-

---

[18] Justin Rohrlich, et. al, *Capitol Rioter and 'Straight Pride' Troll Stiffs Lawyer, Hits New Rally While Out on Bail*, THE DAILY BEAST (March 27, 2021), https://www.thedailybeast.com/capitol-rioter-mark-sahady-stiffs-lawyer-hits-new-rally-while-out-on-bail.

[19] Abigail Hauslohner, *'This is a political prosecution': After its members were charged in the Capitol riot, one group says it is more popular than ever*, THE WASHINGTON POST (April 8, 2021), https://www.washingtonpost.com/national/capitol-riot-group/2021/04/07/5a77bf7e-8cc6-11eb-a730-1b4ed9656258story.html.

[20] Jennifer Valentino-DeVries, et. al, *Arrested in Capitol Riot: Organized Militants and a Horde of Radicals*, THE NEW YORK TIMES (Feb. 4, 2021), https://www.nytimes.com/interactive/2021/02/04/us/capitol-arrests.html.

organizers-bat-wielding-man-arrested-taking-Capitol-riot.html. Thus, just like the defendant in *Rideau*, a trial in the D.C. community that witnessed the evidence on broadcast would be tantamount to a "kangaroo court," as the broadcasted evidence would be "in a very real sense [Mr. Sahady's] trial."

## CONCLUSION

For the reasons explained above, Mr. Sahady requests a transfer of this action to the District of Massachusetts—where Mr. Sahady resides and where the government claims he traveled from to commit his alleged crimes on January 6.

Respectfully submitted, the 17th day of March, 2023.

*/s/ Blake A. Weiner*
Blake A. Weiner, VA Bar No. 94087
BLAKE WEINER LAW, PLLC
1806 Summit Avenue, Suite 300
Richmond, VA 23230
Telephone: (804) 482-1465
Email: bweiner@blakeweinerlaw.com
*Counsel for Mr. Sahady*