**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-134 (CJN)** |
| | : | |
| **MARK SAHADY** | : | |
| | : | |
| Defendant. | : | |

## UNITED STATES' OMNIBUS OPPOSITION TO
## THE DEFENDANT'S MOTIONS TO DISMISS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's two motions to dismiss charges in the Indictment. The defendant's first motion, ECF No. 67, seeks dismissal of what is now Count Five of the Indictment, and his second motion, ECF No. 72, additionally seeks dismissal of Count One. Count One charges the defendant with obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2. Count Five charges the defendant with parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Sahady's arguments for dismissal of both charges lack merit, and his motions should be denied.

## FACTUAL BACKGROUND

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol at approximately 1:00 p.m. to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. Temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd that had gathered outside away from

the Capitol building and the proceedings underway inside.

Shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts. Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

In late December and early January, the defendant, Mark Sahady, as part of his leadership position with the Boston group "Super Happy Fun America" ("SHFA"), organized numerous buses to transport people from Boston to Washington, D.C., on January 6, 2021. Sahady also made numerous statements during this time regarding his understanding of the certification proceeding on January 6 and his expectations of what would occur that day. For example, on January 4, 2021, an acquaintance expressed concern to Sahady about his attending the event, and Sahady responded, "I appreciate your concern 100% because [I] know that you are looking out for me. But it's too late now. SHFA has chart[er]ed 5 buses of 50 people each and they are already filled up." Sahady then discussed his expectations of what would happen in Washington, D.C., on January 6, including that, "[i]f we surround congress[,] and the crowd decides to move into the building then everyone has to make their own decision. That's the only potential illegal act I think anyone would make." Similarly, on January 5, 2021, Sahady said to another acquaintance, "if we get arrested it should be for something important that has a big impact. Such as taking over Congress."

Sahady also posted numerous statements to his Twitter account about the certification,

including a January 4, 2021, tweet stating:

> @Mike_Pence @kimKBaltimore @Perdusenate @Kloeffler We need you to stand with President Trump against election fraud. If Republicans don't back the President then many of us will never back the party again."

The same day, he also tweeted:

> It's time to fight. You have a right to use force against anyone, including the government, that tries to infringe on your rights.

On January 6, Sahady, along with his friend Suzanne Ianni,[1] made his way up the scaffolding on the northwest front of the U.S. Capitol Building amidst hundreds of rioters fighting with police. Sahady and Ianni then walked up the northwest stairs to the Northwest Courtyard. At approximately 2:41 p.m., Sahady and Ianni were standing near the Senate Wing Door into the Capitol Building when a rioter with a crowbar smashed open the nearby Parliamentarian Door. Sahady, upon seeing the other rioter hacking violently at the glass in the Parliamentarian Door, pointed at the rioter, pumped his fist, and yelled, "YEAH! FUCK YEAH! FUCK YEAH! PATRIOTS YEAH! YEAH! YEAH!"



---

[1] Ianni was charged for her participation in the attack on the Capitol in case number 21-cr-451 (CJN). Ianni pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 15 days of incarceration, 30 months of probation, and $500 in restitution.

Approximately three minutes later, Sahady and Ianni entered the Capitol Building through the shattered Parliamentarian Door, stepping on broken glass from the door while a loud alarm blared overhead. Sahady and Ianni then walked down the hallway leading away from the Parliamentarian Door, turned right, and, at approximately 2:58 p.m., confronted a line of U.S. Capitol Police officers. Sahady remained in front of the police line for approximately three minutes before the police backed off from the crowd. Sahady and Ianni then progressed further down the hall. Approximately two minutes later, Sahady and Ianni returned to the area of the initial confrontation with the police, turned right and exited the U.S. Capitol Building through the North Door.

After they left the Capitol Building, Sahady texted an acquaintance, "I finally left. We were tear gassed and backed the police down. They were afraid. We walked all over the building" and "I was one of the ones in front. Wonder if there will be legal consequences. They tear gassed us. People grabbed the cannisters and sprayed them back. Sue [Ianni] and I grabbed a shield and buttons [batons] from police and pulled people out who they were trying to arrest. We were all walking around but were confused" and "when they blocked the doors some people took sledgehammer to windows."

## PROCEDURAL HISTORY

On February 19, 2021, the government filed an Information charging Sahady with one count of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); one count of disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. § 1752(a)(2); and one count of disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D). *See* ECF No. 9. On March 22, 2022, the government filed a Superseding Information that included the same

charges as the original Information but removed references to the Vice President-elect in the charge descriptions. *See* ECF No. 37. In July 2022, the government extended a plea offer to 40 U.S.C. § 5104(e)(2)(D) to Sahady through his previous attorney. The same offer was again extended to Sahady in December 2022.

Current counsel for the defendant joined the case in January 2023. Current counsel for the government entered their appearances on February 1, 2023, and February 6, 2023. *See* ECF Nos. 51, 52. On February 17, 2023, the government once again extended to Sahady the exact same plea offer to Count Three. That renewed offer expired February 24, 2023. On March 22, 2023, the government filed the Second Superseding Information, which added one additional count: parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

As the government began marshalling its evidence and preparing for trial in earnest, it determined that it could prove beyond a reasonable doubt that Sahady had obstructed an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). The government sought to supersede with the new charge, as it has in many cases in a similar posture. See, e.g., Superseding Indictment, *United States v. Speed*, 22-cr-244 (TNM), ECF No. 38 (superseding indictment adding felony charge brought approximately seven weeks before trial); Superseding Indictment, *United States v. Barnett*, 21-cr-38 (CRC), ECF No. 96 (superseding indictment adding felony charge brought less than three weeks before trial); Third Superseding Indictment, *United States v. Miller*, 21-cr-119 (CJN), ECF No. 111 (same, just over one month before trial); Second Superseding Indictment, *United States v. Irwin*, 21-cr-589 (RDM), ECF No. 48 (same, 15 days before trial).

On April 5, 2023, a grand jury returned a five-count indictment charging Sahady with one count of obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C.

§ 1512(c)(2) and 2 (Count One); one count of entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two); one count of disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three); one count of disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four); and one count of parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five).

On April 7, 2023, Sahady filed his motion to dismiss what is now Count Five of the Indictment. That same day, the D.C. Circuit issued its opinion in *United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023). In *Fischer*, the D.C. Circuit reversed orders dismissing the § 1512(c)(2) charges in several cases. On or around April 10, 2023, Sahady's counsel approached the government regarding a re-extension of a plea offer to one or more of the misdemeanor counts in the Indictment. Government counsel declined to extend a plea offer to any of the misdemeanors. On April 11, 2023, the Court held a status conference, during which it granted a defense request for a continuance and set a briefing schedule for Sahady to file a further motion to dismiss and for the government to file its omnibus response. Pursuant to the Court's schedule, on April 28, 2023, Sahady filed his motion to dismiss Count One of the Indictment. ECF No. 72.

