**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-134 (CJN)** |
| | : | |
| **MARK SAHADY,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' MOTION IN LIMINE TO PRECLUDE**
**IMPROPER DEFENSE ARGUMENTS AND EVIDENCE**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby moves in limine, pursuant to Fed. R. Evid. 401, 403, and 611(b), to preclude the defendant, Mark Sahady, from introducing evidence or making arguments:[1]

(1) On the specific location of security cameras in the U.S. Capitol;

(2) That his conduct was authorized by former President Trump or other officials;

(3) That the First Amendment permitted his conduct;

(4) On any matter that encourages jury nullification; and

(5) On his prior good acts or relative culpability to other actors on January 6, 2021.

## I.    LEGAL BACKGROUND

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses. *See Alford v. United States,* 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place

---

[1] This motion is in addition to the government's motions in limine filed at ECF Nos. 53 and 54.

reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See e.g., United States v. Balistreri,* 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to the charges in the case), *overruled on other grounds* by *Fowler v. Butts,* 829 F.3d 788 (7th Cir. 2016). Other permissible reasons for limiting cross-examination include preventing harassment, prejudice, confusion of the issues, or repetitive, cumulative, or marginally relevant questioning. *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986).

While limiting a defendant's opportunity for cross-examination may implicate the constitutional right to confront witnesses, the Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until a defendant sufficiently establishes that defense through affirmative evidence presented during his or her own case-in-chief. *See United States v. Lin,* 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol,* 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief); *United States v. Stamp,* 458 F.2d 759, 773 (D.C. Cir. 1971) (finding trial court properly excluded cross examination of government's witness with response to matter only related to an affirmative

defense and not elicited through direct exam). Preventing the defendant from exploring the topics above will not infringe his Confrontation Clause right because, as shortly explained, such topics have little probative value, and the defendant has more direct ways of making his case.

## II.     ARGUMENT

### A.  This Court Should Preclude the Defendant from Seeking Testimony On the Location of Specific Surveillance Cameras

The United States asks the Court to restrict the defendant's presentation of evidence regarding the specific position of U.S. Capitol Police surveillance cameras. To meet its burden of proof at trial, the government will present video evidence from a variety of sources, including Capitol Police surveillance footage. The Capitol Police maintains an extensive closed-circuit video system which includes cameras inside the Capitol Building, inside other buildings within the Capitol complex, and outside on Capitol grounds. These cameras captured thousands of hours of footage from the breach of the Capitol and have been instrumental in documenting the events of January 6, 2021.

However, the U.S. Capitol Police's surveillance system also serves an important, and ongoing, function in protecting Congress and, by extension, national security. In particular, the footage from the system is subject to limitations and controls on access and dissemination. To find relevant footage from the Capitol Police's surveillance system and adequately prepare for trial, one would need to use maps which display the locations of the interior and exterior cameras. The government has therefore provided the defense with maps that display these locations. However, due to the sensitive nature of these items, the government seeks an order limiting the defense from

probing, during cross-examination, the exact locations of Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, as an exhibit at trial.[2]

1. **The Defendant Should Be Precluded from Questioning Witnesses About the Exact Positions of Capitol Police Cameras, Introducing Such Evidence Himself, or Admitting Capitol Police Maps of Camera Coverage**

Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded in light of the ongoing security needs of the Capitol. The defense can probe what Capitol Police's cameras show, and what they don't, by asking about the general location of each camera. For example, and as is relevant to this case, a camera positioned inside the Lower West Terrace tunnel can be described as "inside the tunnel, facing out" without describing its exact height and depth within the tunnel and without showing a picture of the camera. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning. A general description, and the footage from the camera itself, will make clear what the camera recorded and what it did not. Additionally, presenting the map of all Capitol Police cameras would risk compromising these security concerns for no additional probative value: the map contains numerous cameras installed in parts of the Capitol that the defendant did not visit.

