**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-134 (CJN)** |
| **MARK SAHADY,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mark Sahady to 10 months' imprisonment – near the midpoint of the applicable Guidelines range – 1 year of supervised release, $500 in restitution, a fine in an amount determined by the Court, 60 hours of community service, and a $70 special assessment.

### I.    INTRODUCTION

The defendant, Mark Sahady, extensively participated in the January 6, 2021 attack on the United States Capitol, planning with others to attend the so-called "Stop the Steal" rally weeds before it occurred. The January 6 riot was a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States

In the months leading up to January 6, Sahady, the co-founder of a "straight pride" group in Boston, Massachusetts, discussed his concerns about fraud in the 2020 presidential election with friends. As January 6 approached, he helped organize several coach buses to transport hundreds of individuals from Boston to Washington, D.C. for the Stop the Steal rally. On January 4, 2021, he admitted to a friend that he knew the rally could turn into a riot at the U.S. Capitol and discussed the possibility that "we surround congress and the crowd decides to move into the building…" which would be a "potential[ly] illegal act."

Two days later, on January 6, 2021, Sahady did just that. He listened to former President Trump's Speech, then marched to the U.S. Capitol. He joined the huge crowd on the West Plaza where he saw police deploy flashbang grenades against the rioters and rioters attacking the police, but he didn't turn away. Instead, he marched up the Northwest Stairs, under the scaffolding, and up to the Upper West Terrace, giving other rioters high-fives along the way. On the Upper West Terrace, he called down to other rioters, encouraging them to come up to the building. He also watched as another rioter used a crowbar to smash the window to a door and pull the door open. Moments later, he walked into the building through that same door as a loud alarm blared overhead. Once inside, he joined a large crowd that confronted the police and forced them to back down the hallway further into the building. When first directed by the police to leave the building, Sahady

---

Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

refused, and pushed past them. He finally left the building through the North Door after 18 minutes inside.

In the days that followed, Sahady made multiple statements to friends about January 6, lauding his and others' actions that day. He also made efforts to conceal evidence, including deleting his messages on an encrypted messaging application called Signal. Following his arrest and the arrest of his co-defendant, Suzanne Ianni, Sahady also made statements to the media and established a fundraising page for his legal defenses, professing his innocence and claiming he was being unfairly targeted by the government.

The Court must also consider that Sahady's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Sahady's crime support a sentence of 10 months' incarceration in this case.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case, ECF No. 1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

**B.      Sahady's Role in the January 6, 2021 Attack on the Capitol**

Sahady claimed he believed that the 2020 presidential election was fraudulent. As the co-founder of an activist group called Super Happy Fun America, he organized members to travel from Boston to Washington, D.C. in buses for the Stop the Steal rally. In the days leading up to his trip, he messaged friends telling them he anticipated the rally could evolve into an illegal invasion of the U.S. Capitol building—and possibly something much worse. Days later, he joined the riot and entered the Capitol building. After January 6, he deleted incriminating messages from his phone. Following his arrest, he made several statements proclaiming his innocence and persecution at the hands of the government.

### *Sahady's Leadership Role in Super Happy Fun America*

Sahady is the co-founder and one of the leaders of a group called Super Happy Fun America ("SHFA"), which describes itself as "a right of center civil rights organization focusing on defending the Constitution, opposing gender madness and defeating cultural Marxism." *See* Super Happy Fun America, available at https://superhappyfunamerica.org/ (last visited October 20, 2024). In 2021, Sahady's Twitter account, under the name Mark Shady, included insignia for SHFA and described him as "President-Elect, American Patriot, Army Veteran, [and] Violator of Social Media Community Standards[.]" Sahady's Twitter page also included a link to SHFA's

website.