## LEGAL STANDARDS

### I.   Motions to Dismiss for Failure to State a Claim

An indictment's "main purpose is 'to inform the defendant of the nature of the accusation against him.'" *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001) (quoting *Russell v. United States*, 369 U.S. 749, 767 (1962)). Thus, "an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions

for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). Given these limited requirements, it is "generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Id.* (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)).

## II.    The Facial Constitutional Challenge

In the First Amendment context, "[f]acial challenges are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 450 (2008). "To succeed in a typical facial attack, [a defendant] would have to establish that no set of circumstances exists under which [a statute] would be valid [ . . . ] or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (cleaned up). The Supreme Court recognizes a second type of facial challenge when dealing with First Amendment issues, "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 473 (cleaned up). To rule a statute as facially unconstitutional is "strong medicine" that should only be employed "with hesitation, and then only as a last resort." *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) (cleaned up). In a so-called "as-applied" challenge, the defendant would necessarily show that even if there are no constitutional issues with the statute as-written, it could still "be applied in such a manner as to stifle free expression." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002).

## III.    Vindictive Prosecution

"'Prosecutorial vindictiveness' is a term of art with a precise and limited meaning." *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987) (citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982)). "[T]he doctrine [of prosecutorial vindictiveness] precludes action by a

prosecutor that is designed to penalize a defendant for invoking any legally protected right available to a defendant during a criminal prosecution." *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (citation omitted).   It is traditionally seen in cases in which the prosecution adds additional charges after the defendant successfully appeals. *Id.*

Prosecutors have "broad discretion to enforce the law, and their decisions are presumed to be proper absent clear evidence to the contrary."   *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).   To succeed on a claim of vindictive prosecution, a defendant must show "that the increased charge was 'brought solely to "penalize" [him] and could not be justified as a proper exercise of prosecutorial discretion.'" *Id.* (quoting *Goodwin*, 457 U.S. at 380 n.12) (emphasis in *Slatten*).

"A defendant may prove prosecutorial vindictiveness by submitting either (i) evidence of the prosecutor's actual vindictiveness or (ii) evidence sufficient to establish a realistic likelihood of vindictiveness, thereby raising a presumption the Government must rebut with objective evidence justifying its action." *Id.* Where a presumption of vindictiveness applies, the government can defeat it by producing "objective evidence" that its motivation in charging the defendant was lawful. *Safavian*, 649 F.3d at 694. That burden is "admittedly minimal—any objective evidence justifying the prosecutor's actions will suffice." *Id.* A proffer showing that after the initial charging decision, the government uncovered new evidence documenting the defendant's conduct—e.g., additional criminal offenses or aggravating features of the offense previously charged—suffices. *See, e.g.*, *United States v. Meadows*, 867 F.3d 1305, 1315 (D.C. Cir. 2017) (observing that "the government's evidence regarding the severity of Meadows' fraudulent conduct—which continued for approximately a year, involved two separate false filing schemes, and resulted in approximately 49 false claims—was sufficient to satisfy this court's admittedly minimal requirement of any

objective evidence") (internal citations omitted).

In the pretrial context, prosecutorial vindictiveness claims based on the addition of charges rarely succeed. "A defendant must show that the prosecutor's action was 'more likely than not' attributable to vindictiveness." *Safavian*, 649 F.3d at 692 (quoting *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002)) (quoting *Alabama v. Smith*, 490 U.S. 794, 801 (1989))). This is a difficult showing to make in a pretrial posture, where "'the prosecutor's assessment of the proper extent of prosecution may not have crystallized,' so an increase in charges may be the result of additional information or further consideration of known information, rather than a vindictive motive." *Slatten*, 865 F.3d at 799 (quoting *Goodwin*, 457 U.S. at 381).

## ARGUMENT

The defendant's motions to dismiss should be denied because Counts One and Five were properly brought and sufficiently allege violations of 18 U.S.C. § 1512(c)(2) and 40 U.S.C. § 5104(e)(2)(G).[2]  As set forth below, Count One is not unconstitutional as applied, and properly alleges obstruction of an "official proceeding." Similarly, as numerous courts in this District have found, Count Five does not violate the First Amendment. Finally, the government's addition of Count Five, and the grand jury's return of an Indictment that added Count One, do not constitute vindictive prosecution.

---

[2] Among his other arguments, the defendant contends that the Indictment must be dismissed because the version on the docket "does not contain the signature of the foreperson." ECF No. 72 at 13. This argument can be swiftly disposed of because the public criminal dockets do not contain the copy of an indictment with the foreperson's signature—the signed copy is not made public. *See* LCrR 24.1(b); *cf. United States v. Jones*, No. 2:18-CR-237, 2019 WL 1746370, at *1 (S.D. Ohio Apr. 18, 2019) ("[T]he E-Government Act of 2002 requires that the actual signature page of the indictment be kept under seal in the clerk's office to protect the privacy of the foreperson."); *Howard v. United States*, 435 F. Supp. 3d 198, 205 (D.D.C. 2020) (describing in a FOIA case the proper withholding of a foreperson's signature to protect their identity).

## I.   Section 1512(c)(2) Applies to Sahady's Conduct.

As the government has long maintained and was held in *Fischer*, § 1512(c)(2) "encompasses all forms of obstructive conduct, including . . . efforts to stop Congress from certifying the results of the 2020 presidential election." *Id.* at 335.

The grand jury charged Sahady in Count One with violating § 1512(c)(2), which makes it a crime to "corruptly . . . obstruct[ ], influence[ ], or impede[ ] any official proceeding, or attempt[ ] to do so[.]" The term "official proceeding" means, among other things, "a proceeding before the Congress[.]" 18 U.S.C. § 1515(a)(1)(B). Tracking this statutory language, the Indictment alleged:

> On or about January 6, 2021, within the District of Columbia and elsewhere, **MARK SAHADY** attempted to, and did, corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College Vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18.

ECF No. 65 at 1. This charge properly (1) contained the elements of the offense, (2) fairly informed Sahady of the charge against which he was required to defend, and (3) provided sufficient information to protect him from future prosecutions for the same offense. Nothing more was required. *See, e.g., United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) ("[T]he validity of an indictment 'is not a question of whether it could have been more definite and certain.' . . . Rather, to be sufficient, an indictment need only inform Sahady of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense.") (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)).