Even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger to national security. *See United States v. Mohammed,* 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005) (finding that information having broader national security concerns can be excluded under Rule 403 because its tendency to confuse the issues, mislead the

---

[2] These maps have been disclosed to the defendant but, pursuant to the terms of the protective order, have been designated Highly Sensitive. Moreover, these maps have been designated as "Security Information" under 2 U.S.C. §1979 which forbids their use without the approval of the Capitol Police Board.

jury, create side issues or a mini-trial and can result in undue prejudice that substantially outweighs any probative value). If the map of the Capitol cameras is introduced in this trial, or in any trial, it becomes available to the public. Immediately, anyone could learn about the Capitol Police's camera coverage as of January 6, 2021, and—importantly—could learn about the parts of the Capitol where cameras were not installed. Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. *Id.*

### 2.    The Government Requests an *In Camera* Proceeding to Determine the Admissibility of Certain Evidence

If the defense believes that presentation of the exact locations of the Capitol Police cameras is necessary, or that presentation of the Capitol Police map is necessary, the government requests that the Court conduct a hearing in camera to resolve the issue. As noted, in this case, disclosure of certain information could prove detrimental to the Capitol Police's ability to protect members of Congress and could affect our national security. Courts have found such considerations justify ex parte, in camera proceedings. *See United States v. Nixon,* 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles,* 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that in camera . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor,* 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that in camera proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security."); *United States v. Brown,* 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) (same). At any such hearing, the defendant should be required to make "a proffer of great specificity" regarding the need for the evidence and the scope of his questions. *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991)

(requiring such proffer where evidence of defendant's belief might have permissible and impermissible purposes, and careless admission would raise issues under Fed. R. Evid. 403). As such, an in camera proceeding is appropriate, if the defense believes that presentation of the exact locations of the Capitol Police, or the Capitol Police map itself, is necessary.

> **B.   This Court Should Preclude the Defendant from Arguing Entrapment by Estoppel or Making a Public Authorities Defense**

The United States asks the Court to prohibit the defendant from making arguments or introducing irrelevant evidence that former President Trump or other officials gave him permission to attack the U.S. Capitol, in what are commonly known as "entrapment-by-estoppel" or "public authority" defenses.

Entrapment-by-estoppel and public authority defenses are closely related and derive from a constitutional prohibition against "convicting a citizen for exercising a privilege which the State had clearly told him was available to him." *United States v. Sheppard*, No. 21-cr-203, 2022 WL 17978837, at *7 (D.D.C. Dec. 28, 2022) (J. Bates) (quoting *Cox v. Louisiana*, 379 U.S. 559, 571 (1965)). Both defenses are narrow ones, however, and a defendant may succeed on them only if he meets rigorous evidentiary requirements. *See United States v. Alvarado*, 808 F.3d 474, 484-85 (11th Cir. 2015) ("The public authority defense is narrowly defined, however, and a defendant will not be allowed to assert the defense, or to demand that the jury be instructed on it, unless he meets certain evidentiary prerequisites."); *United States v. Baker*, 438 F.3d 749, 755 (7th Cir. 2006) ("The [entrapment-by-estoppel] defense is a narrow one."). In particular, to succeed on an entrapment-by-estoppel claim, a defendant must prove:

> (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 31 (D.D.C. 2021) (C.J. Howell) (quoting *Cox*,

906 F.3d at 1191). This district has articulated a similar four-part analysis for the public authority

defense:

> [A]n individual (1) reasonably, on the basis of an objective standard, (2) relies on
> a (3) conclusion or statement of law (4) issued by an official charged with
> interpretation, administration, and/or enforcement responsibilities in the relevant
> legal field.

*Sheppard*, 2022 WL 17978837 at *8 (quoting *United States v. Barker*, 546 F.2d 940, 955 (D.C.

Cir. 1976). Common between these standards is, among other things, that a government official

must offer a "state" or "statement" of the law. Moreover, this defense is limited "to a defendant

who reasonably relies on the assurance of a government official that specified conduct will not

violate the law." *Alvarado*, 808 F.3d at 484-485.

The defendant has not, and cannot, argue that, in urging his supporters towards the Capitol,

then-President Trump made a "statement" of law. By now, several courts in this district have

considered various defendants' arguments that the President's words immunized their actions on

January 6. To the government's knowledge, all these arguments have failed. *See*, *e.g.*, *Sheppard*,

2022 WL 17978837 at *9 (prohibiting defendant from seeking discovery or presenting evidence

at trial on entrapment-by-estoppel or public authority defenses); Order at 2, ECF No. 39, *United

States v. Thompson*, No. 21-cr-161 (D.D.C. Mar. 23, 2022) (J. Walton) (excluding evidence of

former President Trump's statements for all purposes as unduly prejudicial under Fed. R. Evid.