*Image 1: Screenshot of Sahady's Twitter Profile from 2021*

### *Pre-January 6 Messaging and Plans to Travel to Washington, D.C.*

In the weeks following the 2020 presidential election, Sahady sent messages to a friend ("Individual A") over the encrypted messaging application, Signal. In these messages, Sahady discussed his suspicions that the presidential election was fraudulent and his fears about what that meant for the country. For example, on November 5, 2020 in response to a question from Individual A about the fraud allegations, Sahady responded, "I have been following this more closely now. There are various allegations. In NV, MI, and WI it appears that dead people voted… I think the Trump's campaign most valid complaint is that their observers were not allowed into the polling stations…" Trial Exhibit 602. A few weeks later, on December 19, 2020, Sahady was still convinced that the election had been fraudulent and messaged Individual A that, "we all

thought Trump should invoke the insurrection act to save America and stay in office." Trial Exhibit 603.

As January 6 neared, Sahady began to make plans to attend the rally in Washington, D.C. with several other members of his group, SHFA. In a Signal message sent on January 4, 2021, in response to Individual A's expression of concern at his attendance at the event on January 6, Sahady stated, "it's too late now. SHFA has charted [sic] 5 buses of 50 people each and they are already filled up. Other groups we are working with have filled another 5 buses, so that's about 500 people going from New England just in our groups." Trial Exhibit 604.

Over the next two days, Sahady sent messages to others indicating he knew there was a risk that the rally would get out of control and lead to violence. Sahady also anticipated that people would illegally enter the Capitol building. For example, on January 4, 2021, Sahady messaged Individual A and said, "the DC police don't have enough man power to control a million people. It would be up to the federal government and since Trump is still President then supposedly he is in charge of it. If federal authorities or the military acts against his order then that would be a cause for civil war… Do you think they would put people on trial for something done before he took office? Perhaps they would but I believe most of us at that point would feel justified in violently resisting arrest and viewing his administration as an enemy." Trial Exhibit 604. He went on to say, "everyone going understands what could happen." *Id.* During that same conversation, Sahady mused, "Im trying to figure out why anyone would be arrested during the day …if we surround congress and the crowd decides to move into the building then everyone has to make their own

decision. Thats the only potential illegal act i think anyone would make." *Id.*

Later that day, he told Individual A, "I'm not going to sit and hide. I'd choose to fight even if I go down doing it. I guess a new administration could find out anyone that went to the protest and come for them, especially if the protest moves into the Congress building." Trial Exhibit 605. Sahady also said, "we are all committed to getting there no matter what … that may mean a confrontation with the police because if they block the roads/bridges eventually the numbers will swell and we will just overrun them. At that point they will either have to retreat or shoot people." *Id.* "If I am scapegoated it is still worth it to me," he said. *Id.* "If everyone decides to just go into the Congress building then so be it." *Id.*

These messages continued the next day, on January 5, 2021. Sahady told Individual A on Signal, "I think there is a slight chance trump supporters escalate the situation by forcing their way into congress" and "I believe like many others the elections are now rigged and that we have to fight." Trial Exhibit 607. Sahady was a member of a large group chat which was discussing the recent arrest of a member of the Proud Boys for stealing a Black Lives Matter banner. Sahady told the group, "the government and far left are no doubt happy the banner was stolen. now they have an excuse to make an arrest. if we get arrested it should be for something important that has a big impact. such as taking over congress." Trial Exhibit 702.1

### *Attendance at the Stop the Steal Rally and March to the U.S. Capitol*

As planned, Sahady rode in one of the several buses chartered to carry members of SHFA and others from Boston to Washington D.C. *See* Trial Exhibit 301, timestamp 00:03 to 2:05. The group left on the evening of January 5 and arrived at Union Station early in the morning on January

6, 2021. The group then made their way to the Ellipse to attend the Stop the Steal rally. *Id.* at timestamp 2:05 to 2:28. Sahady, wearing a baseball emblazoned with the American flag, listened to the speech by Former President Trump while at the Ellipse. *Id.* at timestamp 2:28 to 2:35; *see also* Trial Exhibit 1304.