Sahady argues that § 1512(c)(2) does not apply to his conduct for three reasons. First, Sahady, despite *Fischer*, contends that § 1512(c)(2) is limited by subsection (c)(1). ECF No. 72 at 5. Second, Sahady asserts that the "corrupt" intent requirement in § 1512(c)(2) is "unconstitutionally vague as applied to [him.]" *Id.* at 5–6. Third, Sahady claims that the Electoral

10

College Certification "does not constitute an 'official proceeding[.]'" *Id.* at 7. None of these arguments have merit.

### a.   Section 1512(c)(2) is not limited by subsection (c)(1)

As the D.C. Circuit correctly concluded in *Fischer*, 1512(c)(2)'s plain text unambiguously prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding. When interpreting a statute, courts look first to the statutory language, "giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (internal quotation marks omitted). If the statutory language is plain and unambiguous, this Court's "inquiry begins with the statutory text, and ends there as well." *National Ass'n of Mfrs. v. Department of Defense*, 138 S. Ct. 617, 631 (2018) (internal quotation marks omitted). Here, the meaning of "obstruct[], influence[], or impede[]" is controlled by the ordinary meaning of those words.

Sahady concedes, ECF No. 72 at 5 n.1, that the D.C. Circuit in *Fischer* held that "[u]nder the most natural reading of the statute, § 1512(c)(2) applies to all forms of corrupt obstruction of an official proceeding, other than the conduct that is already covered by § 1512(c)(1)." *Fischer*, 64 F.4th at 336. Sahady only makes this argument "in order to properly preserve the record for appeal on this specific issue. Accordingly, the Court should follow *Fischer* and reject a contrary interpretation of the statute.

### b.   Section 1512(c)(2)'s *mens rea* requirement is not unconstitutionally vague

Despite the clear terms of the statute, Sahady also contends that the "corruptly" requirement in § 1512(c)(2) "is unconstitutionally vague as applied to [ ] Sahady[3] pursuant to the

---

[3] While the defendant utilizes the "as applied" terminology, his argument concerns general constitutionality—concerning whether "'corruptly' is clearly 'so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.'" ECF No. 72 at 7 (quoting uncited authority).

Due Process Clause within the Fifth and Fourteenth Amendments." This argument also lacks merit—by Sahady's logic, all of the "around 50 other references to 'corruptly' in Title 18 of the U.S. Code," *Fischer*, 64 F.4th at 341, should be deemed unconstitutional—an untenable result.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and

"wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Sahady cannot overcome the "strong presumpti[on]" that the use of "corruptly" in § 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. Instead, the statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief[,] and intent— the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

The statute's use of "corruptly" is clear. As Judge Friedman observed in *Puma*, "[j]udges in this district have construed 'corruptly' to require 'a showing of "dishonesty" or an 'improper purpose'[;], 'consciousness of wrongdoing'[;] or conduct that is 'independently criminal,' 'inherently malign, and committed with the intent to obstruct an official proceeding.'" *Puma*, 2022

WL 823079, at *10 (quoting *Montgomery*, 578 F.Supp.3d at 81); *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 581 F.Supp.3d at *19; and *Sandlin*, 575 F.Supp.3d at 33 (alterations omitted). Under any of these common-sense constructions, the term "corruptly" "not only clearly identifies the conduct it punishes; it also 'acts to shield those who engage in lawful, innocent conduct – even when done with the intent to obstruct, impede, or influence the official proceeding.'" *Id.* (quoting *Sandlin*, 575 F.Supp.3d at 33). It presents no vagueness concern.

Nor does *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), support Sahady's attack on the word "corruptly," for at least two reasons. First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to § 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id.* at 629-30. Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). The defendants' invocation of *Poindexter* accordingly fails to establish that § 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id.* at 705 (citation

omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502. Third, and as noted above, courts have encountered little difficulty when addressing "corruptly" in § 1512(c)(2) following *Arthur Andersen*. *See Puma*, 2022 WL 823079, at *10 (quoting *Montgomery*, at 81); *Bozell*, 2022 WL 474144, at *6; *Caldwell*, 581 F.Supp.3d at 19; and *Sandlin*, 575 F.Supp.3d at 32-33 (alterations omitted). Such efforts demonstrate that the statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries.

Likewise, Sahady's misleading references to the D.C. Circuit's opinion in *Fischer* are unavailing. *See* ECF No. 72 at 6–7. The D.C. Circuit did not, as Sahady claims, "stress[] that it could not even adopt a particular definition for the word[.]" *Id.* at 6. To the contrary, Judge Pan's lead opinion noted that "the task of defining 'corruptly' is not before us" and thus "le[ft] the exact contours of 'corrupt' intent for another day." *Fischer*, 64 F.4th at 340 (opinion of Pan, J.). Recognizing that the court had not agreed upon a definition of "corruptly," Judge Walker explained that the indictments in that case nonetheless "should be upheld" because "[e]ach contains 'the essential facts constituting the offense charged.' Fed. R. Crim. P. 7(c)(1). That's because they allege that the Defendants "corruptly obstruct[ed], influence[d], and impede[d] an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote." *Id.* at 361 (Walker, J., concurring). So too here: the indictment sufficiently alleges that Sahady acted corruptly, and the court should leave the exact definition of that term for another day, when the issue is properly before the Court. *See United States v. Munchel*, No. 1:21-CR-118-RCL, 2023 WL 2992689, at * (D.D.C. Apr. 18, 2023) ("While the lead opinion and concurring opinion in *Fischer* were at odds regarding the precise bounds of the corrupt mens rea, both agreed that . . . an indictment alleging a corrupt mens rea in the same manner as the one in

this case survives a motion to dismiss.").

Sahady is likewise incorrect when he suggests that *Fischer* requires a defendant "to be accused of assault" or other "extreme conduct" in order to properly allege that he acted corruptly. Although the defendants in *Fischer* were alleged to have engaged in assaults on law enforcement officers, the D.C. Circuit held that § 1512(c)(2) applies more broadly to "*all* forms of obstructive conduct[.]" 64 F.4th at 335 (emphasis added). The court explained that "the meaning of the statute is unambiguous. . . . Under the most natural reading of the statute, § 1512(c)(2) applies *to all forms of corrupt obstruction of an official proceeding*, other than the conduct that is already covered by § 1512(c)(1)." *Id.* at 336 (emphasis added). The court concluded that "[this] broad interpretation of the statute — encompassing all forms of obstructive acts — is unambiguous and natural, as confirmed by the 'ordinary, contemporary, common meaning' of the provision's text and structure." *Id.* at 337 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). It is impossible to read the D.C. Circuit's repeated references to § 1512(c)(2)'s prohibition on "all forms" of obstructive acts as somehow limiting the statute's scope to obstructive acts involving force or violence. Indeed, as Judge Pan noted, under any potential formulation of the term, "'corrupt' intent exists at least when an obstructive action is independently unlawful[.]" *Fischer*, 64 F.4th at 340 (Pan, J.). But, to state the obvious, an act need not be violent to be independently unlawful.