403); *United States v. Grider*, No. 21-cr-022, 2022 WL 3030974, at *4 (D.D.C. Aug. 1, 2022) (J.

Kollar-Kotelly) (declining to instruct jury on defense of entrapment by estoppel); *Chrestman*, 525

F.Supp.3d at 33 (noting that an entrapment-by-estoppel defense is "highly unlikely" to succeed

and declining to consider it as weighing in favor of granting pre-trial release); *United States v.

Eicher*, No. CR 22-38 (BAH), 2023 WL 3619417, at *3-4, n.4 (D.D.C. May 23, 2023) (J. Howell)

(concluding the defendant failed to show that the former president's "statements prior to her alleged conduct on the afternoon of January 6, 2021, meet" the requirements for invoking a public authority defense and acknowledging the risk in permitting a defense that would "shield from prosecution criminal conduct undertaken at the mere insinuation of a king—or in this case, a president").

Defendants' efforts to assert an entrapment-by-estoppel defense have uniformly failed, given that, as Judge Bates observed, the defense is available "only when the official's statements or conduct state or clearly imply that the defendant's actions are lawful." *Sheppard*, 2022 WL 17978837 at *9. The key challenge for the defendant here is that, as Courts have observed, "President Trump neither stated nor implied that entering the restricted area of the Capitol grounds and the Capitol building or impeding the certification of the electoral vote was lawful." *Id.* Rather:

> [Trump's] speech simply suggests that it would be an act of "boldness" to "stop the steal." Thus, allowing [the defendant's] reliance on these words would be an instance of allowing "following orders, without more, [to] transform an illegal act into a legal one"—something the D.C. Circuit has unequivocally declined to do.

*Id.* (quoting *United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990)).

Similarly, Judge Kollar-Kotelly, in considering an entrapment-by-estoppel argument, noted that "former President Trump's statements did not in any way address the legality of the actions he urged his supporters to take. He did not, for example, assure them that marching along Pennsylvania was 'lawful' or that occupying Capitol grounds was 'permissible.'" *Grider*, 2022 WL 3030974 at *3. In short, then-President Trump did not "actively misle[a]d [the defendant] about the state of the law," because Trump did not make any statement about the law at all. *Id.* at 2 (quoting *Chrestman*, 525 F.Supp.3d at 14).

Yet, even if then-President Trump had made a statement about the law, allowing those statements to immunize the defendant's conduct would raise serious constitutional concerns. As this Court observed about another entrapment-by-estoppel defense by a similarly situated defendant, "No American President holds the power to sanction unlawful actions because this would make a farce of the rule of law." *Chrestman*, 525 F.Supp.3d at 32:

> [N]o President may unilaterally abrogate criminal laws duly enacted by Congress as they apply to a subgroup of his most vehement supporters. Accepting that premise, even for the limited purpose of immunizing defendant and others similarly situated from criminal liability, would require this Court to accept that the President may prospectively shield whomever he pleases from prosecution simply by advising them that their conduct is lawful, in dereliction of his constitutional obligation to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. That proposition is beyond the constitutional pale, and thus beyond the lawful powers of the President.
>
> Even more troubling than the implication that the President can waive statutory law is the suggestion that the President can sanction conduct that strikes at the very heart of the Constitution and thus immunize from criminal liability those who seek to destabilize or even topple the constitutional order. In addition to his obligation to faithfully execute the laws of the United States, including the Constitution, the President takes an oath to "preserve, protect and defend the Constitution." U.S. Const. art. II, § 1, cl. 8. He cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution.

*Id.* at 32–33 (D.D.C. 2021). In other words, to allow an entrapment-by-estoppel or public authority defense based on the President's false statements of law would implicate both the Take Care clause and the presidential oath of office, and more fundamentally question the nature of the rule of law in America.