After the speech, Sahady, and his co-defendant Suzanne ("Sue") Ianni, joined the large group that marched to the U.S. Capitol. During a podcast interview, Ianni admitted that Sahady and Ianni debated whether Vice President Mike Pence was going to stop the certification as they walked to the U.S. Capitol. *See* Sentencing Exhibit A, clip of Ianni interview with Freedom Unchained Podcast.[2] They also saw makeshift gallows that had been erected for Vice President Mike Pence. *Id.* According to Ianni, Sahady and Ianni were told by another rioter with a satellite phone that Vice President Pence did not object to the certification and the rioters became angry and began to march to the U.S. Capitol building. *Id.* As Sahady and Ianni neared the building,

---

[2] The government will provide the Court and defense counsel with copies of its sentencing exhibits via USAfx.

Ianni commented on the barricades they were seeing.



*Image 2: Still image from Trial Exhibit 301 at timestamp 3:47 showing Sahady encountering bike racks as he approached the U.S. Capitol*

### *Conduct at the U.S. Capitol*

When Sahady and Ianni arrived on the West Plaza by approximately 2:00 p.m. a huge crowd was already assembled there, and the police had begun deterrent measures. Ianni and Sahady stood in the crowd as the police deployed flashbang grenades to try to disperse the crowd. *See* Trial Exhibit 301 at timestamp 4:12 to 4:18. Sahady called out to the crowd, "they're just trying to scare us!" *Id.* By approximately 2:03 p.m., MPD officers used a device called a Long-Range Acoustic Device ("LRAD") which broadcast a message to the crowd near Sahady that "all people must leave the area immediately! Failure to comply with this order may subject you to arrest!" *See* Trial Exhibit 201 at timestamp 00:26.

Despite all of these warning signs, Sahady did not leave. Instead, he went up the Northwest Stairs, under the scaffolding, toward the Upper West Terrace. After he made it up the first set of

stairs, he paused before proceeding, stood against the wall, and gave "high fives" to multiple rioters who walked past him up the stairs. *See* Trial Exhibit 101.1 at timestamp 00:38. Similarly, after he reached the Upper West Terrace, he walked to the stone railing overlooking the West Lawn and, along with Ianni, yelled down at other rioters to "Get up here!" Trial Exhibit 305.1 at timestamp 00:18.

From there, Sahady and Ianni walked closer to the building stopping in an area known as the Northwest Courtyard. Sahady moved to an area close to the Senate Wing Door and chanted with other rioters, including yelling, "Fight for Trump!" and "Let us in!" Trial Exhibit 306.1 at timestamps 1:06 and 00:32, respectively.

At approximately 2:41 p.m., a rioter near Sahady used a crowbar to smash the glass of a door in the Northwest Courtyard known as the "Parliamentarian Door." Sahady, still standing near the Senate Wing Door, turned, saw the rioter, pumped his fist in the air and screamed, "Fuck yeah, Patriots! Yeah! Yeah!" Trial Exhibit 307 at timestamp 00:24.



*Image 3: Still image from Exhibit 306.1 at timestamp 3:05 showing Sahady pointing at the rioter smashing the Parliamentarian Door open with a crowbar*

Less than four minutes later, at 2:45 p.m., Sahady and Ianni made their way over to that very door. Ignoring a rioter who was bloodied and pouring water on his eyes, they walked up the stairs, through the broken Parliamentarian Door and into the U.S. Capitol building as a loud alarm blared overhead.



*Image 4: Still image from Trial Exhibit 306.2 at timestamp 00:53 showing Sahady as he entered the U.S. Capitol building through the Parliamentarian Door*

After they entered the building, they walked down the hallway until they encountered a police line. *See* Trial Exhibits 308, 309, 310, 311 and 312. Over the course of the next twenty minutes, Sahady joined the crowd in the Parliamentarian Hallway in repeatedly confronting the police and forcing them to retreat. By approximately 3:00 p.m., the crowd had forced the police to move down the initial corridor, around a corner and down that hallway to an area near another door, the North Door.