In any event, a law is not unconstitutionally vague simply because "the Courts of Appeals have divided on how best to interpret the statute." 561 U.S. at 403. Indeed, a statute "is not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). The concern is not "vagueness in the sense that the [statute] 'requires a person to conform his conduct to an imprecise but comprehensible normative standard,' whose satisfaction may vary

16

depending upon whom you ask." *Id.* (quoting *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971)). "Rather, a statute is unconstitutionally vague if, applying the rules for interpreting legal texts, its meaning 'specifie[s]' 'no standard of conduct . . . at all.'" *Id.* (quoting *Coates*, 402 U.S. at 614).

As previously discussed, by its plain terms, § 1512(c)(2) requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. As every court to have addressed the issue has concluded, this is not an unconstitutionally vague requirement, and thus Sahady's vagueness challenge should be rejected.

### c.  The Electoral College Certification constitutes an "official proceeding"

Sahady argues that the Electoral College certification before Congress does not constitute an "official proceeding" under 18 U.S.C. § 1512(c)(2). ECF No. 72 at 7. According to Sahady, an "official proceeding" under 18 U.S.C. § 1512(c)(2) only applies to judicial or quasi-judicial proceedings, and the certification does not fall under that umbrella. *Id.* at 8. Sahady is incorrect.

While Sahady does not mention *Fischer* in advancing his "official proceeding argument, *id.* at 7–8, the D.C. Circuit nevertheless agreed with this Court's determination in *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022), *reconsideration denied*, 605 F. Supp. 3d 63, *and rev'd and remanded sub nom. in Fischer*, 64 F.4th 329, "that congressional certification of the Electoral College count is an 'official proceeding.'" *Fischer*, 64 F.4th at 342 (citing *Miller*, 589 F. Supp. 3d at 66–67. As *Fischer* explained, narrow interpretations like Sahady's "are inapt when interpreting the meaning of a proceeding *before the Congress*." *Id.* at 343. As the Circuit described:

> Notably, Congress follows statutory directives to complete the certification of the Electoral College vote, including: (1) convening a joint session at 1:00 PM on January 6 in the year following the presidential election; (2) appointing four tellers to read and list the votes; (3) announcement of the voting results by the President of the Senate; and (4) allowing written objections from members of Congress, subject to a procedure for submitting and resolving such objections. *See* 3 U.S.C.

§ 15. Those directives reflect Congress's own intent that the vote certification shall be a "proceeding before the Congress." 18 U.S.C. § 1515(a)(1)(B).

*Id.* at 343.   Accordingly, the Electoral College certification is an "official proceeding" under § 1512(c)(2).

## II.   The Timing of the Indictment's Filing Does Not Warrant Dismissal of Count One

Sahady contends that three different aspects of the Indictment's timing warrants Count One's dismissal. First, Sahady claims that the Indictment's timing violates his constitutional right to a speedy trial. ECF No. 72 at 11. Second, Sahady asserts that the Indictment's timing falls outside of the Speedy Trial Act's indictment deadline. Third, Sahady contends, regardless of his constitutional or statutory speedy trial protections, that the Court should nevertheless exercise discretion under Rule 48(b) to dismiss the Indictment. However, neither the Sixth Amendment nor the Speedy Trial Act have been affronted by the Indictment, and the circumstances do not support the extreme remedy that Sahady seeks under Rule 48(b).

### a.   The Indictment's filing does not violate Sahady's constitutional right to a speedy trial

In evaluating whether a defendant's Sixth Amendment speedy trial right has been violated, the Court must consider four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. See *Barker v. Wingo*, 407 U.S. 514, 530 (1972). While the analysis begins with these four factors, the Court should remain "mindful that none is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial,' and that [the court] must consider them together 'with other such circumstances as may be relevant.'" *United States v. Dent*, 149 F.3d 180, 184 (3d. Cir. 1998) citing *Barker*, 407 U.S. at 530. While the government does not dispute that the first and

fourth factors weigh in the defendant's favor,[4] the second nor the third factors decidedly do not.

There are several reasons explaining the delay in Sahady's trial that weigh against any finding of a deprivation of his right. First, Sahady's case was brought amongst the unprecedented surge of cases arising out of the January 6, 2021 attack on the U.S. Capitol. The government has charged over a thousand defendants like Sahady, and their cases have presented unique challenges that have taken commensurate time to address. Providing full, comprehensive discovery in January 6, 2021 cases has been a massive undertaking that necessarily has extended trial timelines—especially those cases that were initiated as early in the investigation as this one. Accommodating the Court's consequently crowded trial calendar also plays a part in any notable delay.

Second, much of this time—for which the defendant was happy to repeatedly agree was excludable under the Speedy Trial Act—was dedicated mutually to both parties attempting to reach a non-trial resolution. As detailed above, the defendant received multiple plea offers to consider and the government has extensively negotiated in good faith with each of his attorneys.

To the extent the defendant contends the procedural effects caused by the filing of the Second Superseding Information and Indictment have played significant roles in trial delays, this contention is unavailing. First, the delay caused by these events—which occurred in March and April—has been dwarfed by the other reasons, explained above, for this case's age. Counsel for the government has been preparing for trial since they entered their appearances in February and have routinely deferred to the defendant's position on continuances in response to the last three

---

[4] *But see, e.g.*, United States v. Griffin, No. 18-CR-190, 2020 WL 6321995, at *6 (E.D. Tenn. Oct. 28, 2020) ("Although the delay between Defendant's indictment and any trial exceeds one and a half years, a balancing of all four factors establishes that the delay in this case is not a Sixth Amendment violation."); see also United States v. Bass, 460 F.3d 830, 837-38 (6th Cir. 2006) ("Although the delay of six years was presumptively prejudicial, ... 'presumptive prejudice cannot alone carry a Sixth Amendment claim,' but rather must be considered in the context of the other factors, *particularly the reason for the delay*.") (emphasis added).

months' developments. Additionally, as the government previously indicated to the Court, the Indictment was partially filed in response to new evidence,[5] and that new evidence's effect on the government's view of pre-existing evidence. This new material, which arose through—and in tandem with—the typical document review, witness interviews, and strategic assessments that accompany trial preparation, was presented to the grand jury to complement the plethora of other evidence in this case.