Although *Chrestman* involved an argument that former President Trump gave the defendant permission to enter the Capitol grounds, the reasoning in *Chrestman* applies equally to any argument that other officials or law enforcement officers gave permission to the defendant to do the same. Just as a President cannot unilaterally repeal laws, no other officials or members of law enforcement could use their authority to allow individuals to enter the Capitol building during

a violent riot. As this Court observed, "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building." Memorandum and Order, *United States v. Williams*, No. 21-cr-377, at *2 (D.D.C. June 8, 2022).

Even if the defendant in this case could establish that an official or officer told him that it was lawful to enter the Capitol grounds or allowed him to do so, the defendant's reliance on any such statement would not be reasonable considering the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F.Supp.3d at 32; *see also Alvarado*, 808 F.3d at 484 (requiring that a defendant's reliance on the assurances of a public official be *reasonable*) (emphasis added). Moreover, the defendant's actions here contradict any argument that he relied on any such statement by law enforcement when he decided to unlawfully enter the Capitol grounds. The defendant should be prohibited from arguing that his conduct was lawful because someone allegedly told him it was.

## C. This Court Should Preclude the Defendant from Arguing that His Conduct Was Protected by the First Amendment

The Court should preclude the defendant from eliciting evidence, arguing, or asking questions that suggest that there was a First Amendment right to protest inside the restricted area around the Capitol on January 6. At trial, the government will show that the Capitol Grounds were restricted that day. There is no First Amendment right to protest in a restricted area. The government can—and on January 6, 2021, did—restrict an area that is a traditional public forum for legitimate government ends. Such a restriction on a public forum for legitimate government ends has been affirmed in this district *See Mahoney v. U.S. Marshals Service*, 454 F. Supp 2d 21, 32-33 (D.D.C 2006) (U.S. Marshals Service did not violate First Amendment by restricting access

to sidewalk in front of St. Matthew's Cathedral for Red Mass, even though sidewalk was a traditional public forum).

Other courts have similarly upheld temporary closures of traditional public fora for safety reasons. *See Mahoney*, 454 F. Supp. 2d at 21; *Menotti v. City of Seattle*, 409 F.2d 1113, 1129-1130 (9th Cir. 2005) (finding that an emergency order to close a core area of downtown Seattle to protests during World Trade Organization conference was constitutional in part because its purpose was to maintain and restore civic order); *Marcavage v. City of New York*, 489 F.3d 98, 105 (2d Cir. 2012) ("[T]here can be no doubting the substantial government interest in the maintenance of security at political conventions."); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.2d 1212, 1222 (10th Cir. 2007) ("In this case, there can be no doubt that the City's interest in providing security to a gathering of defense officials is of the highest order'); *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004) (upholding a street closure plan around the Democratic National Convention that made it nearly impossible for groups wishing to demonstrate to do so within sight and sound of delegates).

On January 6, 2021, the United States Capitol Police and the United States Secret Service coordinated to establish a restricted perimeter around the Capitol building that encompassed a portion of the Capitol grounds. That restricted perimeter was for a legitimate government purpose. No member of the public, including the defendant, had a First Amendment right to engage in protest or speech within that restricted area. The Court should therefore enter an order precluding the defendant from arguing to the contrary or stating during *voir dire*, questioning, or opening or closing statements that he wasengaged in protected speech or pursuing his "right" to protest at any point when he was on restricted Capitol grounds.

The First Amendment to the United States Constitution protects many sacred rights, but the right to engage in violence or obstruction is not among them. *Grayned v. City of Rockford*, 408 U.S. 104, 116 ("Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment."). "Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message." *United States v. Gregg*, 226 F.3d 253, 267-268 (3d Cir. 2000). Even conduct which is not outright violent but which physically "obstructs or unreasonably interferes" with official functions of government business loses its First Amendment protection. *Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (finding that a picket demonstration which physically blocked ingress or egress from a courthouse was not protected by the First Amendment); *see also Cox*, 379 U.S. at 555 (physical "cordon" of a street or a public or private building by demonstrators who refused to let anyone pass if they "did not agree to listen to their exhortations."). Importantly, that some aspect of an individual's conduct was protected by the First Amendment does not negate criminal action for his unprotected conduct because "when speech and nonspeech elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). That is to say that even if a defendant is engaged in speech that is protected, when his actions turn physically obstructive or outright violent, the First Amendment ceases to protect the speech itself because the government has a legitimate interest in preventing or stopping violent conduct. *Id.*; *see also Grayned*, 408 U.S. at 116. These First Amendment principles have been applied and upheld with respect to the January 6 Capitol Riot. *See*, *e.g.*, *United States v. Nordean et al.*, 579 F.Supp.3d 28, 53-55 (D.D.C. 2021) (Kelly, J.) (finding that charges for violations of 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1512(c)(2) withstood constitutional scrutiny).