*Image 5: Still image from Trial Exhibit 105 at timestamp 3:00:34 showing Sahady standing in front of a police line near the North Door*

Despite the police officers' attempts to get Sahady, Ianni, and other rioters to leave the building through the North Door, Sahady and Ianni refused to leave and pushed forward. *See* Trial Exhibit 105 at timestamp 3:01:29. Sahady returned to the area near the North Door two minutes later, at 3:03 p.m., and finally left the building. *Id.* at timestamp 3:03:25. As Sahady left through

the North Door, he pumped his fist in the air in apparent celebration.



*Image 6: Still image from Exhibit 313 at timestamp 00:07 showing Sahady pumping his fist in the air as he left the U.S. Capitol*

Approximately ten minutes after leaving the U.S. Capitol building, Sahady sent a message to Individual A on Signal, saying, "We won the congress." Trial Exhibit 607. At approximately 4:00 p.m., he sent another message saying, "I finally left. We were tear gassed and backed the

police down. They were afraid. We walked all over the building." *Id.* Later that night, after Sahady

had gotten back on the bus to Boston, he sent another message on Signal:



I was one of the ones in front. Wonder if there will be legal consequences. They tear gassed us. People grabbed the cannisters and sprayed them back. Sue and I grabbed a shield  and buttons from police and pulled people out who they were trying to arrest. We were all walking around but were confused. Cops said if we left we could go freely. So me and her left. When they blocked the doors some people took sledgehammer to windows. But word went out not to damage property and when cioa backed off people thanked them. One gave thumbs up.

*Image 7: Screenshot of Trial Exhibit 607, Signal message sent by Sahady on the evening of January 6, 2021*

That night, Sahady also sent multiple friends a link to a BuzzFeed news article that featured

the below picture of Sahady and Ianni inside the Capitol building. Trial Exhibits 702.3, 607.



*Image 8: Screenshot of photograph from BuzzFeed news article about the riot on January 6, 2021 depicting Sahady and Ianni*

### *Sahady's Destruction of Incriminating Evidence*

Sahady quickly realized the potential consequences of his actions after leaving the U.S. Capitol on January 6 and made efforts to destroy evidence that could be used against him. For example, he deleted his Signal account, which he had used to communicate with Individual A about January 6, as quoted above, and likely others as well. Indeed, starting on January 12, 2021, Sahady sent messages to multiple friends letting them know that he had deleted his Signal account. *See* Trial Exhibits 702.5, 702.6, 702.7, 702.8, and 702.9. He made it clear why he was deleting his Signal account in text messages he sent to friends on January 12 and 14, 2021, saying "I deleted my signal account hoping to get rid of data. Things are getting really bad for sue [Ianni]" (Trial

Exhibit 702.7) and "Ill [sic] call you later. Deleted signal to erase everything. Dont know of [sic] you follow news in Boston area still. Really bad." Trial Exhibit 702.9.

### Recovery of Signal Evidence from Individual A

On January 12, 2021, FBI agents interviewed Individual A. Individual A told the agents about his/her conversations with Sahady over Signal. Individual A then provided the agents with consent to retrieve the Signal messages from Individual A's cell phone, which the agents did the same day.

### Arrest of Sahady and Search of his Home

On January 19, 2021, law enforcement officials arrested Sahady at his home in Malden, Massachusetts. While being taken into custody, Sahady was overheard telling his mother words to the effect of, "Don't give them the phone." On the same day, FBI agents obtained and executed a search warrant for Sahady's residence. During the search, agents seized Sahady's cell phone. Analysts subsequently performed a forensic extraction of the cell phone and were able to recover text messages sent and received by the phone. The extraction could not retrieve any data or communications from the Signal application.