Moreover, the global pandemic that remained a pertinent issue for at least half of this case's age has been found to be "a substantial and compelling reason" justifying a delay:

> As to the reason for the delay, there is a substantial and compelling reason—the public health crisis caused by the COVID-19 pandemic and the significant impact it has had on the Court's ability to maintain the continued operation of grand juries. Briggs argues the reason for the delay is the Government's failure to adequately handle the COVID-19 pandemic. The Court does not find this argument compelling. Moreover, this argument previously has been found meritless. See Order, May 20, 2020, ECF No. 31 (Wolson, J.) (noting Briggs's argument "attempting to describe the Government as responsible for the COVID-19 pandemic" fails because, inter alia, "it makes no showing ... that anything that the Government supposedly did or failed to do caused the suspension of grand jury proceedings").

*United States v. Briggs*, No. 20-MJ-410, 2020 WL 3892979, at *3 (E.D. Pa. July 9, 2020).

Finally, regarding the facts and circumstances of the defendant's assertion of his right to a speedy trial, his assertion "must be viewed in the light of [Sahady's] other conduct." *United States v. Loud Hawk*, 474 U.S. 302, 314–15 (1986). "Viewed as a whole, [Sahady's] track record does not evince a strong or consistent concern with his Sixth Amendment rights." *United States v. Baugh*, 605 F. App'x 488, 492 (6th Cir. 2015). As Sahady admits, he never asserted his speedy

---

[5] While the defendant feigns skepticism towards this representation, the defendant was provided with the material prior to the filing of his motion. His assumption that the Indictment "*appears* to be based on the same evidence[,] ECF No. 72 at 10, reveals a cursory or incomplete understanding of the facts that support Count One, rather than some other deficiency."

trial right, much less "consistently." *See* ECF No. 72 at 11. And although the Second Superseding Information and Indictment have precipitated the defendant's requests for modest amounts of additional time, defense counsel has requested reasonable delays, which have had relatively minor effects on the overall age of the case. Ultimately, "[a] defendant's ability to prove a denial of his Sixth Amendment speedy trial right hinges on his having asserted such a claim[,]" *United States v. Zaitar*, 858 F. Supp. 2d 103, 113 (D.D.C. 2012), and Sahady cannot point to any instance where he "evince[d] a desire to go to trial with dispatch[,]" *United States v. Batie*, 433 F.3d 1287, 1291 (10th Cir. 2006).

### b. Dismissal is not warranted under the Speedy Trial Act

The Speedy Trial Act mandates that "[a]ny information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b) (emphasis added). Sahady's contention that the Indictment violates this directive is mistaken because an indictment superseding an information that is filed after the thirty-day time period does not violate the Act—it is enough for the original Information in this case to have been filed within the 30-day period.[6] *See United States v. Walker*, 545 F.3d 1081, 1086 (D.C. Cir. 2008). The Act "is not a 'statute of limitations' and does not require that an individual under arrest be indicted within [30] days on 'every crime known to the government.'" *Id.* (quoting *United States v. Mosquera*, 95 F.3d 1012, 1013 (11th Cir. 1996).

---

[6] Also, while the Indictment in this case was filed more than 30 days after Sahady's arrest, Speedy Trial Act time has been excluded in this case such that 30 days have not actually elapsed under the Act. By virtue of the magistrate judge's actions, the Court's actions, and the defendant's motions, no more than 23 days have elapsed under the Act—even assuming the time between the defendant's arrest, the case's removal to D.C., and his initial appearance in D.C. would not automatically be excludable pursuant to 18 U.S.C. 3161(h)(1)(E).

### c. Dismissal is not otherwise warranted under Federal Rule of Criminal Procedure 48(b)

Sahady cannot demonstrate that the Court should otherwise exercise its discretion to dismiss the Indictment due to "unnecessary" delay. ECF No. 72 at 12–13. Rule 48(b) provides that "[t]he [C]ourt may dismiss an indictment . . . if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information . . . ; or (3) bringing a defendant to trial." But beyond his speedy trial arguments, Sahady neglects to present any other basis for this relief and fails to show how such a utilization of Rule 48(b) would "avoid unfairness to the defendant" or "to further the public interest in the efficient administration of justice." *United States v. Starr*, 434 F. Supp. 214, 216 (D.D.C. 1977). Indeed, [w]hen the Speedy Trial Act does not require dismissal, it would be imprudent to grant dismissal under Rule 48(b). *United States v. Parga-Rivas*, 689 F. Supp. 2d 25, 30 (D.D.C. 2009). In any event, "a Rule 48(b) dismissal should be imposed only in extreme circumstances." *Id.* (quoting United States v. Huntley, 976 F.2d 1287,1291(9th Cir. 1992)) (internal quotation marks omitted).

### III.   The Indictment Appropriately Charges Count Five

### a.  Background of § 5104

Congress passed the predecessor statute to § 5104, which prohibits certain "unlawful activities" in Capitol Buildings, or on Capitol Grounds, or both, in 1946. *See* Act of July 31, 1946, 60 Stat. 719, 720 (then codified at 40 U.S.C. § 193); *see Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 53 (D.D.C. 2000). One provision in the 1946 legislation made it a crime to "parade, stand, or move in processions or assemblages" or to display "any flag, banner or device designed or adapted to bring into public notice any party, organization, or movement" on Capitol Grounds. *See* 40 U.S.C. § 193g (1964).

In 1967, Congress enacted the provision at issue here, which makes it a crime "willfully

and knowingly [to] parade, demonstrate, or picket in any of the Capitol Buildings." 40 U.S.C. § 5104(e)(2)(G) (originally enacted as 40 U.S.C. § 193f(b)(7)). The 1967 legislation thus "ma[de] clear that the 1946 act relates not only to the Capitol Grounds but also to acts committed within the Capitol Building itself as well as other buildings located on the Capitol Grounds." 113 Con. Rec. H29,390 (daily ed. Oct. 19, 1967) (statement of Rep. Anderson). In 1972, a three-judge panel of this Court struck down the prohibition in § 193g (parading on Capitol Grounds), reasoning that although the government had a substantial interest in protecting the Capitol Grounds, that interest was not sufficient to "override the fundamental right to petition 'in its classic form' and to justify a blanket prohibition of all assemblies, no matter how peaceful and orderly, anywhere on Capitol Grounds." *Jeanette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 585 (D.D.C. 1972). In reaching that conclusion, the three-judge panel identified "existing laws regulating conduct" in the Capitol that its decision did not affect, including the prohibition at issue here. *Id.* at 587–88.