The defendant's conduct on January 6 was plainly not protected by the First Amendment. *Id.* On January 6, 2021, he joined a riotous mob that had descended upon the Capitol, completely obstructing the flow of people, including the Vice President of the United States and other lawmakers inside, from ingress or egress from the building without the consent of the mob. *Cox*, 379 U.S. at 555; *Johnson*, 390 U.S. at 617. His actions, as one among many in the mob, had the effect of interfering with a federally protected function, that being the protection of the Vice President of the United States. *Id.* After breaching the secure perimeter, the defendant entered the U.S. Capitol building itself and confronted police officers inside. *Grayned*, 408 U.S. at 116; *Gregg*, 226 F.3d at 267-268. That some of the defendant's conduct early in the day on January 6 may have been protected by the First Amendment is of no moment in light of his breach of a restricted perimeter and breach of the building itself: the moment he engaged in such conduct, the defendant crossed beyond the boundary of conduct protected by the First Amendment. *Id.*; *see also Grayned*, 408 U.S. at 116. Permitting the defendant to argue that his conduct was protected by the First Amendment, in addition to running contrary to well-established law, risks confusing the issues and the jury. Fed. R. Evid. 401. Therefore, the court should preclude the defendant from raising this defense.

### D. This Court Should Preclude the Defendant from Arguing in a Manner That Encourages Jury Nullification

The defendant should be prohibited from arguing or introducing evidence that encourages jury nullification, whether during voir dire or at trial. As the D.C. Circuit has made clear,

> A jury has no more "right" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983). Evidence that only serves to support a jury nullification argument or verdict has no relevance to guilt or innocence. *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("No reversible error is committed when evidence, otherwise inadmissible under Rule 402 of the Federal Rules of Evidence, is excluded, even if the evidence might have encouraged the jury to disregard the law and to acquit the defendant").

The government has identified the following subject areas that are not relevant to the issues before the jury and that could serve as an improper invitation for the jury to nullify its fact-finding and conclusions under the law. The Court should preclude any reference to these issues either during voir dire, argument or questioning by counsel, or in the defense case-in-chief.

### 1.    Selective Prosecution

The defendant may claim, consistent with his numerous filings in this case, that he has been singled out for prosecution because of his political views. But a "selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Regardless of whether alleged discrimination based on political views is a proper basis for challenging the indictment it has no place in a jury trial. *See United States v. King*, No. 08-cr-002, 2009 WL 1045885, at *3 (D. Idaho Apr. 17, 2009) ("The Court will therefore exclude any evidence or argument as to selective prosecution at trial."); *United States v. Kott*, No. 3:07-cr-056, 2007 WL 2670028, at *1 (D. Alaska Sept. 10, 2007) (precluding the defendant from educing evidence to support a selective prosecution claim at trial). Rather, such an argument could serve as an improper invitation for the jury to nullify its fact-finding and conclusions under the law; the defendant should therefore be precluded from making it.

### 2.      Statements Regarding the Alleged Offenses' Punishment or Collateral Consequences of Conviction

The defendant may face prison time if he is found guilty in this case, and he should not be permitted to arouse the jury's sympathy by introducing any evidence of or attempting to argue about the hardships of prison or the potential effect of incarceration on his family or employment prospects.

It is settled law that the jury should not consider such penalties in reaching its verdict. *See, e.g.*, *United States v. Reed*, 726 F.2d 570, 579 (9th Cir. 1984) (a defendant's possible sentence "should never be considered by the jury in any way in arriving at an impartial verdict as to the guilt or innocence of the accused."); *Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should have been admonished that it "had no sentencing function and should reach its verdict without regard to what sentence might be imposed"). Courts in this district often give a jury instruction stating exactly that:

> The question of possible punishment of the defendant in the event a conviction is not a concern of yours and should not enter into or influence your deliberations in any way. The duty of imposing sentence in the event of a conviction rests exclusively with me. Your verdict should be based solely on the evidence in this case, and you should not consider the matter of punishment at all.