### Sahady's Fundraising Efforts

Sahady and Ianni established a fundraising page on the website Give Send Go seeking donations for their defense in this case. *See* PSR at ¶ 110. The U.S. Probation Officer noted in the PSR that the fund had raised approximately $16,445 as of August 29, 2024, according to her review of the website. *Id.* On October 22, 2024, undersigned counsel attempted to locate the website, but it had been removed. As of the time of Ianni's sentencing, the website described Sahady and Ianni

as "patriotic Americans who are facing a legal battle due to peacefully attending the rally in Washington, DC on January 6." *United States v. Ianni,* 21-CR-451 (CJN), Government's Sentencing Memorandum, ECF No. 54 at 12. The site claimed that Ianni and Sahady were "charged with misdemeanors even though they were peacefully protesting to demand integrity in the Presidential election." *Id.* The website also characterized the cases against Ianni and Sahady as "political prosecutions." *Id.*

## III.    THE CHARGES AND PLEA AGREEMENT

On April 5, 2023, a federal grand jury returned an indictment charging Sahady with five counts, including, obstruction of Congress, in violation of 18 U.S.C. § 1512(c) (Count One), entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Two), disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Three), disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Four), and parading, demonstrating or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Five). ECF No. 65. On July 18, 2024, the Court granted the government's motion to voluntarily dismiss Count One of the indictment without prejudice. On August 15, 2024, this Court convicted Sahady of the remaining offenses following a bench trial.

## IV.    STATUTORY PENALTIES

Sahady now faces sentencing on the misdemeanor offenses charged in Counts Two through Five of the indictment.

As noted by the Presentence Report issued by the U.S. Probation Office, Sahady faces the

following maximum penalties on each count of conviction:

| | |
|---|---|
| Count Two – entering and remaining in a restricted building or grounds | 1 year's imprisonment<br>1 year of supervised release<br>$100,000 fine<br>$25 special assessment |
| Count Three – disorderly and disruptive conduct in a restricted building or grounds | 1 year's imprisonment<br>1 year of supervised release<br>$100,000 fine<br>$25 special assessment |
| Count Four – disorderly conduct in a Capitol building | 6 months' imprisonment<br>$5,000 fine<br>$10 special assessment |
| Count Five – parading or demonstrating in a Capitol building | 6 months' imprisonment<br>$5,000 fine<br>$10 special assessment |

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49. The government agrees with the Sentencing Guidelines calculation set out in the PSR. Specifically:

Count Two: 18 U.S.C. § 1752(a)(1)

| U.S.S.G. § 2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Restricted Building | +2 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| U.S.S.G. § 4C1.1 | Zero-Point Offender | -2 |
| | **Total** | **6** |

Count Three: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| U.S.S.G. § 4C1.1 | Zero-Point Offender | -2 |
| | **Total** | **10** |

**Total Adjusted Offense Level:**                **10**

*See* PSR at ¶ 71.

The U.S. Probation Office calculated Sahady's criminal history as category I, which is not disputed. PSR ¶ 74. Accordingly, based on the government's calculation of Sahady's total adjusted offense level at 10, Sahady's Guidelines imprisonment range is 6 to 12 months' imprisonment.

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Here, the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes – namely, his premeditated intent to stop the certification – which struck at the heart of our democracy and the rule of law. While the government is not advocating for a variance or departure, a sentence near the high end of the Guidelines is not only reasonable, but fully balances the defendant's conduct and the

circumstances in which he committed said conduct. One cannot divorce the gravity of the overall threat to democracy from the defendant's pre-meditated behavior.

Indeed, as it stands now, nothing in this defendant's Guidelines calculation reflects the fact that the defendant was responsible for substantial interference with Congress's work to peacefully transfer power from one administration to the next.[3] There are no specific offense characteristics here for attacking democracy or abandoning the rule of law. Thus, a sentence at the high end of the defendant's range properly ""reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to

---

[3] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.*, *United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context. For example, in *United States v. Sparks*, 21-cr-87-TJK, Judge Kelly sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21, and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr., at 94-95. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral

college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up).   Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the

offense.")