### b. Section 5104(e)(2)(G) Is Not Overbroad.

To begin, in the First Amendment context, as in others, "[f]acial challengers are disfavored." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). Facial overbreadth challenges – in which a defendant asserts that a statute constitutionally applied to him, is nevertheless invalid because it would be unconstitutional in a "substantial number" of *other* cases (*Id.* at 449, n.6 (internal quotations omitted)) – are even more exceptional. "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment's" overbreadth is "'strong medicine' to be employed 'only as a last resort.'" *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999) quoting *New York v. Ferber*, 458 U.S. 747, 769 (1982)); *cf.*

*Virginia v. Hicks¸* 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct") (emphasis omitted).

The Supreme Court has therefore "vigorously enforced the requirement that a statute's overbreadth be *substantial* . . . relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* at 801. And laws that are "not specifically addressed to speech" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124; *see id.* (observing that "an overbreadth challenge" to such a law will "[r]arely, if ever, . . . succeed").

Sahady's challenge fails that demanding standard. Because "it is impossible to determine whether a statute reaches too far without first knowing what the statute covers," the "first step in overbreadth analysis is to construe the challenged statute." *Williams*, 553 U.S. at 293. The prohibition in § 5104(e)(2)(G) presents "no ambiguity"; it "tells the citizen that it is unlawful for him" to parade, demonstrate, or picket inside the Capitol Building. *Jeanette Rankin Brigade*, 342 F. Supp. at 583. The operative verbs—parade, demonstrate, and picket—principally target conduct rather than speech, and those verbs are paired with the "willfully and knowingly" scienter requirements, *see Williams*, 553 U.S. at 294 (focusing on scienter requirement in determining that statute was not overbroad). And the subsequent six words, "in any of the Capitol Buildings," makes clear that the statute prohibits conduct within a nonpublic forum, which cabins the overbreadth of which Sahady complains. *Nassif*, 2022 WL 4130841, at *4. At the very least, Sahady cannot show

that § 5104(e)(2)(G) is "substantial[ly]" overbroad relative to its "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted).

Sahady's prosecution—which involves physically trespassing into the restricted Capitol—is illustrative of the numerous constitutionally legitimate applications of the statute to conduct and unprotected speech. And far from showing a "realistic danger" of constitutionally problematic applications in other cases, *Taxpayers for Vincent*, 466 U.S. at 801, Sahady fails to identify a single actual example of a prosecution based on protected speech. The limitations inherent in the crime of conviction, moreover, render the possibility of any such prosecutions marginal at best, and any such case could be the subject of an as-applied challenge. Nothing at all calls for the "strong medicine," *Los Angeles Police Dep't*, 528 U.S. at 39 (internal quotation marks omitted), of overbreadth invalidation.

Sahady's citations to case law show the weaknesses of his overbreadth claim. First, he relies on *Bynum v. U.S. Capitol Police Bd.*, where Judge Friedman ruled that a Capitol Police regulation interpreting § 5104(e)(2)(G)[7] that defined "demonstration activity" to include "holding vigils" and "sit-ins" swept too broadly because it "invited the Capitol Police to restrict behavior that is no way disruptive." 93 F. Supp. 2d at 53, 57. As an initial matter, *Bynum*'s invalidation of a Capitol Police regulation—which was applied to an individual who was denied permission to pray inside the Capitol building—does not inform the statutory challenge that Sahady presses here. Moreover, Judge Friedman in *Bynum* (and Judge Bates in *Nassif*) concluded that the inside of the Capitol building is a nonpublic forum, where the government may restrict First Amendment activity if "the restrictions are 'viewpoint neutral' and 'reasonable in light of the purpose served

---

[7] At the time, the provision was § 193(f)(b)(7).

by the forum.'" *Id.* at 56 (citing *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 806 (1985)); *see also Nassif*, 2022 WL 4130841, at *4. He reasoned that, although the regulation went too far, § 5104(e)(2)(G) itself set forth "legitimate purposes," *Bynum*, 93 F. Supp. 2d at 57, that were "aimed at controlling only such conduct that would disrupt the orderly business of Congress—not activities such as quiet praying, accompanied by bowed heads and folded hands," *id.* at 58. In short, Judge Friedman concluded that, unlike the regulation at issue in *Bynum*, the statute itself was not "substantial[ly]" overbroad relative to its "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6 (internal quotation marks omitted); *see also Nassif*, 2022 WL 4130841, at *4.

Sahady's reliance on *Lederman v. United States*, 89 F. Supp. 2d 29 (D.D.C. 2000), is likewise unavailing. Like *Bynum*, *Lederman* involved a challenge to a Capitol Police regulation, and is of marginal, if any, relevance for that reason. Furthermore, the regulation at issue there limited the areas within the Capitol *Grounds* in which individuals could engage in "demonstration activity," which in *Lederman* involved the distribution of leaflets in support of the arts. *Id.* at 32. Relying in part on *Jeanette Rankin Brigade*, *supra*, Judge Roberts in *Lederman* concluded that the entire Capitol Grounds constitute a traditional public forum, *id.* at 37, and that although the regulation left open alternative channels for expression, its imposition of a total ban burdened more speech than necessary. *Id.* at 38–39. But § 5104(e)(2)(G)'s prohibition applies only within the nonpublic forum inside the Capitol buildings, rendering the hypothetical inapt. As Judge Friedrich held, the statute does not cover a substantial amount of protected expressive activity. *Seitz*, 21-cr-279 (DLF), ECF No. 51 at 14.

Finally, Sahady's citations to statements during the House debate on the statute are also unavailing. Legislative history "is an uneven tool that cannot be used to contravene plain text."