D.C. Redbook 2.505. Thus, the above-mentioned issues are irrelevant, and any reference to them would invite jury nullification. *See United States v. Bell*, 506 F.2d 207, 226 (D.C. Cir. 1974) ("evidence which has the effect of inspiring sympathy for the defendant or for the victim . . . is prejudicial and inadmissible when otherwise irrelevant") (internal citation omitted); *United States v. White*, 225 F. Supp. 514, 519 (D.D.C 1963) ("The proffered testimony (which was clearly

designed solely to arouse sympathy for defendant) was thus properly excluded."). As such, they should be excluded.

### E.  This Court Should Preclude the Introduction of the Defendant's Good Conduct or Culpability Relative to Other Rioters

The defendant tried to interfere with a federally protected function on January 6, 2021, and did so by entering a restricted area and then a restricted building. The Court should preclude any argument that the defendant's lack of additional criminal actions that day or allegedly helpful acts negate the criminal conduct for which he is charged. *See United States v. Camejo*, 929 F.2d 610, 612-13 (11th Cir. 1991) (a witness's proffered testimony that a defendant declined to participate in a separate, contemporaneous narcotics conspiracy was an inadmissible "attempt to portray [the defendant] as a good character through the use of prior 'good acts'"). Indeed, such evidence would not be particularly probative of whether the defendant is guilty of the offenses with which he is charged; many Capitol Riot defendants acted both violently and helpfully towards law enforcement at different times on January 6, 2021. *See, e.g.*, Government Sentencing Submission, *United States v. Fairlamb*, No. 21-cr-120 (D.D.C. Nov. 3, 2021), ECF No. 50 at 14-19 (defendant who offered police officers water and offered to assist them in leaving the area subsequently shoved and punched another officer).

Evidence of past "good acts" by a defendant is generally not probative unless a defendant is alleged to have always or continuously committed bad acts or engaged in ceaseless criminal conduct. *United States v. Damti*, 109 Fed. Appx. 454, 455-56 (2nd Cir. 2004) (citations omitted). Ceaseless conduct occurs when it is alleged that all the defendant's actions were illegal. *Id*. When that is not alleged and the prosecution can point to specific criminal acts, then evidence of good acts is not probative of the issue of guilt at trial. *Id*. Using specific instances of good acts "to prove lack of intent . . . is not only disfavored, it is not permitted under Rule 405(b)." *United*

*States v. Marrero*, 904 F.2d 251, 259–60 (5th Cir. 1990) (affirming decision to exclude evidence that the defendant "provided more services to some clients than they were actually billed for and that sometimes she rendered services free of charge," which the defendant sought to introduce to show that she did not intend to improperly bill a government agency for medical services).

Even if probative, however, introducing evidence about the defendant's irrelevant conduct risks confusing the issues by inviting the jury to weigh his respective culpability relative to other rioters, and ought to be excluded. *See United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001) ("Evidence that is admissible under Rule 404 may nonetheless be excluded under Rule 403 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'"). Any alleged specific good acts by the defendant are not connected to the issues of this case. Introducing evidence of such acts carries an unnecessary risk of distracting the jury by allowing it to decide based, not on whether the evidence showed that the defendant committed the charged crimes, but instead on whether the defendant performed unrelated good deeds.

## III.    CONCLUSION

Motions in limine are "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Graves v. District of Columbia*, 850 F.Supp.2d 6, 10 (D.D.C. 2011) (quoting *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1070 (3d Cir. 1990)). The government presents these issues to the Court to prepare this case for an efficient trial. For the reasons described above, the United States respectfully requests that this Court grant the government's motion in limine.  If this Court determines an evidentiary hearing is necessary to rule on this motion, the government asks that the hearing be held *in camera* and *ex parte*.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      */s/ Kaitlin Klamann*
KAITLIN KLAMANN
NATHANIEL WHITESEL
Assistant United States Attorneys
601 D Street NW
Washington, D.C. 20530