To be clear, the fact that the government is not seeking a variance or departure does not diminish the gravity of our request and the need to appropriately account for the conduct and the crime.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a sentence of 10 months' incarceration here.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Sahady's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Sahady, the absence of violent or destructive acts is not a mitigating factor. Had Sahady engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Sahady's case is that he knew that entering the U.S. Capitol building would be illegal before he even traveled to Washington D.C., but he did it anyway. In fact, Sahady believed the claims of election fraud in the months after the election and that drastic measures were necessary to prevent the certification of the election results. In the days leading up

to January 6, he accurately predicted in his statements to Individual A that the events of January 6 could escalate and people could surround the U.S. Capitol and take over Congress. And he admitted that doing so would be illegal. But as he said, "I'm not going to sit and hide. I'd choose to fight even if I go down doing it." Trial Exhibit 605. In this way, Sahady is different from many other misdemeanor defendants who came to the U.S. Capitol to attend the rally but got swept up in the riot. Sahady went to Washington, D.C. fully aware that the event could escalate—potentially to the point of civil war—and prepared to break the law if it did.

Similarly, and equally as important, Sahady acted with specific and corrupt intent to interfere with Congress, as discussed above. He not only understood that entering the building was illegal, but he also understood that the vote count was going on inside the building and that his presence and the presence of others could stop it. In this way, Sahady's crimes are extremely serious and distinguishable from many other misdemeanants on January 6 because they were undertaken with the intent to interrupt one of the oldest and most reliable traditions in this country: the peaceful transfer of power.

Sahady's organization of numerous buses containing a total of more than 500 people on January 6th is another aggravating factor. While organizing a group to attend a rally is not criminal, Sahady organized his group with the knowledge that the event could turn violent and illegal acts could be committed.

Finally, Sahady also destroyed evidence that he knew proved him guilty of various crimes on January 6. Despite the bravado of his text messages before and immediately after January 6, Sahady soon realized that he may actually face consequences for his crimes and deleted his Signal

account.

Sahady's advanced intent to break into the Capitol building and interfere with the peaceful transfer of power, his recruitment of others to participate in the riot, his brazen perseverance in that goal despite the violence and destruction of the riot, and his destruction of evidence after January 6 all support a sentence of 10 months' imprisonment here.

### B.  Sahady's History and Characteristics

 Sahady is a 50-year-old software engineer from Malden, Massachusetts. PSR at ¶¶ 80, 98. Sahady reported a "great" childhood free of abuse, neglect, poverty, or violence. *Id.* at ¶ 80. He graduated from high school and received his B.A. in Computer Science and Mathematics from Syracuse University. *Id.* at ¶ 93. At the time of his arrest, Sahady was not married, did not have any children and lived with his parents. *Id.* at ¶¶ 81, 83. Sahady served in the United States Army for 18 years, retiring as a Captain.   *Id.* at ¶ 95. Sahady was employed as a software engineer for many years. *Id.* at ¶¶ 98-100. Sahady has no previous criminal history. *Id.* at ¶ 74.

For the most part, Sahady's history and background is neither mitigating nor aggravating. He has no criminal history, a strong employment history, stable finances, a good education, and a supportive family. All these factors would ordinarily support an argument that Sahady poses a lower risk of recidivism. However, they also demonstrate that Sahady had every advantage and every choice available to him except to engage in criminal conduct on January 6. Sahady's crimes were not motivated by poverty, abuse, or addiction. Instead, Sahady committed a very serious crime – rioting at the United States Capitol – because his preferred candidate did not win an election.

There are two aspects of Sahady's background that should be considered aggravating factors: (1) his service in the United States Army; and (2) his leadership role in SHFA. Ordinarily, service in the Army may be considered a mitigating factor. But here, Sahady participated in a violent attack on the heart of his country, the same country he swore an oath to protect. He violated that oath and betrayed the trust of the American people when he joined the mob on January 6. Not only that, but Sahady, as a member of the Army, knew what his actions that day were doing to the police who were just trying to do their job and protect Congress. But Sahady did not back down, even going so far as to use his experience in the military to soothe and encourage other rioters on the West Plaza by telling them that the police's use of flashbangs were "just trying to scare us."