*Bingert*, 2022 WL 1659163, at *11 (citing *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)); *see also Nassif*, 2022 WL 4130841, at *7 (defendant's "reliance on legislative history is misplaced where the plain text of the statute leaves no need to resort to alternative methods of interpretation"). The floor statements on which Sahady relies are "particularly 'unreliable.'" *United States v. Powell*, No. 21-cr-179,   ECF No. 73, at 6 (D.D.C. July 8, 2022) (citing *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 474 (1921)). For example, Sahady accurately quotes Representative O'Neal's statement that O'Neal is "a little bit disturbed" about the language of the predecessor to § 5104(e)(2)(G), *see* ECF No. 67 at 5, but omits the later discussion in which O'Neal makes clear that the basis for his concern was that the prohibition does not also include the Capitol Grounds. *See* 113 Con. Rec. H29,390 (daily ed. Oct. 19, 1967) (statement of Rep. O'Neal) (asking if "anyone would have an objection to adding the word 'grounds' to the new language").[8]

### c.  Section 5104(e)(2)(G) is Not Unconstitutionally Vague.

Sahady also is incorrect when he asserts that § 5104(e)(2)(G) is "unconstitutionally vague."[9] ECF No. 67 at 6. His flawed argument should be rejected, as it was when raised by other

---

[8]  Other representatives clarified that the law enacted in 1946 already included a similar prohibition that applied to the Capitol Grounds. *See* 113 Con. Rec. H29,390 (daily ed. Oct. 19, 1967) (statement of Rep. Colmer) (noting that such an addition "would be surplusage").

[9]  As a general matter, one making such a facial vagueness challenge must demonstrate that the law is "impermissibly vague in all its applications"; one whose conduct is "clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests.*, 455 U.S. 489, 494–95 (1982). Sahady cannot surmount that demanding standard. Where the facial challenge relies on a First Amendment theory, a facial challenge may be available where the challenger shows that the law in question "reaches a substantial amount of constitutionally protected conduct." *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 940 (9th Cir. 1997) (citing *Kolender v. Lawson*, 461 U.S. 352, 359 n.8 (1983)). Even assuming that is viable theory under governing law, *see Quigley v. Giblin*, 569 F.3d 449, 457–58 (D.C. Cir. 2009) (questioning the breadth of "First Amendment vagueness doctrine"), Sahady's facial vagueness claim fails for the same reasons that his overbreadth challenge falls short.

January 6 rioters in *Nassif*, 2022 WL 4130841, at \*7, and *Seitz*, No. 21-cr-279 (DLF),   ECF No. 51 at 7–8.

Just as was the case regarding the term "corruptly" in § 1512(c)(2), Sahady fails to overcome the strong presumption that 40 U.S.C. § 5104(e)(2)(G) passes constitutional muster. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."). Similarly to § 1512(c)(2), § 5104(e)(2)(G) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. That the statute makes it unlawful to "willfully and knowingly … parade, demonstrate, or picket in any of the Capitol Buildings," gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306; *see also Nassif*, 2022 WL 4130841, at \*7. That is, the plain language prohibits an individual from engaging in disruptive conduct inside the Capitol building. *See Bynum*, 93 F. Supp. 2d at 57–58 (explaining that Capitol Police regulation at issue in that case was unnecessary because Congress had provided "more than sufficient guidance" in § 5104(e)(2)(G)'s statutory text). While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief[,] and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

28

As Judge Bates explained as he rejected an identical argument that § 5104(e)(2)(G) "does not define the offense so as to put ordinary people on notice of what is prohibited," *Nassif*, 2022 WL 4130841, at *6,

> The definition of demonstrate—"to make a public demonstration; esp. to protest against or agitate for something," Oxford English Dictionary (3d ed. 2005), or "to make a public display of sentiment for or against a person or cause," as by "students demonstrating for the ouster of the dictator," Webster's New International Dictionary (3d ed. 1993)—is not so vague as [defendant] contends. When read "in light of its neighbors," *McHugh I*, 2022 WL 296304, at *12, "parade" and "picket," it is clear that § 5104(e)(2)(G) prohibits taking part in an organized demonstration or parade that advocates a particular viewpoint—such as, for example, the view that the 2020 U.S. Presidential Election was in some way flawed.

Accordingly, Judge Bates held, as this Court should, that "§ 5104(e)(2)(G) is not unconstitutionally vague on its face." *Id.* at *7.

## IV.    Sahady's Claims of Vindictive Prosecution are Factually and Legally Flawed.

The Court should deny Sahady's motions to dismiss for vindictive prosecution because Sahady fails to put forth any evidence of either (1) the government's actual vindictiveness or (2) even a realistic likelihood of vindictiveness. Sahady bases his vindictive prosecution claim on four grounds:[10] (1) the fact that Count Five was added "just weeks after Mr. Sahady's plea offer expired;" (2) the fact that Count Five was added "just weeks before trial;" (3) the fact that the government possessed the information needed to add Count Five "long before it chose to do so;" (4) that the government has a strong incentive to avoid trial; and (5) after Sahady filed a motion to compel discovery for selective prosecution. ECF No. 67 at 11. None of these arguments is

---

[10] While Sahady includes vindictive prosecution claims in both of his motions, his motion to dismiss Count Five contains all of his actual arguments in support of those claims. *See* ECF No. 72 at 13 (indicating "Sahady now moves to dismiss Count One and Count Five of the Indictment for the same reasons stated in that previously filed motion and based on the further evidence of vindictive prosecution based on the government's addition of Count One in the Indictment.").

sufficient to make the requisite legal showing for vindictive prosecution.

First, the fact that the government adds more charges after failed plea negotiations does not itself give rise to a vindictiveness presumption.[11] The Supreme Court has held that charging a defendant with additional charges after failed plea negotiations does not violate due process. In *Bordenkircher v. Hayes*, the Court held that the Due Process Clause does not prohibit a prosecutor from carrying out a threat, made during plea negotiations, to bring additional charges against a

---

[11] A presumption of vindictiveness generally does not arise pretrial. *United States v. Goodwin*, 457 U.S. 457 U.S. 368, 381 (1982) ("[A] change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision."); *see also United States v. Stewart*, 590 F.3d 93, 122-23 (2nd Cir. 2009) (no presumption of vindictiveness as a general rule in a pretrial setting); *United States v. Perry*, 335 F.3d 316, 324 (4th Cir. 2003) (presumption of vindictiveness should be applied extremely cautiously to pretrial prosecutorial decisions). In fact, "[i]n the ordinary case, the exercise of prosecutorial discretion, at the very core of the executive function, has long been held presumptively unreviewable." *In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997); *see also United States v. Sanders*, 211 F.3d 711, 716 (2nd Cir. 2000) ("[T]he decision as to whether to prosecute generally rests within the broad discretion of the prosecutor, and a prosecutor's pretrial charging decision is presumed legitimate."). As the Supreme Court has explained, a pretrial presumption of vindictiveness is rare due to the nature of the proceedings:

> [Pretrial defendants may be] expected to invoke procedural rights that inevitably impose some "burden" on the prosecutor. Defense counsel routinely file pretrial motions . . . to challenge the sufficiency and form of an indictment; . . . [i]t is unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter. The invocation of procedural rights is an integral part of the adversary process in which our criminal justice system operates.