Similarly, Sahady's leadership role in SHFA is also aggravating. While Sahady, like all Americans, has a right to free speech and association, in this instance, his role in SHFA was a contributing factor to the commission of his crimes on January 6. Sahady's role in SHFA is also relevant to sentencing because, as discussed above, Sahady knew that the rally could turn violent before he traveled to Washington D.C., but he still organized hundreds of his fellow group members to attend the event with him.[4]

For these reasons, Sahady's history and characteristics support a sentence of 10 months'

---

[4] For example, fellow January 6 defendant Cindy Young is one of the people who traveled with Sahady on the buses organized by SHFA. *See United States v. Cindy Young*, 23-CR-241 (GMH). She entered the U.S. Capitol building through the broken Senate Wing Door after scaling the stone ledge around the northwest stairs to the Upper West Terrace. Young moved to many locations in the U.S. Capitol Building, including the vestibule outside the House Chamber. Young spent a total of 26 minutes inside the building. Similarly to Sahady, Young made numerous statements indicating her disdain for the January 6 prosecutions and her belief that they are political. A jury convicted Young of the same four misdemeanors that Sahady was convicted of. Young is scheduled to be sentenced by Judge Harvey on November 21, 2024.

imprisonment.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.") This is especially true in this case where Sahady has repeatedly claimed he is innocent and that he has been selectively prosecuted or targeted by the government - despite his clear premeditated knowledge that entering the U.S. Capitol was a crime.

### D.    The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

#### *General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Sahady knew that entering the building was illegal days before he did just that. His willful and premeditated actions prove there is a greater need for specific deterrence here. Additionally, Sahady's persistent push into the Capitol building on January 6, despite the multiple signs that he was committing a crime, indicate a greater need for specific deterrence here. Sahady's statements eschewing any responsibility for his actions on January 6, and placing blame on the government for the charges against him also show that Sahady does not accept responsibility for his actions on January 6. His continued belief in the righteousness of his actions that day poses a real threat that he will recidivate, especially as another closely contested election nears. Finally, his destruction of evidence shows he's willing to commit further crimes. For all of these reasons, a sentence within the applicable Guidelines range is appropriate here.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[5] This Court must sentence Sahady based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot.

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Sahady was convicted of four misdemeanor offenses after a bench trial. Two of these offenses are Class A misdemeanors and two of these offenses are Class B misdemeanors. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*United States v. Suzanne Ianni*, 21-CR-451 (CJN). Ianni is Sahady's co-traveler from January 6 and was by Sahady's side for most of the day. She pleaded guilty in September 2022 to a single violation of 40 U.S.C. § 5104(e)(2)(D) via plea agreement with the government. This Court sentenced her to 36 months' probation to include 15 days of incarceration. Ianni's case is distinguishable from Sahady's in a number of ways. First, she pled guilty early in the prosecution. This is significant for two reasons: (1) it indicates an acceptance of responsibility that is utterly

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

lacking in Sahady's case, which proceeded for almost two years after Ianni's pled guilty; and (2) Ianni's early guilty plea meant that the evidence against her at the time of her sentencing was not as developed as the evidence is now – almost two years later – against Sahady. For example, Sahady and Ianni's movements and observations prior to their arrival in the Northwest Courtyard were not known to the government at the time of Ianni's sentencing hearing. Similarly, the government had not yet determined that Sahady and Ianni witnessed the breaking of the Parliamentarian Door by the rioter with the crowbar.

Second – and importantly – there was no evidence that Ianni anticipated the riot may break out or that she knew going into the building was illegal *before* she arrived in Washington, D.C. on January 6. Nor was there evidence that Ianni had the same specific and corrupt intent to interfere with the peaceful transfer of power. As set out above, Sahady's clear illegal intent is a major aggravating factor in this case that was absent from Ianni's case.