> Thus, the timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. . . . *A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution.* An initial decision should not freeze future conduct.

*Goodwin*, 457 U.S. at 381-82 (emphasis added).[11]

defendant who refused to plead guilty to the offense with which he was originally charged. 434 U.S. 357 (1978). The Court reasoned that prosecutors enjoy wide discretion in bringing charges against a defendant, and that in the "give and take" of plea bargaining, there is no element of punishment or retaliation as long as the defendant is free to accept or reject the prosecutor's offer. *Id.* at 363. Similarly, in *Goodwin*, the Court held that a prosecutor's pretrial decision to bring a felony charge against a defendant who had rejected a guilty plea to a misdemeanor did not violate due process. 457 U.S. 368.

These decisions stem from the bedrock principle that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher*, 434 U.S. at 364; *see also Goodwin*, 457 U.S. at 382-383 ("*Bordenkircher* made clear that the mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified."); *United States v. Meyer*, 810 F.2d 1242, 1246 (D.C. Cir. 1987) ("[P]roof of a prosecutorial decision to increase charges after a defendant has exercised a legal right does not alone give rise to a presumption in the pretrial context."). As the *Meyer* court explained:

> [Prosecutors] often make their initial charging decisions prior to gaining full knowledge or appreciation of the facts involved in a given case. In addition, officials often make charging decisions before analyzing thoroughly a case's legal complexities. The decision in *Goodwin* stemmed largely from the Supreme Court's understanding of these facts: the *Goodwin* Court recognized the frequency with which prosecutors must act on (and later compensate for) incomplete information or understanding.

810 F.2d at 1246–47.

Regarding Sahady's second and third points, the proximity to trial and the absence of these

charges earlier in the proceeding do not constitute evidence of—let alone prove—vindictiveness. If anything, it is clear that the government did not seek additional charges "to avoid the annoyance and expense of prosecuting" him in this case. *See Meyer*, 810 F.2d at 1247. Instead, bringing Counts One and Five has added to the government's burden in both a practical and legal sense.

Even if the later additions of Counts One and Five establish a likelihood of vindictiveness, it is immediately rebutted by objective evidence of proper motivation. *See Safavian*, 649 F.3d at 694. As set out above, in February 2023, undersigned counsel entered the case as newly assigned trial attorneys. In March 2023, when reviewing the Superseding Information in preparation for trial, the undersigned noted that a violation of § 5104(e)(2)(G), which had been charged against other similarly situated defendants, was omitted when Sahady was originally charged in February 2021—just a little over one month following January 6, 2021. As Sahady himself points out, the violations charged in the Indictment at Counts Two through Five are typically charged together in misdemeanor January 6 cases. Recognizing the conduct revealed by the initial investigation in January and February 2021 met this now-typical roster of charges, the undersigned took immediate action to file a Second Superseding Information charging the violation of § 5104(e)(2)(G). Regarding Count One, the undersigned's trial preparation—involving evidentiary reviews, witness interviews, legal analysis, and perhaps the fresh perspective of prosecutors new to the case—led the government to assess both preexisting and new evidence. This assessment convinced the undersigned that pursuing Count One would both prevent Sahady from "escap[ing] punishment for [his] criminal conduct," *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002), and "manifest the government's legitimate response to new circumstances[,]" *United States v. Hill*, 93 F. App'x. 540, 546 (4th Cir. 2004). These simple explanations rebut any showing of vindictiveness from not charging Counts One and Five earlier. *Cf. United States v. Barner*, 441 F.3d 1310, 1319 (11th Cir.

2006) ("the government's attempt to correct its earlier mistake and charge the conduct in a way that could support a conviction does not show a desire to punish Barner for exercising his rights, but rather to punish him for the alleged felonious conduct."); *United States v. Johnson*, 171 F.3d 139, 141 (2nd Cir. 1999) (bringing weapons charge based on evidence that predated defendant's acquittal on RICO charge "is entirely legitimate, and certainly cannot be considered vindictive."); *United States v. King*, 126 F.3d 394, 399-400 (2nd Cir. 1997) (presumption of vindictiveness rebutted because government strategized and sought to increase likelihood that at least one defendant would be convicted).

Fourth, the government did not bring additional charges to pressure Sahady to enter into a plea agreement. Regarding Count Five, § 5104(e)(2)(G) carries lower statutory maximum penalties than two of the previously charged misdemeanors and had the same Class B misdemeanor penalties as the third. Importantly, Count Five does not have penalties greater than the charge that was the subject of the government's plea offer, nor do the sentencing guidelines apply to Count Five. In this way, with the Second Superseding Information, the government did not add a more serious charge such that it would induce a person to take an outstanding plea offer to a lesser offense. *Meyer*, which is cited by Sahady, is a good illustration. In that case, the court found that the defendant established a presumption of vindictiveness when the government added several *more serious* charges against the defendant prior to trial and *then* offered plea agreements to the original less serious charge. That is not the case here. The Superseding Information did not add a more serious charge. And while the Indictment did bring a more serious charge, the government did not (and has not) extended a new plea offer to Sahady since it filed both the Second Superseding Information and Indictment. Ultimately, to show vindictiveness in a pretrial posture, a defendant "must point to something more than routine invocations of procedural rights, such as

declining a plea offer." *United States v. Michel*, No. 1:19-cr-148 (CKK), 2022 WL 4182342, at *8

(D.D.C. Sept. 13, 2022) (quoting *Meyer*, 810 F.2d at 1247).

Lastly, Sahady claims that the additional charges were somehow related to his filing of a

motion to compel discovery relating to selective prosecution, though he does not describe how.

Without any showing of a nexus between Sahady's motion to compel and the Second Superseding

Information or Indictment, he fails to meet the threshold showing of likelihood of vindictiveness

on this ground as well.

## **CONCLUSION**

For the reasons set forth herein, the defendant's motions to dismiss should be denied.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:         */s/ Kaitlin Klamann*
KAITLIN KLAMANN
Assistant United States Attorney
601 D Street NW
Washington, DC 20530
(202) 252-6778
Kaitlin.klamann@usdoj.gov
IL Bar No. 6316768

*/s/ Nathaniel K. Whitesel*
NATHANIEL K. WHITESEL
Assistant United States Attorney
DC Bar No. 1601102
601 D Street NW
Washington, DC 20530
nathaniel.whitesel@usdoj.gov
(202) 252-7759