Finally, there is also no evidence that Ianni destroyed evidence after January 6, another aggravating factor in Sahady's case. For all of these reasons, the Court should enter a substantially higher sentence against Sahady, a sentence of 10 months' incarceration.

*United States v. Glen Brooks*, 21-CR-503 (RCL). Brooks entered the U.S. Capitol building through a broken window near the Senate Wing Door while alarms blared overhead. Like Sahady, he stayed in the building for approximately 18 minutes. He also refused to leave the Capitol despite being directed to do so by police and evinced a lack of remorse. A jury convicted Brooks of the same four misdemeanors that Sahady was convicted of.

Judge Lamberth sentenced Brooks to 6 months' incarceration. Sahady should receive a higher sentence of 10 months' incarceration because, in addition to also entering the building through a broken door, refusing to leave when told to by the police, and spending 18 minutes in the building, Sahady's text messages show a recognition of the risk of violence before he even showed up at the Capitol building on January 6, and Sahady organized the transportation of other protestors to D.C. And most significantly, Sahady, unlike Brooks, destroyed evidence he knew would implicate him in this investigation.

*United States v. Kirstyn Niemela*, 21-cr-623 (CRC). Niemela was also convicted of the same four misdemeanors as Sahady in connection with her breach of the Capitol building all the way to the House Main Doors.   Before breaching the building, Niemela climbed a tree within the restricted grounds and observed violence on the West Plaza. Like Sahady, Niemela was aware of the illegality of her actions – she responded to a Tweet immediately after entering the Capitol Building admitting as much. Like Sahady, she also repeatedly confronted the police in the building and spent about 21 minutes inside. Niemela never expressed remorse for her conduct on January 6 and, like Sahady, claims she is a victim of her prosecution.

Judge Cooper sentenced Niemela to 11 months of incarceration. A similar sentence is warranted for Sahady because Sahady also knew the illegality of his actions prior to breaking into the building, he spent approximately the same time in the building as Niemela, and has never expressed remorse for his conduct on January 6.

*United States v. Alford*, 21-CR-263 (TSC). Alford was convicted of the same four misdemeanors as Sahady following a jury trial. Like Sahady, Alford ignored several signs that the

grounds and building were closed on January 6th before entering the Capitol building. Alford also entered the building through a door that Alford knew had been violently breached by other rioters. Once inside, like Sahady, Alford ignored police officers' orders to leave the building and instead pressed further into the building. Unlike Sahady, Alford spread disinformation about the riot on social media and mocked the pain of police officers. Alford also testified falsely at trial.

Judge Chutkan sentenced Alford to 12 months' incarceration. A slightly lower sentence is appropriate for Sahady who did not testify falsely (or at all) and did not spread disinformation, but who obstructed justice by destroying evidence and acted with the specific intent to interrupt the certification.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### VII.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Sahady was convicted of a violation of two offenses under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because Sahady engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Sahady responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Sahady to pay $500 in restitution for his convictions on Counts Two through Five. This amount fairly reflects Sahady's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

Sahady's convictions for violations of 18 U.S.C. § 1752(a) subject him/her to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide

for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994). Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000. U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. As the PSR notes, Sahady has a net worth of over $933,000. PSR ¶ 102. Additionally, Sahady and Ianni have raised over $16,000 in an online campaign. PSR ¶ 110. Their request for donations called their cases "political prosecutions" and continued to claim that they only engaged in "peaceful protest", two claims that their convictions in this case prove false. The removal of the website after publication of the draft PSR to the parties but before sentencing is also telling and indicates Sahady does not want this Court to have access to the funds he's raised. Sahady should not be able to mislead the public about his case to make money or to use his own notoriety gained in the commission of his crimes to "capitalize" on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 10 months' incarceration, 1 year of supervised release, $500 in restitution, a fine in an amount determined by the Court, 60 hours of community service, and a $70 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    */s/ Kaitlin Klamann*
KAITLIN KLAMANN
NATHANIEL WHITESEL
Assistant United States Attorneys